

CV 07 4370

Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281-1022
(212) 336-1020

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 19 2007 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GARAUFIS, J.

-------------------------------------------------------------------:

SECURITIES AND EXCHANGE COMMISSION,       :

                Plaintiff,       :

LEVY M.J.

          v.       :

ZEV SALTSMAN, MENACHEM EITAN, MARTIN E.       :
WEISBERG, EDWARD G. NEWMAN, STEVEN A. NEWMAN, :
AND ANDREW BROWN,       :

07 Civ. _____

                               :

**COMPLAINT**

                Defendants.       :

-------------------------------------------------------------------:

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Zev Saltsman ("Saltsman"), Menachem Eitan ("Eitan"), Martin E. Weisberg

("Weisberg"), Edward G. Newman ("Edward Newman"), Steven A. Newman ("Steven

Newman"), and Andrew Brown ("Brown") (collectively, the "Defendants"), alleges as follows:

    1. This case concerns two short sellers residing in Israel, Saltsman and Eitan, and their

scheme to conceal their control over Xybernaut Corporation and Ramp Corporation, companies

that traded on the NASDAQ Small Cap Market and the American Stock Exchange ("AMEX"),

respectively. Between 2001 and 2004, Saltsman and Eitan, through 34 nominees, invested more than $88 million in private investments in public equity ("PIPE") transactions of Ramp and Xybernaut.

2. During that period, Xybernaut issued more than 123 million shares of common stock to 21 nominees of Saltsman and Eitan in return for more than $67 million in PIPE financing. Similarly, between December 2002 and November 2004, Ramp issued more than 161 million shares of common stock to 13 nominees of Saltsman and Eitan in return for more than $21 million in PIPE financing.

3. In connection with those PIPE transactions, Xybernaut and Ramp filed 18 registration statements registering the resale of the shares issued to the nominees in the PIPE transactions. Those registration statements were misleading because, among other things, they created the impression that the investors were independent from one another and were controlled by persons other than Saltsman and Eitan.

4. Saltsman and Eitan profited from the scheme by executing short sales in the stock of both companies and covering those short positions with newly issued PIPE shares in violation of the registration provisions of the federal securities laws. Saltsman and Eitan often executed wash sales between their various nominee accounts to disguise these violations of the federal securities laws.

5. To ensure access to future PIPE deals and maintain control over the companies, Saltsman and Eitan paid officers and directors of Ramp and Xybernaut. In December 2003, Saltsman and Eitan gave Brown (Ramp's CEO) $50,000 in cash. Similarly, in 2003 and 2004,

Saltsman and Eitan paid $4.1 million to Steven Newman (Xybernaut's COO) and Weisberg (Xybernaut's director and counsel to Ramp and Xybernaut). These payments, as well as the relationships that developed between the companies' management and Saltsman and Eitan, were never disclosed in Ramp or Xybernaut's corporate filings or registration statements.

6. During the course of the scheme, Brown, Weisberg, Edward Newman, and Steven Newman provided valuable assistance to Saltsman and Eitan. In 2001, Weisberg helped Edward Newman and Steven Newman (collectively, the "Newmans") transfer their own Xybernaut stock (a total of 1.1 million shares) to Saltsman and Eitan to allow Saltsman and Eitan to cover existing short positions in Xybernaut. In 2003, Weisberg lied to the Commission staff about sales of securities to Saltsman and Eitan that occurred during the pendency of a PIPE registration statement. The Newmans, Weisberg, and Brown also concealed Saltsman and Eitan's control over the PIPE investments and the nominees.

7. In total, Saltsman and Eitan earned more than $55 million in illicit profits by trading in Ramp and Xybernaut stock.

8. The Defendants, directly or indirectly, have engaged in transactions, acts, practices and courses of business which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Weisberg aided and abetted Xybernaut's violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9. Edward Newman, Weisberg, and Steven Newman aided and abetted Xybernaut's violations of Section 13(a) of the Exchange Act,

3

15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13. Brown and Weisberg aided and abetted Ramp's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13. Edward Newman, Steven Newman, and Brown violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14. Saltsman and Eitan violated Sections 5(a), 5(b)(2), and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(b)(2), and 77a(c), and Sections 13(d) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78m(d) and 78p(a), and Rules 13d-1, 13d-2, and 16a-3, 17 C.F.R. §§ 240.13d-1, 240.13d-2, and 240.16a-3.

## JURISDICTION AND VENUE

9. The Commission brings this action pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), to enjoin the Defendants from engaging in the acts, practices and courses of business alleged herein. The Commission also seeks a judgment ordering the Defendants to disgorge their ill-gotten gains with prejudgment interest thereon and to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). In addition, the Commission seeks an order barring Weisberg, Edward Newman, Steven Newman, and Brown from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d). The Commission also seeks such other relief as the Court may deem appropriate.

10. This Court has jurisdiction of this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

11. Venue in this District is proper pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within this District. For example, Saltsman and Eitan sold Xybernaut and Ramp stock through brokerage accounts located in Brooklyn, New York.

## DEFENDANTS

12. **Saltsman**, age 44, is a U.S. citizen and resides in Israel. From 1998 through 2005, Saltsman invested in PIPE transactions of U.S. publicly traded companies through various offshore entities created and controlled by Saltsman and Eitan.

13. **Eitan**, age 55, is an Israeli citizen and resides in Israel. Eitan, with his business partner Saltsman, invested in PIPE transactions of U.S. public companies through various offshore entities.

14. **Weisberg**, age 57 and a resident of Waccabuc, New York, is an attorney who has been practicing law since 1976. From 1996 through approximately May 2005, Weisberg represented Xybernaut as its securities counsel. Weisberg was also a member and Secretary of Xybernaut's Board of Directors. From September 2003 through March 2005, Weisberg represented Ramp as its securities counsel. Between 2001 and April 2005, Weisberg was a partner in the corporate department at the New York office of Jenkens & Gilchrist, LLP. In April

2005, Weisberg became a partner in Troutman Sanders LLP's New York office. In May 2005, Troutman terminated Weisberg. Weisberg is currently a partner in Baker & McKenzie's New York office.

15. **Edward Newman**, age 63, resides in Fairfax Station, Virginia. From December 1994 until April 2005, Edward Newman served as Xybernaut's CEO and Chairman of the Board.

16. **Steven Newman**, age 61, resides in McLean, Virginia and is Edward Newman's brother. From January 2003 until April 2005, Steven Newman served as Xybernaut's president and COO. From August 1997 through May 2005, he served as the company's Vice-Chairman of the Board of Directors. Steven Newman was principally involved in fundraising for Xybernaut.

17. **Brown**, age 37, resides in New York, New York. From August 2001 to October 2003, Brown served as an investor relations consultant to Ramp. In October 2003, Brown became President of Ramp, and shortly thereafter became its CEO. On May 22, 2005, Ramp's Board of directors suspended Brown as CEO and President following Brown's disclosure that he received $50,000 from Saltsman and Eitan in 2003.

## RELATED PARTIES

18. **Xybernaut** is a Delaware corporation. From 1996 through 2004, it operated as a developer of wearable computers and maintained its headquarters in Fairfax, Virginia. From its inception, Xybernaut was unprofitable. To cover its day-to-day expenses, Xybernaut raised money through PIPE transactions. From 1996 until the time that the company declared bankruptcy in 2005, the company's common stock traded on the NASDAQ Small Cap Market, and its common stock was registered with the Commission pursuant to Section 12(g) of the

Exchange Act. On January 3, 2007, Xybernaut filed a Form 15 terminating its Section 12(g) registration.

19. **Ramp**, previously known as Medix Resources, Inc., is a Delaware corporation located in New York, New York. Ramp's common stock is currently registered with the Commission pursuant to Section 12(g) of the Exchange Act and was registered pursuant to Section 12(b) of the Exchange Act until July 1, 2005. From April 2000 through May 2005, Ramp developed and marketed e-communication software for the healthcare industry. From April 2000 through May 15, 2005, Ramp's common stock traded on AMEX. During that period, Ramp was unprofitable and paid expenses by raising capital in PIPE transactions. On June 2, 2005, Ramp filed for bankruptcy protection from the U.S. Bankruptcy Court in the Southern District of New York. Ramp's stock (symbol 'RCOCQ') is quoted in the inter-dealer market, also known as the grey market.

## FACTS

A. **Saltsman and Eitan Invested in PIPE Transactions**

20. Between approximately June 2001 and December 2004, Saltsman and Eitan invested a total of $67 million in PIPE transactions with Xybernaut, and in return, received approximately 123 million Xybernaut shares, which represented approximately 85% of the total shares issued during that period or approximately 58% of the total issued and outstanding shares as of September 30, 2004.

21. Between December 2002 and December 2004, Saltsman and Eitan invested more than $21 million in PIPE transactions with Ramp, and in return received approximately 161 million

7

shares of common stock, which represented approximately 63% of the stock issued by Ramp during that period.

22. The term PIPE refers to a private placement of securities by a public company, whereby investors agree to purchase restricted shares of stock at a specified price. As an inducement to invest in the PIPE, the PIPE investors typically receive the shares at a discount to the prevailing market price, and may receive warrants and other securities. As part of its agreement with the PIPE investors, the public company usually files a registration statement with the Commission registering the resale of the PIPE securities around the close of the transaction. The resale registration statement, once declared effective by the Commission, allows the investors to resell the securities to the public.

23. Saltsman and Eitan negotiated the terms of their investments in Xybernaut with Steven Newman and Weisberg. When investing in Ramp, Saltsman and Eitan negotiated the terms of their investments with Brown.

24. Saltsman and Eitan invested in Ramp and Xybernaut through 34 nominee entities. Each of the nominees was an offshore company or limited partnership.

25. To create the nominee entities, Saltsman and Eitan employed the services of Turks and Caicos First Secretarial ("TCFS"), an offshore management company located in the Turks and Caicos Islands, and Granot Strauss Adar & Co., an Israeli law firm. TCFS and Granot Strauss formed, either directly or indirectly through a third party, offshore or foreign entities for Saltsman and Eitan and allowed their employees to act as nominees for Saltsman and Eitan. The employees of TCFS and Granot Strauss exercised no actual authority over the investments or the

8

stock issued to those entities.

26. When the Ramp and Xybernaut resale registration statements became effective, all of the shares issued to Saltsman and Eitan's nominees were electronically transferred to a few domestic brokerage accounts that Saltsman and Eitan controlled. In fact, between April 3 and September 11, 2003, one such account received 41 million shares of Xybernaut stock. The 41 million shares purportedly had been issued to eight separate PIPE investors and represented approximately 98% of the total shares issued by Xybernaut during that period and approximately 24% of the outstanding shares reported in its Form 10-Q for the period ended September 30, 2003.

27. At various times, Saltsman and Eitan beneficially owned more than 10% of the common stock outstanding of Ramp and Xybernaut.

**B.    Saltsman and Eitan's Short Sales**

28. Saltsman and Eitan received the Ramp and Xybernaut PIPE shares at discounts to the market price. Prior to the effective date of the resale registration statements, Saltsman and Eitan used Canadian brokerage accounts to accumulate short positions. When the resale registration statements became effective, Saltsman and Eitan used the shares issued in the PIPE transactions to cover their short positions. Saltsman and Eitan often executed wash sales (i.e., purchases and sales of securities involving no change in beneficial ownership) between their Canadian accounts and their domestic accounts to hide the fact that they were using the stock issued in the PIPEs to cover their short positions.

29. At the time that Saltsman and Eitan executed the short sales, no registration was in

9

effect for the PIPE shares, and Saltsman and Eitan did not deliver a prospectus to any purchaser in connection with their short sales.

30. By short selling the stock before the resale registration statements became effective and by covering those short sales with the PIPE shares, Saltsman and Eitan effectively sold the PIPE shares prior to their registration.

31. Saltsman and Eitan earned illicit profits of approximately $39 million and $16 million from their trading in Xybernaut and Ramp stock, respectively.

## C.    Ramp and Xybernaut's False Public Filings

32. Between approximately June 2001 and December 2004, Xybernaut filed with the Commission 11 registration statements on Forms S-3 registering the resale of the 123 million shares of common stock issued to Saltsman and Eitan's 21 nominees.

33. Between December 2002 and December 2004, Ramp filed with the Commission 7 registration statements on Forms S-3 registering the resale of the 161 million shares of common stock issued to Saltsman and Eitan's 13 nominees.

34. The 18 resale registration statements filed by Ramp and Xybernaut identified employees of TCFS or Granot Strauss as the persons with dispositive or voting control over the PIPE securities. These statements were false because, in fact, Saltsman and Eitan had dispositive and voting control over the PIPE securities.

35. For example, in June 2003, Xybernaut filed a Form S-3 ("June 2003 Xybernaut Form S-3") registering the resale of securities issued in PIPE transactions with three entities (Capecove International, Ltd., London Properties Ltd., and Sussex Consulting Ltd.). The June 2003

10

Xybernaut Form S-3 stated that, as a result of the PIPE transactions, Capecove International, London Properties, and Sussex Consulting owned 6.1%, 4.1%, and 4.1%, respectively, of Xybernaut's common stock and for each entity listed a different individual as the person with dispositive and voting control over the stock. These disclosures were false and misleading, because the three entities were merely Saltsman and Eitan's nominees and, as a result, Saltsman and Eitan owned 14.3% of the company's common stock.

36. Weisberg prepared Xybernaut's Forms S-3, and the Newmans and Weisberg signed them. At the time, the Newmans and Weisberg knew, or recklessly disregarded, that Saltsman and Eitan had dispositive and voting control over the Xybernaut securities issued in the PIPE transactions.

37. Weisberg prepared Ramp's Forms S-3 and Brown signed them. At the time, Weisberg and Brown knew, or recklessly disregarded, that Saltsman and Eitan had dispositive and voting control over the Ramp securities sold in the PIPE transactions.

38. Additionally, in 2002, 2003, and 2004, Xybernaut filed Forms S-3 in which the company stated that the PIPE investors identified in the respective Forms S-3 were "not affiliated with us and have not had any material relationship with us or our affiliates during the past three years." Those statements were false. Saltsman and Eitan, through their nominees, repeatedly invested in Xybernaut during that period, and, thus, had an ongoing material relationship with the company.

39. The Newmans and Weisberg signed Xybernaut's Forms S-3. At the time, Weisberg and the Newmans knew, or recklessly disregarded, that Saltsman and Eitan, through their

nominees, had an ongoing relationship with the company.

**D.**    <u>Weisberg, Steven Newman, and Brown Benefited from Saltsman and Eitan's Scheme</u>

40. During the course of the scheme, Weisberg, Steven Newman, and Brown entered into self-serving, undisclosed transactions with Saltsman and Eitan.

    **i.**    **Weisberg and Steven Newman Received $4.1 Million from Saltsman and Eitan**

41. Saltsman and Eitan paid Steven Newman and Weisberg $4.1 million in undisclosed payments to ensure their access to future PIPE deals and to maintain control over Xybernaut. During 2003 and 2004, Saltsman and Eitan sent money from their domestic brokerage accounts in Brooklyn, New York to a TCFS account at Barclays Bank. From the TCFS account, Saltsman and Eitan then sent $1.736 million and $1.463 million to Weisberg and Steven Newman, respectively. Additionally, in 2004, Saltsman and Eitan made a $1 million payment to a foreign trust controlled by Steven Newman. The majority of $4.1 million was from sale proceeds of Xybernaut stock that Saltsman and Eitan received in connection with PIPE transactions.

42. During the relevant period, Item 404 of Regulation S-K required issuers to disclose in Forms 10-K and proxy filings related party transactions, which were defined as transactions in which the issuer was a party, where the amount involved exceeded $60,000, and a director, officer, or beneficial owner of more than 5% of the issuer's stock had or would have had a direct or indirect material interest.

43. As a result of these payments, Weisberg and Steven Newman had an interest in Saltsman and Eitan's investments in Xybernaut, and thus, the PIPE transactions in which

Saltsman and Eitan invested (between August 2003 and December 2004) should have been disclosed as related party transactions in Xybernaut's corporate filings. However, no Xybernaut filing ever disclosed Weisberg and Steven Newman's receipt of the payments or their interests in Saltsman and Eitan's PIPE investments.

44. For example, on April 26, 2004, Xybernaut filed an amended Form 10-K for the year ended December 31, 2003 ("2003 Xybernaut Form 10-K") that contained a section regarding related party transactions. The filing, however, did not disclose that virtually all of the Xybernaut stock issued during 2003 went to Saltsman and Eitan, who, in turn, transferred at least $3.1 million to Weisberg and Steven Newman for their personal use. Weisberg prepared this amended 2003 Xybernaut Form 10-K, which the Newmans signed and certified.

45. At the time, Weisberg and the Newmans knew, or recklessly disregarded, that the 2003 Xybernaut Form 10-K did not disclose Weisberg and Steven Newman's interest in Saltsman and Eitan's investments in Xybernaut (as a result of the payments from Saltsman and Eitan).

## ii.     Brown Received Cash from Saltsman and Eitan

46. In 2003, Saltsman and Eitan paid Brown $50,000 in cash to ensure access to future PIPE transactions. Saltsman and Eitan gave Brown the $50,000 around the time that Saltsman and Eitan were negotiating with Brown the terms of a Ramp PIPE investment. Brown did not disclose the receipt of the cash to anyone at the company until May 2005.

47. Ramp's Code of Business Conduct and Ethics, which was attached to Ramp's Form 10-K for the period ended December 31, 2003 ("2003 Ramp Form 10-K"), required all

13

employees to disclose any actual or apparent conflicts of interest and prohibited any officer or director from accepting any gift from anyone transacting business with the company if there was a likelihood that it was intended to influence the individual's judgment in acting for the company.

48. The 2003 Ramp Form 10-K, which Brown signed, described the various PIPE investments by Saltsman and Eitan's nominees during 2003 and the first three months of 2004. However, it did not disclose Brown's receipt of the cash and the interest that Brown had in Saltsman and Eitan's PIPE investments in 2003 and the first three months of 2004. At the time, Brown knew, or recklessly disregarded, that the 2003 Ramp Form 10-K did not disclose his interest in Saltsman and Eitan's investments in Ramp.

## E.  Weisberg, Edward Newman, Steven Newman and Brown Assisted Saltsman and Eitan in the Scheme

49. During the course of the scheme, Weisberg, Steven Newman, and Brown abused their positions within Xybernaut and Ramp to help Saltsman and Eitan profit from their scheme.

### i.  Saltsman and Eitan Covered Short Positions with Stock Received from the Newmans

50. In February 2001, Steven Newman transferred 300,000 Xybernaut shares held in his name to an account controlled by Saltsman and Eitan. In July and October 2001, the Newmans transferred a total of 800,000 Xybernaut shares from trusts that they controlled, New Ember Trust and Manassas Bay Trust (collectively, the "Newman Trusts"), to two other brokerage accounts controlled by Saltsman and Eitan, Volare Overseas Ltd. and Beeston Investments Ltd. At the time of the transfers, the 1.1 million shares of Xybernaut stock were valued at

approximately $3.24 million.

51. At the time of the transfers from the trusts, an attorney with the Granot Strauss law firm acted as trustee of the Newman Trusts.

52. Saltsman and Eitan used at least 400,000 of the 800,000 shares received from the Newman Trusts to cover short positions in Xybernaut stock, and Saltsman and Eitan used a portion of the proceeds received from the short sales to invest in Xybernaut PIPE transactions.

53. Weisberg reviewed and prepared documentation causing the transfers of stock. At the time, Weisberg and the Newmans knew, or recklessly disregarded, that Saltsman and Eitan intended to use the Xybernaut shares to cover existing short positions.

54. As a result of these stock transfers, the Newmans had an interest in Saltsman and Eitan's investments in Xybernaut PIPE transactions. These transfers were never disclosed in any Xybernaut corporate filings. In particular, Xybernaut's Form 10-K for the period ended December 31, 2001 ("2001 Xybernaut Form 10-K") did not disclose the Newmans' interests in Saltsman and Eitan's investments in PIPE transactions during 2001.

55. Weisberg and the Newmans signed the 2001 Xybernaut Form 10-K which Xybernaut filed on March 27, 2002. At the time, Weisberg and the Newmans knew, or recklessly disregarded, that the 2001 Xybernaut Form 10-K did not disclose the Newmans' interests in Saltsman and Eitan's investments in Xybernaut PIPE transactions.

56. In addition, on May 15, 2002, Xybernaut filed a Definitive Proxy Statement ("2002 Proxy") which, among other things, listed a series of related party transactions existing between Xybernaut's officers and directors and various third parties during 2001. The 2002 Proxy,

15

however, did not disclose the Newmans' interest in Saltsman and Eitan's investments in Xybernaut PIPE transactions as a result of the stock transfers.

57. Weisberg prepared and signed the 2002 Proxy and, at the time, knew or recklessly disregarded, that the 2002 Proxy did not disclose the interests that the Newmans had in Saltsman and Eitan's PIPE investments in 2001 as a result of the stock transfers.

**ii.    The Undisclosed Repricing of Warrants Issued to Saltsman and Eitan**

58. On July 12, 2002, Xybernaut filed a Form S-3 ("July 2002 Xybernaut Form S-3") regarding the issuance of 1,544,361 warrants to three entities (the "Newly-Issued Warrants"). The July 2002 Xybernaut Form S-3 stated that Xybernaut sold 3,333,333 shares of common stock and 833,333 warrants (exercisable at $1.50) to Rema Investments Ltd. in a PIPE transaction and that Xybernaut issued the Newly-Issued Warrants (exercisable at a price of $1.50) to three entities as consideration for exercising warrants issued in earlier PIPE transactions. According to the Forms S-3 relating to those earlier PIPE transactions, the warrants issued to the three entities had exercise prices ranging from $2.50 to $4.53 (the "Previously-Issued Warrants").

59. The July 2002 Xybernaut Form S-3 description of the issuance of the Newly-Issued Warrants was false and misleading. First, it created the false impression that the issuance of the Newly-Issued Warrants was unrelated to the Rema financing. Saltsman and Eitan controlled Rema and the entities that obtained the Newly-Issued Warrants. In fact, Saltsman and Eitan negotiated the issuance of the Newly-Issued Warrants as a condition to the Rema investment. Second, the July 2002 Xybernaut Form S-3 created the false impression that the nominees exercised the Previously-Issued Warrants at the exercise prices disclosed in the prior Forms S-3

16

(i.e., between $2.50 and $4.53). In reality, as part of the Rema financing, Saltsman and Eitan had negotiated the exercise prices for all of the Previously-Issued Warrants to $0.50, a fraction of the previously disclosed exercise prices.

60. Prior to the filing of the July 2002 Xybernaut Form S-3, Weisberg and Steven Newman approved the re-pricing of the Previously-Issued Warrants and the reduction of the exercise prices as part of the Rema's financing negotiated by Saltsman and Eitan.

61. Weisberg and Steven Newman signed the July 2002 Xybernaut Form S-3, and they knew, or recklessly disregarded, that it contained false and misleading statements about the Newly-Issued Warrants.

iii. **Weisberg Lied to the Commission Staff about Two Unregistered, Non-Exempt Stock Offerings by Ramp to Assist Saltsman and Eitan**

62. In April, May, and June 2003, Ramp entered into three PIPE transactions, raising a total of $1.85 million ("PIPEs #1, #2, and #3"), of which Saltsman and Eitan invested $1.55 million. In June 2003, Ramp filed a Form S-3 ("June 2003 Form S-3") registering the resale of the Ramp stock issued in connection with those PIPEs. On July 29 and September 11, 2003, while the June Form 2003 S-3 was pending (i.e., before the Commission declared it effective) Ramp entered into two additional PIPE transactions totaling $1.4 million (PIPEs #4 and #5). Saltsman and Eitan invested $1.25 million in PIPEs #4 and #5.

63. On September 22, 2003, Ramp received a comment letter regarding the June 2003 Form S-3 from the Commission staff ("September 22nd Comment Letter") asking: (1) whether Ramp had engaged in any additional offers of its securities other than PIPEs #1, #2, and #3; and

(2) how any additional offers would affect Ramp's reliance upon Section 4(2) of the Securities Act, which exempts certain offerings from registration.

64. The following day, Weisberg met with, among others, Brown, Saltsman, and Eitan to discuss the September 22nd Comment Letter. Weisberg confirmed to the group that PIPEs #4 and #5 violated Section 5 of the Securities Act. Weisberg then suggested that Ramp rescind and terminate PIPEs #4 and #5 and issue promissory notes in their place.

65. On September 29, 2003, Weisberg sent a letter to the Commission staff in response to the September 22nd Comment Letter in which Weisberg falsely stated that Ramp had not engaged in any offering of its securities while the June 2003 Form S-3 was pending ("September 29th Letter"). Weisberg wrote that the "company has not made, and is not making, any offers of its securities during the pendency of the Registration Statement. The company is aware of and understands the restrictions imposed under the Securities Act of 1933 on private offerings of securities by an issuer while an issuer has a registration statement on file with the Commission." This statement was false because, in fact, Ramp offered and sold securities during the pendency of the registration statement. Weisberg knew, or recklessly disregarded, that his September 29th Letter contained false statements.

66. Weisberg made the false statements to help Saltsman and Eitan, with whom Weisberg had a longstanding personal and financial relationship. At the time of the September 29th Letter, Saltsman and Eitan had significant short positions of Ramp stock that they needed to cover with newly-registered stock. On October 17, 2003, after the Commission staff received Weisberg's September 29th Letter, the Commission declared the June 2003 Form S-3 effective.

18

### iv.    Weisberg Misled Ramp's Auditor

67. Between October 31 and November 3, 2003, Ramp entered into termination agreements with the investors in PIPEs #4 and #5 and issued $1.4 million in promissory notes to those investors to account for the funds raised in PIPEs #4 and #5. Both the termination agreements and promissory notes were backdated to September 30, 2003 to account for Ramp's receipt of funds in the third quarter of 2003.

68. On November 7, 2003, an accountant representing Ramp's auditor emailed Weisberg and asked him for a legal opinion regarding the rescission and termination of PIPEs #4 and #5. That accountant told Weisberg that he believed Ramp should disclose to the Commission and AMEX the decision to rescind PIPEs #4 and #5 and replace them with new promissory notes. On November 10, 2003, Weisberg wrote a letter to Ramp's auditor acknowledging that Ramp entered into PIPEs #4 and #5 in July and September 2003. Weisberg wrote that PIPEs #4 and #5 violated Section 5 of the Securities Act and that Weisberg advised Ramp to rescind and terminate PIPEs #4 and #5 on or before September 30. Weisberg further wrote that Ramp, on Weisberg's advice, had entered into termination agreements with the investors on September 30, 2003 and that Ramp was not required to notify the Commission or the AMEX about the existence of PIPEs #4 and #5.

69. Weisberg's November 10, 2003 letter falsely stated that Ramp entered into termination agreements with the investors on September 30, 2003. In fact, Ramp did not enter into the termination agreements until at least October 31, 2003. Weisberg's letter did not disclose that the termination was backdated.

### v.  Weisberg Misrepresented PIPEs #4 and #5 in Ramp's Quarterly Filing

70. In its Form 10-Q for the period ended September 30, 2003 ("September 2003 Ramp Form 10-Q"), Ramp omitted and misrepresented facts concerning the rescission and termination of PIPEs #4 and #5. Weisberg assisted in preparing disclosure language regarding PIPEs #4 and #5 for the September 2003 Ramp Form 10-Q, which Ramp filed on November 14, 2003. In particular, Ramp disclosed the following in its September 2003 Ramp Form 10-Q:

> **On September 30, 2003,** the Company issued an aggregate of $1,400,000 of promissory notes (the "Notes"), with an 18-month term and bearing interest at a rate of 10% per annum. The Notes were issued in exchange for $1,400,000 of outstanding 7% convertible debentures **previously issued** by the Company in an offering to non-US investors. The holders of these debentures consented to the exchange when it was determined that, under the rules of the American Stock Exchange, stockholder approval was required before the Company could honor requests to convert these debentures into shares of the Company's common stock. Therefore, the Company accounted for the Notes in lieu of the debentures. [Emphasis added.]

71. This was false and misleading because it did not disclose that Ramp had entered into PIPEs #4 and #5 in July and September 2003, while the June 2003 Form S-3 was still pending, and because Ramp, in fact, did not issue the promissory notes until after October 31, 2003. At the time, Weisberg knew, or recklessly disregarded, that the language was false and misleading.

### vi.  Weisberg and Brown Made Misleading Statements about Saltsman and Eitan's Control Over Ramp's Board of Directors

72. In March 2004, Saltsman and Eitan, acting through their nominee Hilltop Services Ltd., invested $5 million in a Ramp PIPE transaction. Also in March 2004, Brown informed Saltsman and Eitan that Ramp's Board intended to remove Brown as its President. Shortly

thereafter, Hilltop threatened to rescind the $5 million investment unless Ramp met its demands regarding Brown and the composition of Ramp's Board.

73. On March 25, 2004, Weisberg wrote a memorandum to Ramp's Board outlining Hilltop's demands: (1) the resignations of Ramp's three independent Board members; (2) the appointment of two other individuals as Hilltop's nominees; and (3) Ramp retain Brown as its President with a two-year employment agreement. At the time that Weisberg drafted the March 25, 2004 memorandum, he knew that Hilltop owned more than 5% of Ramp's stock and that neither Hilltop nor Saltsman and Eitan had filed any beneficial ownership disclosures with the Commission.

74. On March 29, 2004, Brown certified Board resolutions that the above actions would be taken by Ramp. On April 1, 2004, in a letter from Saltsman and Eitan's counsel to Weisberg, Hilltop withdrew its demand for rescission of the $5 million investment.

75. On April 14, 2004, Ramp filed its 2003 Ramp Form 10-K, which stated that Ramp reduced its number of Board members in order to "avoid the possibility of a deadlocked Board with an evenly split vote." The 2003 Ramp Form 10-K also stated, "[a]t the time of such change, [the company's three independent directors] indicated their intention to resign from our Board . . . ." The statements were false and misleading because, in reality, the independent directors were forced to resign by Saltsman and Eitan.

76. Weisberg prepared and reviewed and Brown signed and reviewed the 2003 Ramp Form 10-K. At the time, Brown and Weisberg knew, or recklessly disregarded, that the 2003 Ramp Form 10-K contained false statements concerning the Board members' resignations.

### vii.  Saltsman and Eitan Received Gratuitous Issuance of Stock

77. On August 20, 2004, Ramp filed with the Commission a Form S-3 registering the resale of the shares issued to the investors in connection with a July 2004 $4.2 million investment by two entities ("August 2004 Ramp Form S-3"). In the August 2004 Ramp Form S-3, Ramp disclosed that it had entered into promissory notes with two entities, both of which were Saltsman and Eitan nominees. Ramp also disclosed that it issued the securities to Hilltop in connection with certain anti-dilution rights it received as part of its $5 million investment in March 2004. This disclosure was misleading because it created the impression that the two investing entities were separate and independent from Hilltop.

78. In fact, Saltsman and Eitan forced Ramp to issue Hilltop over 24 million additional shares of Ramp common stock, 17 million additional warrants, and a $1.92 million convertible promissory note purportedly pursuant to an anti-dilution provision contained in Hilltop's March 2004 stock purchase agreement. An anti-dilution feature protects an investor from dilution resulting from subsequent issuances of stock to other investors at more favorable terms. Here, however, the July $4.2 million investment did not properly trigger the anti-dilution feature because Saltsman and Eitan controlled all three investor entities (the two investing entities, as well as Hilltop) and therefore, did not suffer from any dilution of its previous investment. As such, Ramp's issuance of the additional stock, warrants and convertible promissory note to Hilltop was gratuitous.

79. Weisberg prepared the August 2004 Ramp Form S-3, which Brown signed.

80. Brown and Weisberg knew, or recklessly disregarded, that the issuance of securities

22

to Hilltop was gratuitous. On July 13, 2004, Brown sent an email to Weisberg and another attorney in which he stated that the transaction was "highly troubling" because the investors were "not truly independent." Brown further stated that the transaction created "exposure as to the appropriateness of this transaction, and the independence (or should I say, interdependence) of all the parties."

81. Additionally, Saltsman and Eitan's counsel cautioned Weisberg about the appropriateness of the transaction. On July 9, 2004, the attorney emailed Weisberg and wrote: "[T]he idea of paying hilltop 1.92 mm for allowing a 5mm deal strains the limits of the business judgment rule and is an invitation to litigation [against the Company and its directors]."

82. Ramp's Form 10-Q for the period ended September 30, 2004, which Brown certified and the company filed on November 15, 2004, described the issuance of stock to Hilltop and similarly created the false impression that Hilltop and the two investing entities were independent and that Hilltop's anti-dilution provision was properly triggered as a result of subsequent investments by Saltsman and Eitan's nominees.

## F. Weisberg Transferred Xybernaut PIPE Proceeds Directly to Edward Newman's Personal Account

83. In 2002, Weisberg surreptitiously provided Edward Newman with funds from another PIPE transaction, unrelated to Saltsman and Eitan. On March 29, 2002, Xybernaut filed a registration statement on Form S-3 ("March 2002 Xybernaut S-3") in connection with a PIPE transaction with three entities. Two of those entities invested a total of $5 million in the PIPE transaction. The March 2002 Xybernaut S-3 did not disclose that the company intended to

transfer $100,000 of the $5 million investment to Edward Newman as a purported fee. Weisberg prepared the March 2002 Xybernaut S-3, which Weisberg and the Newmans signed.

84. On April 12, 2002, Weisberg directed the transfer of $100,000 of the $5 million investment to Edward Newman's personal bank account.

85. Weisberg and Edward Newman then concealed the $100,000 payment in subsequent filings. For example, in Xybernaut's Form 10-Q for the period ended March 31, 2002 ("March 2002 Xybernaut Form 10-Q"), Xybernaut disclosed that in connection with the PIPE transaction, "the Company also paid $270,000 in cash to financial advisors." This statement was misleading because Edward Newman had received $100,000 of the $270,000 paid in connection with the PIPE transaction and the filing did not disclose that fact. Weisberg prepared and Edward Newman signed the March 2002 Xybernaut Form 10-Q.

86. In addition, Xybernaut's Form 10-K for the period ended December 31, 2002 ("2002 Xybernaut Form 10-K") and its Form 10-Q for the period ended March 31, 2003 ("March 2003 Xybernaut Form 10-Q") contained the same misstatement concerning the $270,000 payment to "financial advisors." Weisberg prepared and signed and the Newmans signed the 2002 Xybernaut Form 10-K, which the company filed on March 28, 2003. Weisberg prepared and the Newmans signed and certified the March 2003 Xybernaut Form 10-Q, which the company filed on May 15, 2003.

87. At the time that they prepared and signed the March 2002 Xybernaut Form 10-Q, the 2002 Xybernaut Form 10-K, and the March 2003 Xybernaut Form 10-Q, Weisberg and the Newmans knew, or recklessly disregarded, that Edward Newman had received a $100,000

payment from the proceeds of the $5 million investment.

## FIRST CLAIM FOR RELIEF
Violations of Section 17(a) of the Securities Act
(All Defendants)

88. Paragraphs 1 through 87 are hereby realleged and incorporated by reference.

89. All Defendants, and each of them, directly and indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would operate as a fraud or deceit upon purchasers of the securities referenced above.

90. As part of and in furtherance of this violative conduct, all Defendants, and each of them, knowingly or recklessly engaged in some or all of the fraudulent transactions, acts, practices, and courses of business described above, including, among other things, concealing Saltsman and Eitan's control over the PIPE investors and making false statements in resale registration statements, Forms 10-K and Forms 10-Q. These transactions, acts, practices, and courses of business operated as a fraud or deceit upon investors who purchased the securities referenced above.

91. By reason of the foregoing, all of the Defendants, and each of them, have violated, and, unless enjoined, will again violate Section 17(a) of the Securities Act, 15 U.S.C. §77q(a).

## SECOND CLAIM FOR RELIEF
Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
(All Defendants)

92. Paragraphs 1 through 91 are hereby realleged and incorporated by reference.

93. All Defendants, directly and indirectly, singly and in concert, by use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would operate as a fraud or deceit upon purchasers of the securities referenced above.

94. As part of and in furtherance of this violative conduct, all Defendants, and each of them, knowingly or recklessly engaged in some or all of the fraudulent transactions, acts, practices, and courses of business described above, including, among other things, concealing Saltsman and Eitan's control over the PIPE investors and making false statements in resale registration statements, Forms 10-K and Forms 10-Q. These transactions, acts, practices, and courses of business operated as a fraud or deceit upon investors who purchased the securities referenced above.

95. By reason of the foregoing, all Defendants, and each of them, have violated, and, unless enjoined, will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

26

Rule 10b-5, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF
Violations of Section 5(a), 5(b)(2) and 5(c) of the Securities Act
(Saltsman and Eitan)

96. Paragraphs 1 through 95 are hereby realleged and incorporated by reference.

97. Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), prohibit any person from offering or selling a security through interstate commerce unless a registration statement is in effect as to such offer or sale.

98. Section 5(b)(2) of the Securities Act, 15 U.S.C. § 77e(b)(2), prohibits the sale or delivery of securities without the delivery of a prospectus.

99. During the time Saltsman and Eitan sold Ramp and Xybernaut stock short ahead of the effective date of the registration statements, no registration statement was in effect for the offer or sale and no exemption from registration existed. Moreover, Saltsman and Eitan failed to deliver a prospectus in connection with those sales.

## FOURTH CLAIM FOR RELIEF
Violation of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder
(Saltsman and Eitan)

100. Paragraphs 1 though 99 are hereby realleged and incorporated by reference.

101. Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(a), and Rule 13d-1, 17 C.F.R. § 240.13d-1, thereunder require that any person or a group of persons that acquires directly or indirectly, beneficial ownership of more than 5% of a company's class of stock registered under Section 12 of the Exchange Act, must notify the issuer and the Commission within 10 days of the acquisition. Exchange Rule 13d-2, 17 C.F.R. § 240.13d-2, requires that the

person notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership.

102.   Saltsman and Eitan failed to notify the Commission that they, as a group, controlled more than 5% of Ramp and Xybernaut common stock.

103.   By reason of the foregoing, Saltsman and Eitan violated and, unless enjoined, will continue to violate Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13d-1 and 13d-2 thereunder, 17 C.F.R. §§ 240.13d-1 and 240.13d-2.

## FIFTH CLAIM FOR RELIEF
Violation of Section 16(a) of the Exchange Act and Rule 16a-3 thereunder
(Saltsman and Eitan)

104.   Paragraphs 1 through 103 are hereby realleged and incorporated by reference.

105.   Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3, 17 C.F.R. § 240.16a-3, thereunder require that any person that directly or indirectly beneficially owns more than 10% of a company's class of stock registered under Section 12 of the Exchange Act, or who is an officer or director, shall notify the Commission within ten days after the person becomes such beneficial owner, director, or officer.  Additionally, Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), requires that if there has been a change of such ownership during a month, the reporting persons shall file with the Commission a statement indicating their ownership at the end of the calendar month and the changes in that ownership that occurred during the month. Exchange Act Rule 16a-3, 17 C.F.R. § 240.16a-3, requires that initial statements of beneficial ownership be filed on Form 3, and that statements of changes in beneficial ownership be filed on Form 4.

106.     As noted above, at various times, Saltsman and Eitan owned more than 10% of Xybernaut stock. As such, they were obligated to file a Form 3 within ten days of becoming owners of 10% of the company's stock, and a Form 4 for any changes in their beneficial ownership. They failed to make any filings under Section 16(a) to conceal their ownership and sale of Xybernaut stock from the investing public.

107.     By reason of the foregoing, Saltsman and Eitan violated and, unless enjoined, will continue to violate Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3.

## SIXTH CLAIM FOR RELIEF
### Violation of Exchange Act Rule 13a-14
### (Edward Newman, Steven Newman, Brown)

108.     Paragraphs 1 though 107 are hereby realleged and incorporated by reference.

109.     Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), requires companies filing reports with the Commission to file reports that do not contain untrue statements of material fact or omit material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading. Rule 13a-14, 17 C.F.R. § 240.13a-14, requires the principal executive officer and principal financial officer of the company to sign a certification that the report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which such statements were made, not misleading.

110.     The Newmans and Brown signed Xybernaut and Ramp filings, respectively, certifying the filings did not contain any untrue statements of material fact or omit to state a

material fact necessary to make the statements made, in light of the circumstances in which the statements were made, not misleading. Those Forms 10-K and Forms 10-Q contained false statements and omission of material fact.

111.     By reason of the foregoing, the Newmans and Brown violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

### SEVENTH CLAIM FOR RELIEF
Aiding and Abetting Violation of Section 13(a)
of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder
(Edward Newman, Steven Newman, Weisberg, Brown)

112.     Paragraphs 1 though 111 are hereby realleged and incorporated by reference.

113.     Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), imposes liability upon "any person that knowingly provides substantial assistance" to another violator of the Exchange Act. During the relevant time period, the Newmans, Weisberg, and Brown actively participated in and controlled Xybernaut's or Ramp's management and operations. They each signed corporate filings and knew or were reckless in not knowing that the filings contained false and misleading information. Therefore, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), they each are liable for aiding and abetting the companies' violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

114.     By reason of the foregoing, the Newmans, Weisberg and Brown aided and abetted violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

## EIGHTH CLAIM FOR RELIEF
Aiding and Abetting Violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder
(Weisberg)

115.    Paragraphs 1 through 114 are hereby realleged and incorporated by reference.

116.    The Exchange Act and the rules promulgated thereunder prohibit any person from soliciting any proxy or consent, in respect of any registered security, by means of any proxy statement or other communication containing any untrue statement of material fact or omitting to state a material fact.

117.    By reason of the foregoing, Weisberg, aided and abetted violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Exchange Act Rule 14a-9, 17 C.F.R. §240.14a-9.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

I.

Enter a final judgment of permanent injunction permanently restricting and enjoining the Defendants, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §§ 240.10b-5.

II.

Enter a final judgment of permanent injunction permanently restricting and enjoining Saltsman and Eitan, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Sections 5(a), 5(b)(2), and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(b)(2), and 77a(c), and Sections 13(d) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78m(d) and 78p(a), and Rules 13d-1, 13d-2, and 16a-3, 17 C.F.R. §§ 240.13d-1, 240.13d-2, and 240.16a-3.

## III.

Enter a final judgment of permanent injunction permanently restricting and enjoining Weisberg, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9.

## IV.

Enter a final judgment of permanent injunction permanently restricting and enjoining Edward Newman, Steven Newman, and Brown, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

## V.

Enter a final judgment of permanent injunction permanently restricting and enjoining Edward Newman, Steven Newman and Brown, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

## VI.

Enter a Final Judgment ordering the Defendants to disgorge an amount equal to the funds and benefits that they obtained illegally as a result of the violations alleged herein, plus prejudgment interest.

## VII.

Enter a Final Judgment ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Enter a Final Judgment pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. §78u(d)(2), permanently prohibiting Edward Newman, Steven Newman, Weisberg, and Brown from serving as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act, 15 U.S.C. §78l, or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. §78o(d).

## IX.

Grant such other and further relief as the Court may deem just and appropriate.

Dated:        October 17, 2007
                New York, New York

MARK K. SCHONFELD (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281-1022
(212) 336-1020

Of Counsel:

Gerald A. Gross
Todd D. Brody
John P. Nowak
Daphna A. Waxman
Christina Marshall