THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------:
SECURITIES AND EXCHANGE COMMISSION,                                    :
                                                                       :
                        Plaintiff,                                     :
                                                                       :
             v.                                                        :
                                                                       :
ZEV SALTSMAN, MENACHEM EITAN, MARTIN E.                                :
WEISBERG, EDWARD G. NEWMAN, STEVEN A. NEWMAN,                          : 07 Civ. 4370 (NGG)
RICHARD NAIMER, AND ANDREW BROWN,                                      :
                                                                       : **AMENDED**
                                                                       : **COMPLAINT**
                                                                       :
                        Defendants.                                    :
-----------------------------------------------------------------------:

Plaintiff Securities and Exchange Commission ("Commission"), for its Amended

Complaint against defendants Zev Saltsman ("Saltsman"), Menachem Eitan ("Eitan"), Martin E.

Weisberg ("Weisberg"), Edward G. Newman ("Edward Newman"), Steven A. Newman ("Steven

Newman"), and Andrew Brown ("Brown") (collectively, the "Defendants"), alleges as follows:

    1.      This case concerns an Israeli investor group managed by Saltsman, Eitan and an

Israeli lawyer (the "Israeli Investor Group"), and its scheme to defraud shareholders of

Xybernaut Corporation ("Xybernaut") and Ramp Corporation ("Ramp"), companies that traded

on the NASDAQ Small Cap Market and the American Stock Exchange ("AMEX"), respectively.

The Israeli Investor Group was assisted in this fraudulent scheme by Steven Newman, Edward

Newman, and Andy Brown, senior executives and/or directors at Xybernaut and Ramp, who

made fraudulent misrepresentations about the Israeli Investor Group in corporate filings and

other documents, and also by Martin Weisberg, the securities counsel to Xybernaut and Ramp

who prepared the filings and also served as a director of Xybernaut.

    2.      Between 2001 and 2004, the Israeli Investor Group, through 34 nominees,

invested more than $88 million in private investments in public equity ("PIPE") transactions of Ramp and Xybernaut. A PIPE transaction is a private sale of securities in a public company to a limited group of investors, at a discount to current market value. It is a direct investment in the company, with securities issued directly by the company and in which the proceeds of the investment go directly to the company.

3.      During that period, the Israeli Investor Group (through 21 nominees) purchased in PIPE transactions more than 123 million shares of Xybernaut common stock at a cost of more than $67 million. Similarly, between December 2002 and November 2004, the Israeli Investor Group (through 13 nominees) purchased in PIPE transactions more than 161 million shares of Ramp common stock at a cost of more than $21 million. Notwithstanding the large amount of shares that it purchased, which included blocks of greater than 10% of all outstanding shares, the Israeli Investor Group never filed a beneficial owner report (either a Schedule 13D or a Schedule 13G) and never filed a Form 3, Form 4, or Form 5. As an example, in the November 2002 Xybernaut PIPE transaction, the Israeli Investor Group purchased shares and warrants comprising more than 18% of all issued and authorized common stock and common stock reserved for issuance on exercise of warrants, but did not file any ownership report.

4.      The Newmans, Weisberg and Brown actively helped the Israeli Investor Group to hide its interest in the companies. In connection with the PIPE transactions, Xybernaut and Ramp filed 18 registration statements (and amendments thereto) registering the resale of the shares issued to the Israeli Investor Group in the PIPE transactions. Those registration statements were all false and misleading because, among other things, the Newmans, Weisberg, and Brown concealed the Israeli Investor Group's control over the large blocks of shares that it purchased by naming nominee entities and nominee directors as the control persons.

5.     The Israeli Investor Group was keenly aware of the companies' disclosure obligations with respect to the large blocks of shares it was purchasing.  In 2000, Saltsman was named in a Form S-3 as having control over certain shares in an unrelated company and was very upset that this had taken place.  Saltsman, in fact, would have not invested in Xybernaut or Ramp at all or would have invested significantly less had the companies required that his name be disclosed.  As a result, the Israeli Investor Group always provided the names of the nominee entities to be used in the corporate filings, although Steven Newman, Edward Newman, Weisberg and Brown all knew that the Israeli Investor Group had actual control over the shares.

6.     The registration statements approved and signed by Steven Newman, Edward Newman, Weisberg, and Brown (as well as other public filings and statements) collectively gave the false impression that Xybernaut and Ramp had been able to obtain financing from multiple institutional investors -- demonstrating the companies' vitality and future prospects.  In actuality, the Israeli Investor Group was the primary (and for large periods of time only) source of funding for Xybernaut and Ramp, and they were short-term investors who were quickly liquidating their shares and also selling short the companies' stock.

7.     The identity of the beneficial owners of the large quantity of shares being sold in the PIPE transactions (in many cases greater than 5% of the outstanding shares) was material to long-term investors and prospective investors.  These investors were concerned that the PIPE transactions were having a significant dilutive impact on their investments.  The representations made by the Newmans, Weisberg, and Brown in the Forms S-3, periodic filings, press releases, and quarterly earnings calls, however, led reasonable investors to believe that the participants in the PIPE transactions were multiple institutions and long-term investors who, through their significant investments in the companies, expressed their belief that Xybernaut and Ramp had

real promise and an ability to succeed in a challenging market. The Israeli Investor Group however, was the exact opposite; an opportunistic, short-term investor that was going to liquidate the millions of shares it had purchased. In addition, the Israeli Investor Group was a short seller whose trading activity could not only adversely impact the price of the stock but also increase the stock's volatility, driving away prospective long-term investors.

8.     The Israeli Investor Group profited from the scheme by executing short sales in the stock of both companies and covering those short positions with newly registered PIPE shares in violation of Section 5 of the Securities Act of 1934. The Israeli Investor Group also profited by selling its long position in the stock of both companies that it purchased at a significant discount to market price.

9.     In order to encourage the Israeli Investor Group to invest more money in Xybernaut, Edward Newman (Xybernaut's CEO and Chairman of the Board) and Steven Newman (Xybernaut's COO) lent Xybernaut shares that were either held in their own name or in the name of trusts they controlled to the Israeli Investor Group so that the Israeli Investor Group could short the company's stock without depositing additional collateral. By doing so, the Newmans were able to lower the costs of the Israeli Investor Group which, as a result, committed to larger investments. In addition, in order to offset the purchase price of shares the Israeli Investor Group acquired in connection with at least two PIPE transactions, Steven Newman authorized the Israeli Investor Group to receive substantial undisclosed "finders' fees," including hundreds of thousands of dollars and hundreds of thousands of Xybernaut shares and warrants. Xybernaut's public disclosures, however, hid the fact that the Israeli Investor Group was receiving these finders' fees – and, as such, misled the public as to the true price of the shares being sold to the Israeli Investor Group in the PIPE transactions. The Newmans, Weisberg, and

4

Brown also received monetary incentives from the Israeli Investor Group, which encouraged their complicity in hiding the existence of the Israeli Investor Group and also ensured access to future PIPE transactions at advantageous terms.

10.     For example, in November 2000, Steven Newman borrowed $500,000 from the Israeli Investor Group, which he ultimately kept in exchange for the Xybernaut shares pledged as collateral.  This transaction was, in fact, structured as a means to enable Steven Newman to sell his 300,000 shares to the Israeli Investor Group without proper disclosure.  In July 2001, an entity controlled by Steven and Edward Newman, Da Vinci International Limited, received a fee of $120,000 as well as warrants in the company as a purported "finders' fee" in connection with a July 2001 PIPE transaction that included the Israeli Investor Group.  In 2003 and 2004, Steven Newman and Weisberg (Xybernaut's director and counsel to Ramp and Xybernaut), received payments of $4.1 million that came from the accounts of the Israeli Investor Group.  In December 2003, Saltsman and Eitan gave Brown (Ramp's CEO) $50,000 in cash.  These payments were never disclosed in Xybernaut's corporate filings and were not disclosed by Ramp until years later.

11.     In total, the Israeli Investor Group earned more than $55 million in profits by trading in Ramp and Xybernaut stock.  Because it cannot be determined how much of the profits went to each of the participants in the Israeli Investor Group, Saltsman and Eitan should be held jointly and severally liable for the entire amount.

12.     The Defendants, directly or indirectly, have engaged in transactions, acts, practices and courses of business which constitute violations of  Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Weisberg aided and abetted Xybernaut's violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9.  Edward Newman, Weisberg, and Steven Newman aided and abetted Xybernaut's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.  Brown and Weisberg aided and abetted Ramp's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.  Edward Newman, Steven Newman, and Brown violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.  Saltsman and Eitan violated Sections 5(a), 5(b)(2), and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(b)(2), and 77a(c), and Sections 13(d) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78m(d) and 78p(a), and Rules 13d-1, 13d-2, and 16a-3, 17 C.F.R. §§ 240.13d-1, 240.13d-2, and 240.16a-3.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to Section 20(b) of the Securities

Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), to enjoin the

Defendants from engaging in the acts, practices and courses of business alleged herein.  The

Commission also seeks a judgment ordering the Defendants to disgorge their ill-gotten gains

with prejudgment interest thereon and to pay civil money penalties pursuant to Section 20(d) of

the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §

78u(d)(3).  In addition, the Commission seeks an order barring Weisberg, Edward Newman,

Steven Newman, and Brown from acting as officers or directors of any issuer that has a class of

securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is

required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).  The

Commission also seeks such other relief as the Court may deem appropriate.

14.     This Court has jurisdiction of this action pursuant to Sections 20(d) and 22(a) of

the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a), and Sections 21(d) and 27 of the Exchange

Act, 15 U.S.C. §§ 78u(d) and 78aa.

15.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Certain of the

transactions, acts, practices, and courses of business alleged herein occurred within this District.

For example, the Israeli Investor Group sold Xybernaut and Ramp stock through its brokerage

accounts, which were located in Brooklyn, New York.

## DEFENDANTS

16.     Saltsman, age 52, is a U.S. citizen who resides in Israel.  From 1998 through

2005, Saltsman invested in PIPE transactions of U.S. publicly traded companies first by himself

and, later, through the Israeli Investor Group. Saltsman was indicted in 2007 in connection with the same facts that are alleged in the Amended Complaint. (07-cr-0641). On March 11, 2010, Saltsman pled guilty to a Superseding Information, charging him with violations of Title 15 U.S.C. §§ 78j(b) and 78ff. Saltsman paid $5 million in restitution and on July 28, 2010, was sentenced to three years probation. On July 26, 2010, a judgment in this case was entered against Saltsman (by his consent) whereby he was enjoined from violations of the securities laws and ordered to pay disgorgement, prejudgment interest, and a civil penalty in amounts to be determined by the Court upon later motion of the Commission.

17.     Eitan, age 63, is an Israeli citizen who resides in Israel. Eitan, is a licensed C.P.A. As part of the Israeli Investor Group, Eitan invested in PIPE transactions of U.S. public companies through various offshore entities. Eitan was indicted in 2007 in connection with the same facts that are alleged in the Amended Complaint. (07-cr-0641). Eitan did not appear in the criminal action and is considered by the Justice Department to be a fugitive.

18.     Weisberg, age 65, formerly of Waccabuc, New York, was an attorney who had been practicing law since 1976. Between 2001 and April 2005, Weisberg was a partner in the corporate department at the New York office of Jenkens & Gilchrist, LLP. In April 2005, Weisberg became a partner in Troutman Sanders LLP's New York office. From 1996 through approximately May 2005, Weisberg represented Xybernaut as its securities counsel. Weisberg was also a member and the Secretary of Xybernaut's Board of Directors. From September 2003 through March 2005, Weisberg represented Ramp as its securities counsel. In May 2005, Troutman terminated Weisberg. Weisberg was indicted in 2007 in connection with the same facts that are alleged in the Amended Complaint as well as in connection with an unrelated money laundering charge. (07-cr-0641). On May 21, 2012, Weisberg pled guilty to one charge

8

of money laundering and one charge of conspiracy to commit securities fraud.  On August 7,

2013, Weisberg was sentenced to 24 months imprisonment with three years of supervised release

to follow and was also ordered to pay restitution of $297,500.00.  By order of the New York

Appellate Division, First Department, dated January 15, 2013, Weisberg was disbarred and his

name stricken from the roll of attorneys and counselors-at-large.

      19.      Edward Newman, age 71, currently resides in Pensacola, Florida.  From

December 1994 until April 2005, Edward Newman served as Xybernaut's CEO and Chairman of

the Board.  In 2005, the Xybernaut Board of Directors requested the resignation of Edward

Newman after an audit committee investigation determined that "[m]ajor transactions were

entered into by certain members of senior management in violation of Company internal controls

[and that] [c]ertain members of senior management failed properly to advise the Board of

material financial conditions regarding major transactions."  The audit committee also

determined that Edward Newman "improperly used substantial Company funds for personal

expenses and failed to properly substantiate expenses charged to the Company."  In addition, the

investigation report indicated that members of Edward Newman's family were hired in direct

violation of the Company's anti-nepotism policy and the employment of such family members

was not disclosed in Commission filings as required by Commission disclosure regulations.

Finally, the audit committee concluded that Edward Newman impeded its investigation.  Edward

Newman was indicted in 2007 in connection with the same facts that are alleged in the Amended

Complaint (07-cr-0641).  The criminal charges against Edward Newman were dismissed on

September 5, 2012, pursuant to a deferred prosecution agreement, which provided that "in

connection with the conspiracy to commit securities fraud, and conspiracy to commit money

laundering charged in the Second Superseding Indictment, the defendant received $100,000 in

criminal proceeds." Pursuant to the deferred prosecution agreement, Edward Newman forfeited $100,000.

20.     Steven Newman, age 68, resides in McLean, Virginia and is Edward Newman's brother. From January 2003 until April 2005, Steven Newman served as Xybernaut's president and COO. From August 1997 through May 2005, he served as the company's Vice-Chairman of the Board of Directors. Steven Newman was principally involved in raising capital for Xybernaut and directing, drafting and/or editing press releases for the company. In 2005, the Xybernaut Board of Directors requested the resignation of Steven Newman after an audit committee investigation concluded that "[m]ajor transactions were entered into by certain members of senior management in violation of Company internal controls [and that] [c]ertain members of senior management failed properly to advise the Board of material financial conditions regarding major transactions." The audit committee also concluded that Steven Newman impeded its investigation. Steven Newman was indicted in 2007 in connection with the same facts that are alleged in the Amended Complaint (07-cr-0641). The criminal charges against Steven Newman were dismissed on September 5, 2012 pursuant to a deferred prosecution agreement, which provided that "in connection with the conspiracy to commit securities fraud, and conspiracy to commit money laundering charged in the Second Superseding Indictment, the defendant received in excess of $430,000 in criminal proceeds." Pursuant to the deferred prosecution agreement, Edward Newman forfeited approximately $430,000.

21.     Brown, age 45, resides in New York, New York. From August 2001 to October 2003, Brown served as an investor relations consultant to Ramp. In October 2003, Brown became President of Ramp, and shortly thereafter became its CEO. On May 22, 2005, Ramp's Board of Directors suspended Brown as CEO and President following Brown's disclosure to an

attorney representing the company that he received $50,000 from Saltsman and Eitan in 2003. Brown was indicted in 2007 in connection with the same facts that are alleged in the Amended Complaint (07-cr-0641). Brown pled guilty and was sentenced on June 6, 2014 to time served.

## RELATED PARTIES

22.     Xybernaut is a Delaware corporation. From 1996 through 2004, it operated as a developer of wearable computers and maintained its headquarters in Fairfax, Virginia. From 1996 until the company declared bankruptcy in 2005, the company's common stock traded on the NASDAQ Small Cap Market under the symbol XYBR, and its common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act. On January 3, 2007, Xybernaut filed a Form 15 terminating its Section 12(g) registration.

23.     Ramp, previously known as Medix Resources, Inc., is a Delaware corporation located in New York, New York, that developed and marketed e-communication software for the healthcare industry. By order dated November 29, 2007, the Commission revoked the registration of each class of securities issued by Ramp pursuant to Section 12(j) of the Securities Exchange Act of 1934. Prior to that time, Ramp's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and had been previously been registered (until July 1, 2005) pursuant to Section 12(b) of the Exchange Act. From April 2000 through May 15, 2005, Ramp's common stock traded on AMEX. On June 2, 2005, Ramp filed for bankruptcy protection from the U.S. Bankruptcy Court in the Southern District of New York. From that point in time until 2007, when its securities were revoked, Ramp's stock (symbol 'RCOCQ') was quoted in the inter-dealer market, also known as the grey market.

24.     Richard Naimer ("Naimer"), is an Israeli citizen and resides in Israel. Naimer holds a Bachelor's degree in law (LL.B.) from Bar Ilan University and is a partner in Granot &

Co. (formerly Granot, Strauss, Adar & Co.) ("Granot") a law firm located in Ramat Gan, Israel.

Naimer's law practice specializes in corporate financing, venture capital and project financing,

and according to his firm's website, he "has accumulated many years of experience in tax

planning and adjusting tax structures to corporations and individual clients." Naimer, as part of

the Israeli Investor Group, invested in PIPE transactions of U.S. public companies through

various offshore entities. In addition, on May 7, 2001, Naimer became the trustee for the

Manassas Bay Trust and the New Ember Trust, which had been established by Edward Newman

and Steven Newman, respectively, for the benefit of their children. Naimer became the trustee

for the Newmans' trusts at the recommendation of Saltsman.

## XYBERNAUT RAISES FUNDS IN PRIVATE PLACEMENTS

25.    Xybernaut had large annual operating losses. For the year ended December 31,

1998, its net losses were $14,078,280. For the year ended December 31, 1999, its net losses

were $18,594,887. In order to continue its operations, notwithstanding these large losses,

Xybernaut conducted private placements of its shares to investors in what are known as PIPE

transactions. The PIPE transactions that Xybernaut offered to investors also included warrants,

which essentially were options to purchase additional shares at a fixed price.

26.    Before the shares sold by Xybernaut to the investor in a PIPE transaction could be

resold by that investor, a registration statement, called a Form S-3, had to be filed by Xybernaut

with the Commission. In the Form S-3, various disclosures have to be made regarding the

transaction and identifying the controlling person for the investor, also described as the "selling

shareholders." Regulation SK, the SEC rule which governs filings with the SEC, mandates in

Item 507 (17 C.F.R. Sec. 229.507) the following:

> If any of the securities to be registered are to be offered for the account of the
> security holders, name each such security holder, indicate the nature of any

position, office or other material relationship which the selling security holder has had within the past three years with the registrant or any of its predecessors or affiliates . . . .

27.     In 1997, the Commission's Division of Corporate Finance further explained that "[t]he term 'security holder', as used in Item 507 of Regulation S-K, means beneficial holders, not nominee holders or other such holders of record."

28.     While many PIPE transactions during the relevant period of time explicitly prevented the investor from transacting in the stock (including short selling the stock) prior to the filing of the registration statement (because PIPE transactions have a dilutive effect and, therefore, are considered to be material nonpublic information), in Xybernaut's case, the share purchase agreements did not contain such prohibitions.   This was by design, as the Israeli Investor Group would not have invested in either Xybernaut or Ramp had it been prohibited from short selling under the terms of the share purchase agreements.

**THE INVESTMENTS IN XYBERNAUT**

29.     In or about 1999, Saltsman was introduced to Xybernaut and Steven Newman by a placement agent who was also a member of Xybernaut's advisory board.  Steven Newman was in charge of obtaining financing for Xybernaut, and it was important for Steven Newman to meet and gain an understanding as to who was investing.  Saltsman informed Steven Newman at this time that he was not a long-term investor in the company and would be shorting the stock prior to the Form S-3 being filed with the SEC and the company's public disclosure of the PIPE transaction.

30.     In March 1999, Saltsman first invested in a PIPE transaction with Xybernaut.   In order to avoid paying Israeli tax, Saltsman structured the transaction so that the investment was not made in his own name, but in the name of Crystalite Investments, Ltd., a British Virgin

Islands ("BVI") corporation, with an address at 111 Arlosorov St. in Tel Aviv, Israel. Based on his conversations with Saltsman, however, Steven Newman understood that Salstman was the beneficial owner of the Xybernaut shares with voting and dispositive control over them.

31.     In May 1999, Xybernaut filed a Form S-3, signed by Steven Newman and Edward Newman. The Form S-3 failed to disclose that Saltsman was the beneficial owner of the shares registered to Crystalite Investments Ltd. In November 1999, Xybernaut filed an Amended Form S-3, signed by Steven Newman and Edward Newman, which falsely identified a nominee director as the control person for Crystalite Investments. In fact, the entity was controlled by Saltsman. On January 12, 2000, Xybernaut filed a second Amended Form S-3, signed by Steven Newman and Edward Newman, which again falsely identified the nominee director as the control person for Crystalite Investments. On January 27, 2000, Xybernaut filed a third Amended Form S-3, signed by Steven Newman and Edward Newman, which again falsely identified the nominee director as the control person.

32.     During October 1999, Crystalite Investments issued a promissory note to Xybernaut, and from October 1999 through December 1999, Xybernaut borrowed $1,000,000 from Crystalite. In connection with this loan, Xybernaut issued warrants to purchase 1,000,000 shares of its common stock at $1.00 per share. On December 31, 1999, the warrants were converted into 1,000,000 shares of the Xybernaut's common stock in repayment of the loan.

33.     Shortly after his first investment in Xybernaut, Saltsman partnered with Eitan, who lived in the same neighborhood in Israel and was also an investor in PIPE transactions. Thereafter, Eitan introduced Saltsman to Naimer and the three worked together. Saltsman invested his own money as well as the money of a few close relatives and friends. Eitan invested his own money. Naimer invested money of several clients and perhaps his own money as well.

These investors –Saltsman and his close relatives and friends, Eitan, and Naimer and his clients – comprised the Israeli Investor Group. The investors in the group did not change from at least 2000 through 2004 and profits generally were not distributed but were reinvested.

34. As part of this informal partnership, Saltsman would meet with brokers and "finders" who were looking for investors to participate in various PIPE transactions. Saltsman would bring the deals to Eitan who, along with Saltsman, would determine whether to invest. Naimer was responsible for setting up foreign entities in Turks & Caicos and other countries that would become the nominal and publicly disclosed investors in the PIPE transactions, and, along with Eitan, would determine how the money would flow between the various entities, bank accounts, and brokerage accounts established by the Israeli Investor Group to effectuate its trading strategy.

35. On January 3, 2000, the Israeli Investor Group entered into a PIPE transaction with Xybernaut. Under the terms of the stock purchase agreement, which was negotiated by Saltsman, the Israeli Investor Group purchased 747,500 shares of Xybernaut common stock for $2,590,000. The transaction was structured so that the investment was not made in the name of any of the members of the Israeli Investor Group, but in the name of Dalston Holdings Ltd., a Turks & Caicos company, that had been created by Naimer. Steven Newman understood that the Israeli Investor Group controlled the stock.

36. On April 4, 2000, Xybernaut filed a Form S-3, signed by Steven Newman and Edward Newman, which included both the 1,000,000 shares that Cystalite had received in connection with the loan as well as the shares that were registered in the name of Dalston Holdings Ltd. Instead of identifying anyone from the Israeli Investor Group as the control person, the Form S-3 falsely named the nominee directors of Crystalite and Dalton as the control

persons. As with Crystalite, the nominee director of Dalton did not exercise any control over the shares and had no authority to do anything without the approval of the Israeli Investor Group.

37.     In November 2000, Steven Newman borrowed $500,000 from an offshore entity controlled by the Israeli Investor Group called Felton Investments, secured by 300,000 Xybernaut shares that Steven Newman personally owned. Weisberg drafted the loan documents. This loan was structured as a means of enabling Steven Newman to sell his shares without proper disclosure. Indeed, neither Steven Newman nor Weisberg disclosed this transaction (or that Xybernaut's outside counsel was involved) to the Xybernaut Board of Directors. As a result, Xybernaut never disclosed this transaction in any of its corporate filings, including its form 10-K for the year ended December 31, 2000, its Form 10-Q for the first quarter of 2001, or its Form 10-K for the year ended December 31, 2001.

38.     The only public notice of this transaction was a Form 4 filed by Steven Newman on February 12, 2001, disclosing that on January 24, 2001, he had transferred 300,000 shares of Xybernaut to a pledgee pursuant to a loan agreement. The Form 4 stated that the loan agreement was secured with the 300,000 shares and that the loan was in default so the shares were transferred to the lender. This Form 4, however, did not provide sufficient information so that Xybernaut investors would understand that the lender was the same group of offshore investors that had been providing a significant percentage of Xybernaut's funding.

39.     From 2001-2004, the Israeli Investor Group invested in numerous PIPE transactions with Xybernaut, again hiding behind the names of nominee companies and directors. Naimer was in charge of forming the entities and employed the services of a management company located in the Turks and Caicos Islands for this purpose. The offshore management company provided employees to serve as nominee directors. Those nominee directors exercised

no actual authority or control over the entities or over the shares issued to those entities. Naimer also set up companies in several other countries (including Anguilla and the BVI) to be used as nominees and allowed employees of his law firm Granot (including a receptionist) to serve as directors. Again, the nominee directors who were Granot employees exercised no actual authority or control over the nominee entities or the shares. All decisions were made by Saltsman, Eitan, and Naimer on behalf of the Israeli Investor Group.

40. Between 2001 and December 2004, the Israeli Investor Group invested more than $67 million in Xybernaut PIPE transactions, and in return, received more than 123 million shares, which represented approximately 85% of the total shares issued during that period or approximately 58% of the total issued and outstanding shares as of September 30, 2004.

41. Specifically, on April 19, 2001, the Israeli Investor Group invested $5 million in Xybernaut shares and warrants through a Turks & Caicos company called Archway Holdings, Ltd. On July 31, 2001, the Israeli Investor Group invested $4 million in Xybernaut shares and warrants through a Turks & Caicos company called Eva Holdings, Ltd. On November 15, 2011, the Israeli Investor Group invested $4 million in Xybernaut shares and warrants through a Turks & Caicos company called Holly Investments, Ltd. On March 13, 2002, the Israeli Investor Group invested $4 million in Xybernaut shares and warrants through a Gibraltar company called Yeshua Investments, Ltd. On June 30, 2002, the Israeli Investor Group invested $2 million in Xybernaut shares and warrants through a Turks & Caicos company called Rema Investments, Ltd. On August 29, 2002, the Israel Investor Group invested $2 million in Xybernaut shares and warrants equally through two entities: Rewell Holdings, Ltd., a Turks & Caicos company and Sundale Corp., an Anguillan company. On November 6, 2002, the Israeli Investor Group invested $4.1 million in Xybernaut shares and warrants equally through four companies: Greta

Holdings Ltd and Reno Holdings, Ltd, both Turks & Caicos companies, and State Street

Corporation and Company Management, Ltd., both Anguillan companies.  On February 8, 2003,

the Israeli Investor Group invested $2 million in Xybernaut shares and warrants through Maple

Systems, Ltd., a BVI company.  On March 26, 2003, the Israeli Investor Group loaned

$1,750,000 to Xybernaut through Sundial Investments, a BVI company, and received warrants to

purchase 1,750,000 shares.  (This loan was repaid on May 30, 2003 through the issuance of

681,701 shares to Sundial.)  On May 30, 2003, the Israeli Investor Group invested $3 million in

Xybernaut shares and warrants equally through London Properties Ltd. and Sussex Consulting

Ltd., both Anguillan companies.  On June 4, 2003, the Israeli Investor Group invested $2 million

in Xybernaut shares and warrants through Capecove International Ltd., a BVI company.  On

September 8, 2003, the Israeli Investor Group invested $5 million in Xybernaut shares and

warrants through Chesterfield Inc., an Anguillan company.  On September 16, 2003, the Israeli

Investor Group invested $2 million in Xybernaut shares and warrants through Essex Trading

Ltd., a Nevesian company.  On March 4, 2004, the Israeli Investor Group invested $6 million in

Xybernaut shares and warrants through Western Ventures Ltd. and Polar Properties Ltd., both

Anguillan companies.  In December 2004, the Israeli Investor Group loaned $5 million to

Xybernaut through Western Ventures (discussed in greater detail below).  On December 20,

2004, the indebtedness to Western Ventures was cancelled through the issuance of shares and

warrants to Western Ventures.  In addition, on that same date, the Israeli Investor Group invested

an additional $3.5 million in Xybernaut shares and warrants through Polar Properties.

  42. From August 2002 until December 2004, the only investors who participated in

Xybernaut's PIPE transactions were the members of the Israeli Investor Group.  Steven and

Edward Newman both knew that the Israeli Investor Group was the primary source of funding

for Xybernaut during this period of time and, upon information and belief, did not spend

significant time looking for long-term investors or investors who were not short sellers.

43.    At various times, the Israeli Investor Group beneficially owned more than 5% and

even 10% of the common stock outstanding of Xybernaut.  For example, following the August

30, 2002 private placement, the common stock and warrants issued to two nominee entities of

the Israeli Investor Group compromised 15.33% of all issued and authorized common stock and

common stock reserved for issuance on exercise of warrants.  Following the November 6, 2002

private placement, the common stock and warrants issued to four nominee entities of the Israeli

Investor Group compromised 18.60% of all issued and authorized common stock and common

stock reserved for issuance on exercise of warrants.  As the Israeli Investor Group held more

than 10% of the shares at various points in time, the Israeli Investor Group was an "affiliate" of

Xybernaut.  While the Israeli Investor Group was not a long-term investor, there were often

extended periods of time when it held more than 5% of the common stock outstanding of

Xybernaut.  The Israeli Investor Group, however, never filed any ownership disclosures,

including Schedules 13D and/or 13G and Forms 3, Forms 4, or Forms 5.

44.    The Forms S-3 filed by Xybernaut on May 9, 2001, August 31, 2001, October 15,

2001, November 29, 2001, March 29, 2002, July 12, 2002, August 30, 2002, November 15,

2002, April 1, 2003, May 2, 2003, June 19, 2003, September 29, 2003, March 22, 2004, and

December 30, 2004, which were prepared by Weisberg and signed by Weisberg, Edward

Newman and Steven Newman, were all false and misleading.  Each Form S-3 named the

nominee directors as having voting and/or dispositive control over the shares even though

Regulation SK and the guidance from the Commission's Division of Corporate Finance required

the company to disclose the beneficial owners.  The Newmans and Weisberg knew, or recklessly

disregarded, that Saltsman, Eitan, and Naimer had dispositive and voting control over the Xybernaut securities issued in the PIPE transactions.

45.     Each of the Forms S-3 filed by Xybernaut listed above was also false and misleading because it stated that the selling stockholders were "not affiliated with us and have not had any material relationship with us or our affiliates during the past three years." Those statements were false because the Israeli Investor Group, through its nominees (including Crystalite, Felton, and Sundial), were lenders to both Xybernaut and personally to Steven Newman during the three-year time period. In addition, the Israeli Investor Group was an "affiliate" by virtue of its greater than 10% ownership position in the company. Indeed, from August 2002 through December 2004, Xybernaut's most significant source of operating funds was the investments made by the Israeli Investor Group.

46.     The Forms S-3 filed by Xybernaut on August 30, 2002, November 15, 2002, April 1, 2003, June 19, 2003, September 29, 2003, March 22, 2004, and December 30, 2004 were additionally false and misleading because they gave the impression that each of the multiple "selling shareholders" were separately owned and controlled. In fact, each of the multiple entities named in the Forms S-3 was controlled by the Israeli Investor Group, which had invested through multiple entities to avoid disclosing ownership positions of greater than 5% as required under Section 13 of the Securities Exchange Act of 1934.

47.     For example, the June 19, 2003 Form S-3 registered the resale of securities issued in PIPE transactions to three entities (Capecove International, Ltd., London Properties Ltd., and Sussex Consulting Ltd.). The Form S-3 disclosed that, as a result of the PIPE transactions, Capecove International, London Properties, and Sussex Consulting owned 6.1%, 4.1%, and 4.1%, respectively, of Xybernaut's common stock and for each entity listed a different individual

20

as the person with dispositive and voting control.  This disclosure was misleading because it did

not disclose that the three entities were nominees of the Israeli Investor Group, which owned in

total 14.3% of the company's common stock.  The Newmans and Weisberg knew or were

reckless and should have known that the multiple entities were a sham to avoid disclosure

requirements and that the entities were all controlled by the Israeli Investor Group.

48.     The Newmans and Weisberg knew or were reckless in not knowing that the

nominee directors (who were named in the Forms S-3) were not the beneficial owners of the

stock.  First, Saltsman specifically told Steven Newman and Weisberg that he (and his group)

were the investors and also explained how they were going to manage their investment.

Consequently, internal Xybernaut documents referred to the entities as being "controlled by Zev

[Saltsman]."  Second, Xybernaut (through Steven Newman and Weisberg) negotiated the terms

of the PIPE transactions with Saltsman or sometimes Saltsman together with Eitan.  The

nominee directors were not involved in any way in the transactions.  Third, Steven Newman had

developed a close personal relationship with Saltsman – even referring to Saltsman as his best

friend – and understood exactly who controlled the nominee entities.  Fourth, as Steven Newman

and Weisberg knew, the Xybernaut shares for most of the nominee entities were sent to two

accounts at the same brokerage firm in Brooklyn, New York, as opposed to separate accounts for

each of the entities.  Steven Newman and Weisberg knew or recklessly disregarded this fact

because Weisberg prepared and Steven Newman signed documents authorizing Xybernaut's

transfer agent to send the newly issued shares for the nominees to the two brokerage accounts.

In fact, between April 3 and September 11, 2003, one of these accounts received 41 million

shares of Xybernaut stock.  The 41 million shares purportedly had been issued to eight separate

PIPE investors and represented approximately 98% of the total shares issued by Xybernaut

during that period and approximately 24% of the outstanding shares reported in its Form 10-Q for the period ended September 30, 2003.  Fifth, the named control person for virtually all of the purportedly unrelated Turks & Caicos entities was the same individual (and an employee of the offshore management company), which would have led a reasonable person to conclude that this individual was not the beneficial owner, but likely a nominee who did not have control over the shares.

49.     Many of the Forms S-3 were additionally false because they stated that the investors who participated in the PIPE transactions were "institutional investors."  For example, Xybernaut's Form S-3 filed on September 29, 2003, stated that "[d]uring the period from January 1, 2003 through the date of this filing, we raised approximately $22,000,000 through sales of our common stock to institutional investors."  This statement was false because the only investor who participated in the PIPE transactions during this period of time was the Israeli Investor Group, which was a group of individuals; not an "institutional investor."  The company's Form S-3 filed on December 30, 2004, similarly stated "[d]uring the period from January 1, 2004 through the date of this filing, we raised approximately $19 million through sales of our common stock to institutional investors."  Again, the only investor who participated in the PIPE transactions during this period of time was the Israeli Investor Group.

50.     The Newmans and Weisberg who signed the Forms S-3 knew that the Israeli Investor Group was not comprised of institutional investors.  Their characterization of the nominee entities as institutional investors, therefore, can only be explained as an intentional effort to conceal the fact that Xybernaut was selling large control blocks of shares to individual investors who were short sellers.  By characterizing the Israeli Investor Group as "institutional

investors," the Newmans and Weisberg were trying to convey to reasonable investors that the entities participating in the PIPE transactions were long-term investors, which was not the truth.

51.     Xybernaut press releases announcing the completion of financing, which were directed, written, and/or edited by Steve Newman (who had ultimate authority over Xybernaut's press releases), similarly announced that the PIPE transactions were with "institutional investors." For example, in a November 31, 2001 press release, Xybernaut announced that it had "raised more than $11 million in equity capital through a $9.2 million private placement of common stock with institutional investors and a $2.0 million exercise of warrants issued in connection with previous financings." Edward Newman was quoted in the same press release as stating that "[a]s institutional investors continue to show confidence in the company's future, we are also working with a number of sources to provide additional strategic capital to fund our expected growth." This press release was misleading. The Israeli Investor Group, which participated in this PIPE transaction through its nominee Holly Investments, Ltd., was a group of individuals, not an institutional investor.

52.     Xybernaut's press releases dated November 30, 2001, December 7, 2001, March 21, 2002, July 11, 2002, April 2, 2003, and September 29, 2003 all stated that the PIPE transactions had been done with institutional investors. Indeed, a news report concerning the September 29, 2003 press release, stated that the "[i]nstitutional investors that participated in the investment deal included Chesterfield, Essex Trading and Sundial Investments." Each of these three entities was, in fact, a nominee of the Israeli Investor Group, not an institutional investor.

53.     Xybernaut and the Newmans made similar representations in quarterly earnings conference calls. At the November 13, 2003 earnings call, Edward Newman stated that Xybernaut "made it through the tech crash" with the support of institutional investors. At the

March 9, 2004 earnings call (in which Steven Newman and Edward Newman participated),
Xybernaut stated "during the first quarter of 2004, we completed $6 million in financing. These
funds were raised through straight sales of common stock to institutional investors." The Israeli
Investor Group, however, was not an institutional investor. It was a group of individual investors
who were short-term investors and short sellers.

54.     The importance and materiality of institutional ownership was highlighted by
Xybernaut in its quarterly earnings conference calls. At the November 13, 2003 earnings call,
Xybernaut stated its belief that the increase in the company's stock price was "due to the
increased demand we are seeing from institutional investors." At the March 9, 2004, earnings
call, Xybernaut proudly announced: "you may have noticed that institutional investors have
steadily been increasing their ownership position in Xybernaut stock. In fact, 2003 institutional
ownership increased over four times from 2002 levels." At the May 6, 2004, earnings call,
Xybernaut stated that it was focused on increasing institutional ownership and that "[s]hares held
by institutions have been steadily increasing over prior quarter[s]." At the August 5, 2005
earnings call, Xybernaut also reported on institutional investment in the company, stating that
"we have seen increases in institutional investment in recent quarters." All of these false
statements were intended to give shareholders and other investors the impression that serious
long term investors saw significant long term value in Xybernaut. In fact, the actual PIPE
investors were a bunch of short term short sellers who perceived the company in precisely the
opposite light.

## THE ISRAELI INVESTOR GROUP'S SHORT SALES OF XYBERNAUT

55.     The Israeli Investor Group purchased the Xybernaut shares at discounts to the
market price, ranging from 10% to 20%. Prior to the effective date of the resale registration

statements, the Israeli Investor Group used Canadian brokerage accounts to accumulate short positions (of up to 50% of the shares purchased in the PIPE transaction) as a hedge of their long position, which they could not liquidate until the registration statement became effective.

56.     Canadian brokerage accounts were used because, at the time, Canadian law did not require that the seller borrow shares in order to effectuate a short sale. Rather, the seller only had to deposit money in a margin account to engage in short selling.

57.     When the resale registration statements became effective, the Israeli Investor Group used the shares issued in the PIPE transactions to cover their short positions.

58.     At the time that the Israeli Investor Group executed the short sales, no registration was in effect for the PIPE shares, and the Israeli Investor Group did not deliver a prospectus to any purchaser in connection with its short sales.

59.     By short selling the stock before the resale registration statements became effective and by covering those short sales with the PIPE shares, the Israeli Investor Group effectively sold the PIPE shares prior to their registration in violation of Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a) and 77e(c)), which prohibit any person from offering or selling a security through interstate commerce unless a registration statement is in effect as to such offer or sale and Section 5(b)(2) of the Securities Act (15 U.S.C. § 77e(b)(2)), which prohibits the sale or delivery of securities without the delivery of a prospectus.[1] The Israeli Investor Group earned profits of approximately $39 million from their trading in Xybernaut stock.

**THE NEWMANS PROVIDED THEIR SHARES TO THE ISRAELI INVESTOR GROUP**

60.     As described above, Steven Newman transferred 300,000 Xybernaut shares that he personally owned to an account controlled by the Israeli Investor Group.

---

[1] In this Amended Complaint, the SEC does not assert any claim against any other defendant besides Saltsman and Eitan for violating Section 5 of the Securities Act or for aiding and abetting any violation of Section 5.

61.    Subsequently, in October 2001, pursuant to a Share Loan Agreement, Edward

Newman transferred an additional 400,000 Xybernaut shares from the Manassas Bay Trust that

he controlled (and for which Naimer was the trustee) to Beeston Investments Ltd., a brokerage

account controlled by the Israeli Investor Group.  Edward Newman transferred the shares to the

Israeli Investor Group specifically so those shares could be used to short Xybernaut stock.

Steven Newman was also aware of this transfer and the reason for the transfer because he was

involved in the negotiations for the Share Loan Agreement and in an original draft, shares that he

controlled were also going to be "loaned" to the Israeli Investor Group.

62.    As described above, to sell shares short under Canadian law, the seller had to

deposit money in a margin account.  By loaning the shares to the Israeli Investor Group – which

would reduce its need to deposit collateral and thereby lower the Israeli Investor Group's

transaction costs – Edward and Steven Newman were incentivizing the Israeli Investor Group to

invest more money in the company than it otherwise would have committed.

63.    The Israeli Investor Group used the 400,000 shares received from the Manassas

Bay Trust to cover short positions in Xybernaut stock.  The Israeli Investor Group also used a

portion of the proceeds received from the short sales to invest in Xybernaut PIPE transactions.

At the time, Weisberg and the Newmans knew, or recklessly disregarded, that the Israeli Investor

Group intended to use the Xybernaut shares to cover existing short positions.

64.    As a result of these stock transfers, the Newmans had an interest in the Israeli

Investor Group's investments in Xybernaut PIPE transactions.  These transfers were never

disclosed in any Xybernaut corporate filings.  In particular, Xybernaut's Form 10-K for the

period ended December 31, 2001 (filed on March 27, 2002), signed by Weisberg, Edward

Newman, and Steven Newman, did not disclose the Newmans' interest in the Israeli Investor

26

Group's investments in PIPE transactions during 2001. Weisberg and the Newmans knew, or recklessly disregarded, that the 2001 Xybernaut Form 10-K did not disclose the Newmans' interests in the Israeli Investor Group's investments in Xybernaut PIPE transactions.

65.    In addition, on May 15, 2002, Xybernaut filed a Definitive Proxy Statement ("2002 Proxy") which, among other things, listed a series of related party transactions between Xybernaut's officers and directors and various third parties. The 2002 Proxy, however, did not disclose Steven Newman's interest in the Israeli Investor Group's investments in Xybernaut PIPE transactions as a result of the stock transfers. Weisberg prepared and signed the 2002 Proxy and knew or recklessly disregarded that the 2002 Proxy did not disclose the Newmans' interests in the Israeli Investor Group's PIPE transactions in 2001.

## XYBERNAUT FAILS TO DISCLOSE WARRANT REPRICING

66.    On July 12, 2002, Xybernaut filed a Form S-3 regarding the sale of 3,333,333 shares of common stock and 833,333 warrants (exercisable at $1.50) to Rema Investments Ltd. in a PIPE transaction. Separately, the Form S-3 disclosed that 1,544,361 warrants (the "Newly-Issued Warrants") had been issued to three entities (Eva Holdings, Holly Investments, and Yeshua Investments) "as consideration for the exercise of warrants previously issued to these entities." According to the Forms S-3 relating to those earlier PIPE transactions (dated August 31, 2001, November 29, 2001, and March 29, 2002), the warrants issued to the three entities had exercise prices ranging from $2.50 to $4.53 (the "Previously-Issued Warrants").

67.    The July 12, 2002 Form S-3's description of the issuance of the Newly-Issued Warrants was false and misleading. First, it created the false impression that the issuance of the Newly-Issued Warrants was unrelated to the Rema financing. The Israeli Investor Group controlled Rema as well as the three entities that obtained the Newly-Issued Warrants. In fact,

Saltsman negotiated the issuance of the Newly-Issued Warrants (on behalf of the Israeli Inveestor Group) as a condition to the Rema investment.

68.     Second, the July 2002 Xybernaut Form S-3 was misleading because it created the false impression that the three entities exercised the Previously-Issued Warrants at the exercise prices disclosed in the prior Forms S-3 (i.e., between $2.50 and $4.53).  In reality, as part of the Rema financing, Saltsman negotiated with Steven Newman and Weisberg to reduce the exercise prices for all of the Previously-Issued Warrants from the originally disclosed exercise price to $0.50, a fraction of the previously disclosed exercise price.

69.     Prior to the filing of the July 2002 Xybernaut Form S-3, Weisberg and Steven Newman approved the re-pricing of the Previously-Issued Warrants and the reduction of the exercise prices as part of Rema's financing negotiated by Saltsman.  Weisberg and Steven Newman signed the July 2002 Xybernaut Form S-3, and they knew, or recklessly disregarded, that it contained false and misleading statements about the Newly-Issued Warrants.

## THE FRAUDULENT DECEMBER BRIDGE LOAN

70.     In 2004, Xybernaut reached a funding crisis.  It needed to raise additional funds, but had little stock to sell.  In its March 22, 2004 Form S-3, the company disclosed that "[a]s of March 15, 2003, [Xybernaut] had issued 176,776,818 shares of common stock" [out of 200 million shares that the company was authorized to issue].  In addition, the company disclosed that it needed to reserve approximately 18.5 million additional shares to comply with options and warrants (including options to pay employees).  This left Xybernaut with approximately 5 million shares, an insufficient amount for the financing the company needed.

71.     On November 1, 2004, Xybernaut filed its preliminary proxy statement providing notice of its annual meeting of stockholders to be held on December 15, 2004.  In the

preliminary proxy statement, the company announced that it would be seeking the approval and adoption of an amendment to the company's Certificate of Incorporation to increase the number of authorized shares of common stock from 200,000,000 shares to 240,000,000 shares.  While the preliminary proxy statement stated that the increase in the number of shares "will provide the Company with the flexibility to execute its business plan by having an adequate number of authorized but unissued shares of Common Stock available to facilitate potential acquisitions, business combinations, stock dividends, stock options, stock splits, recapitalizations, equity financings and other general corporate purposes," the company advised that it "currently has no arrangements or understandings for the issuance of the additional shares of Common Stock to be authorized by the proposed Amendment."  On November 15, 2004, the Company filed its final proxy statement, which contained the same representation.

72.    On November 9, 2004, Steven Newman stated on Xybernaut's Q3 2004 Earnings Conference Call that in the proxy statement, the company was seeking "an increase in our shares, authorized shares, basically an increase of some 40 million shares, **not that we have identified any specific activity that they will be designated for**." (emphasis added).

73.    On November 29, 2004, Steven Newman gave an interview to The Wall Street Transcript, where he made a similar representation.  In response to the question of whether the company had sufficient financial resources, Steven Newman stated:  "We might well need more capital.  We are not actively looking for it as we speak and haven't been this year particularly."

74.    These representations were all false as Xybernaut was, at this time, actively seeking financing from the Israeli Investor Group and intended to use the newly authorized shares for a PIPE transaction with the Israeli Investor Group – the only investors who had participated in PIPE transactions with Xybernaut since August 2002.

75.     In October or early November 2004, Steven Newman and Weisberg discussed with Saltsman the possibility of the Israeli Investor Group providing a 30 day bridge loan to Xybernaut, which would be paid off with common stock once the shareholders approved the issuance of additional stock.  Under the terms of this transaction, the Israeli Investor Group would receive a financing fee of 4% of the funds lent in the bridge loan.

76.     Ultimately, the Israeli Investor Group loaned Xybernaut $5 million in a 30-day bridge loan through its Western Ventures entity that had previously invested in the March 4, 2004 PIPE transaction.  While it was unusual for the Israeli Investor Group to use a nominee entity more than once, in this case Weisberg requested that such an entity be used.

## THE FRAUDULENT DECEMBER 2004 PIPE TRANSACTION

77.     Following the December 15, 2004 shareholder vote approving the issuance of up to 240 million shares, Steven Newman and Weisberg approached Saltsman to work out the terms of the PIPE transaction that had previously been discussed with Saltsman.  Newman sought $10 million of financing from the Israeli Investor Group, which was significantly larger than any other PIPE transaction done to date by the Israeli Investor Group.

78.     In response to this larger request for financing, Saltsman (who was negotiating on behalf of the Israeli Investor Group) asked for a larger discount to the market price.  Steven Newman responded that he could not offer the larger discount to the market price because he believed that any discount greater than 20% would have an adverse impact on Xybernaut's share price.  Saltsman, however, was not prepared to commit the requested amount because changes to Canadian law had made shorting the stock more difficult and, as a result, the Israeli Investor Group would not be able to hedge its risk as before.

79.     As a compromise, Weisberg suggested that the Israeli Investor Group receive a secret finder's fee that would effectively give the Israeli Investor Group the discount to market price it wanted without the company having to disclose a discount of greater than 20%. Steven Newman responded that this was a good solution.  Steven Newman then called Xybernaut's CFO to describe the transaction.  Steven Newman, however, did not disclose to the CFO that the Israeli Investor Group would be receiving the finders' fee, which was agreed to be 3.5% of the $8.5 million private placement ($297,500) on top of the 4% that the Israeli Investor Group had already received as consideration for the bridge loan.

80.     On December 20, 2004, the Israeli Investor Group agreed to purchase $8.5 million of stock and warrants;  5,392,580 shares went to Western Ventures to pay off the $5 million bridge loan and 3,774,806 shares (and warrants) went to Polar Properties.  The Form S-3 dated December 30, 2004 signed by Weisberg and the Newmans, falsely represented that the discount rate was 20% of the average closing price for the ten trading days ended December 7, 2004. The stated discount rate was false because did not include the purported "finders' fee" of $297,500 that was received by Tall Spruce, the nominee entity set up to receive the fee.

81.     Following the public announcement of the December 20, 2004 PIPE transaction, Xybernaut received numerous complaints from investors who were upset that Xybernaut had sold these shares after Xybernaut and Steven Newman had represented that there were no arrangements or understandings regarding future financings.

82.     This was not the first time that the Israeli Investor Group had received a "finders' fee" in connection with a Xybernaut PIPE transaction.  Xybernaut's July 12, 2002 Form S-3 provided that one of the selling shareholders would be an entity called Dune Holdings, Ltd.  The Form S-3 explained that Dune Holdings Ltd. "is a consultant that provides financial advisory and

31

business development services to us. Under the terms of a consulting agreement between Dune Holdings Ltd. and us dated June 30, 2002, we agreed to issue $370,370 shares of our common stock to Dune Holdings, Ltd. as full compensation for certain services performed or to be performed over a one year period." In fact, Dune Holdings was just another nominee entity for the Israeli Investor Group. Dune Holdings never provided any services to Xybernaut. This was another false statement in the Form S-3 that was signed by Weisberg and the Newmans.

## THE NEWMANS ALSO RECEIVE "FINDERS' FEES"

83.        On August 31, 2001, Xybernaut filed a registration statement on Form S-3 concerning a July 31, 2001 PIPE transaction. The registration statement disclosed that "[o]n July 31, 2001, DaVinci International Limited received cash in the amount of $120,000 and warrants to purchase 39,735 shares of our common stock at $4.53 per share as a finders [sic] fee in connection with the private placement transaction." This disclosure was false and misleading. DaVinci performed no services in connection with that PIPE transaction. Rather, DaVinci was a company controlled by Edward Newman and Steven Newman.

84.        Edward Newman, Steven Newman, and Weisberg, who each signed the August 31, 2001 Form S-3 knew that this disclosure concerning DaVinci was false.

85.        On November 14, 2001, Xybernaut filed its Form 10-Q for the quarter ending September 30, 2001. The Form 10-Q, which was signed by Edward Newman, twice reported that in connection with the June 31, 2001 PIPE transaction, "[t]he Company also paid $120,000 in cash and issued callable warrants to purchase 39,735 shares of common stock with the same terms to a financial advisor." This statement, which referred to DaVinci, was false. DaVinci was not a financial advisor. DaVinci was a company controlled by the Newmans and this payment was simply of way of funneling additional compensation to the Newmans.

86.     Similarly, on March 29, 2002, Xybernaut filed a Form S-3 in connection with a PIPE transaction with three entities, including Yeshua Investments Limited, an entity controlled by the Israeli Investor Group.  On April 12, 2002, Weisberg directed the transfer of $100,000 of the money from this private placement to Edward Newman's personal bank account. The Form S-3 did not disclose the payment to Edward Newman.

87.     Weisberg and Edward Newman concealed the $100,000 payment in subsequent filings.  In Xybernaut's Form 10-Q for the period ended March 31, 2002 ("March 2002 Xybernaut Form 10-Q"), Xybernaut disclosed that in connection with the PIPE transaction, "the Company also paid $270,000 in cash to financial advisors."  This statement was false and misleading because Edward Newman was not a "financial advisor" and he had received $100,000 of the $270,000 purportedly paid to the financial advisors.  Weisberg prepared and Edward Newman signed the March 2002 Xybernaut Form 10-Q.

88.     Xybernaut's Form 10-K for the period ended December 31, 2002 (filed on March 28, 2003) and its Form 10-Q for the period ended March 31, 2003 (filed on May 15, 2003) contained the same misstatement concerning the $270,000 payment to "financial advisors." Weisberg prepared and signed and the Newmans signed the 2002 Xybernaut Form 10-K and the March 2003 Xybernaut Form 10-Q.

89.     At the time that they prepared and signed the March 2002 Xybernaut Form 10-Q, the 2002 Xybernaut Form 10-K, and the March 2003 Xybernaut Form 10-Q, Weisberg and the Newmans knew, or recklessly disregarded, that Edward Newman had received a $100,000 payment from the proceeds of the PIPE transaction.

## KICKBACKS TO STEVEN NEWMAN AND WEISBERG

90.     The Israeli Investor Group paid Steven Newman and Weisberg $4.1 million in undisclosed payments which encouraged the executives' complicity in hiding the existence of the Israeli Investor Group and also ensured access to future PIPE transactions at advantageous terms (including no prohibition against short selling).  During 2003 and 2004, the Israeli Investor Group sent money from its domestic brokerage accounts in Brooklyn, New York to an account at Barclays Bank.  From the Barclays account, the Israeli Investor Group then sent $1.736 million and $1.463 million to Weisberg and Steven Newman, respectively.  In 2004, the Israeli Investor Group paid an additional $1 million to a foreign trust controlled by Steven Newman.

91.     The transfers to Weisberg and to Steven Newman were documented as loans from an entity controlled by Steven Newman's New Ember Trust.  In fact these were not actual loans and Steven Newman never repaid the New Ember Trust.  Naimer – part of the Israeli Investor Group as well as the trustee for the New Ember Trust – provided the loan documentation.

92.     The majority of the $4.1 million paid by the Israeli Investor Group to Steven Newman and Weisberg came from the proceeds of the Israeli Investor Group's sale of Xybernaut stock that it had received in the numerous PIPE transactions.

93.     During the relevant period, Item 404 of Regulation S-K required issuers to disclose "related party transactions" in Forms 10-K and proxy filings.  Related party transactions were defined as transactions in which the issuer was a party, where the amount involved exceeded $60,000, and a director, officer, or beneficial owner of more than 5% of the issuer's stock had or would have had a direct or indirect material interest.

94.     As a result of these payments from the proceeds of Xybernaut's stock sales, Weisberg and Steven Newman had an interest in the Israeli Investor Group's investments in

34

Xybernaut.  Therefore, the PIPE transactions in which the Israeli Investor Group invested (between August 2003 and December 2004) should have been disclosed as related party transactions in Xybernaut's corporate filings.  No Xybernaut filing ever disclosed Weisberg and Steven Newman's receipt of the payments or their interests in the PIPE transactions.

95.     For example, on April 26, 2004, Xybernaut filed an amended Form 10-K for the year ended December 31, 2003 that contained a section regarding related party transactions.  The filing, however, did not disclose that virtually all of the Xybernaut stock issued during 2003 went to the Israeli Investor Group, which, in turn, transferred at least $3.1 million to Weisberg and Steven Newman for their personal use.  Weisberg prepared this amended 2003 Xybernaut Form 10-K, which Steven Newman and Edward Newman signed and certified.

96.     At the time, Weisberg and the Newmans knew, or recklessly disregarded, that the 2003 Xybernaut Form 10-K did not disclose Weisberg and Steven Newman's interest in the Israeli Investor Group's investments in Xybernaut.

## RAMP RAISES FUNDS IN PRIVATE PLACEMENTS

97.     Like Xybernaut, Ramp had large operating losses.  In its Form 10-K for the year ended December 31, 2002 (filed on March 27, 2003), Ramp "reported net losses of $9,014,000,  $10,636,000  and $5,415,000 for the years ended December 31, 2002, 2001 and 2000, respectively."  The company further disclosed that its "products are in the development and early deployment stage and have not generated any revenue to date" and that it was "funding [its] operations through the sale of our securities" (i.e., PIPE transactions).

98.     Between December 2002 and December 2004, the Israeli Investor Group invested more than $21 million in PIPE transactions with Ramp, and in return received approximately 161 million shares of common stock, which represented approximately 63% of the stock issued by

Ramp during that period.  The strategy employed by the Israeli Investor Group with respect to Ramp was similar to the strategy it employed for Xybernaut.  The Israeli Investor Group invested in Ramp stock and warrants through nominee entities and shorted the stock in its Canadian brokerage accounts prior to the filing of the registration statements.  The Israeli Investor Group then covered its short positions with shares received in the PIPE transaction.

99.     Between February 2003 and August 2004, Ramp filed with the Commission six registration statements on Forms S-3 (and amendments thereto) registering the resale of the 161 million shares of common stock issued to Saltsman and Eitan's 13 nominees (Cavell Investments Ltd; Bertrade Overseas Ltd.; Brookside Financial Ltd; Pearl Ltd.; Canary Point Ltd.; Firewall Universal Ltd.; Green Meadow Finance, Ltd.; Hazel Investments Ltd.; Sycamore Properties Ltd.; Canon Ventures, Ltd.; Hilltop Services, Ltd.; Cottonwood, Ltd.; and Willow Bend Management, Ltd.).  Many of these entities were Turks & Caicos companies that Naimer had formed through the offshore management company and whose nominee director was an employee of the management company.  The other entities were Anguillan and BVI companies whose listed control persons were Granot employees (including the receptionist).

100.     The Forms S-3 were all false or misleading because each stated that the nominee director of the entity was "the only natural person having voting or dispositive power" over the shares of common stock and warrants.  In fact, the Israeli Investor Group held voting and dispositive control over the shares.  Weisberg prepared Ramp's Forms S-3 and Brown signed them.  At the time, Weisberg and Brown knew, or recklessly disregarded, that the Israeli Investor Group had dispositive and voting control over the Ramp securities sold in the PIPE transactions and not the nominee directors.  Brown knew this to be the fact because he was negotiating with

Saltsman and Eitan and the nominee directors had no involvement.  Indeed, Brown stated to
Weisberg in a July 13, 2004 email that the various nominee entities were not independent.

### BROWN RECEIVES A CASH PAYMENT FROM SALTSMAN AND EITAN

101.    In 2003, Saltsman and Eitan paid Brown $50,000 in cash to ensure access to
future PIPE transactions at advantageous terms.  Saltsman and Eitan gave Brown the $50,000
around the time that Saltsman and Eitan were negotiating with Brown the terms of a Ramp PIPE
investment.  Brown did not disclose the receipt of the cash to Ramp until May 2005.

102.    Ramp's Code of Business Conduct and Ethics, which was attached to Ramp's
Form 10-K for the period ended December 31, 2003 ("2003 Ramp Form 10-K"), required all
employees to disclose any actual or apparent conflicts of interest and prohibited any officer or
director from accepting any gift from anyone transacting business with the company if there was
a likelihood that it was intended to influence the individual's judgment in acting for the
company.

103.    The 2003 Ramp Form 10-K, which Brown signed, described the various PIPE
transactions during 2003 and the first three months of 2004.  However, it did not disclose
Brown's receipt of the cash and/or the interest that Brown had in those PIPE investments in 2003
and the first three months of 2004.  At the time, Brown knew, or recklessly disregarded, that the
2003 Ramp Form 10-K did not disclose his interest in PIPE investments in Ramp.

### WEISBERG LIED TO THE COMMISSION ABOUT THE RAMP DEALS

104.    In April, May, and June 2003, Ramp entered into three PIPE transactions, raising
a total of $1.85 million ("PIPEs #1, #2, and #3"), of which the Israeli Investor Group invested
$1.55 million.  In June 2003, Ramp filed a Form S-3 ("June 2003 Form S-3") registering the
resale of the Ramp stock issued in connection with PIPEs #1, #2, and #3.  On July 29 and

September 11, 2003, while the June Form 2003 S-3 was still pending (i.e., before the Commission declared it effective), Ramp entered into two additional PIPE transactions totaling $1.4 million (PIPEs #4 and #5). The Israeli Investor Group invested an additional $1.25 million in PIPEs #4 and #5.

105. On September 22, 2003, Ramp received a comment letter regarding the June 2003 Form S-3 from the Commission staff ("September 22nd Comment Letter") asking: (1) whether Ramp had engaged in any additional offers of its securities other than PIPEs #1, #2, and #3; and (2) how any additional offers would affect Ramp's reliance upon Section 4(2) of the Securities Act, which exempts certain offerings from registration.

106. The following day, Weisberg met with, among others, Brown, Saltsman, and Eitan to discuss the September 22nd Comment Letter. Weisberg confirmed to the group that PIPEs #4 and #5 violated Section 5 of the Securities Act. Weisberg then suggested that Ramp rescind and terminate PIPEs #4 and #5 and issue promissory notes in their place.

107. On September 29, 2003, Weisberg sent a letter to the Commission staff in response to the September 22nd Comment Letter in which Weisberg falsely stated that Ramp had not engaged in any offering of its securities while the June 2003 Form S-3 was pending ("September 29th Letter"). Weisberg wrote that the "company has not made, and is not making, any offers of its securities during the pendency of the Registration Statement. The company is aware of and understands the restrictions imposed under the Securities Act of 1933 on private offerings of securities by an issuer while an issuer has a registration statement on file with the Commission." This statement was false because, in fact, Ramp offered and sold securities during the pendency of the registration statement. Weisberg knew, or recklessly disregarded, that his September 29th Letter contained false statements.

108.     Weisberg made the false statements to help Saltsman, Eitan, and Naimer with whom Weisberg had longstanding personal and financial relationships.  At the time of the September 29th Letter, the Israeli Investor Group had significant short positions of Ramp stock that it needed to cover with newly-registered stock.  On October 17, 2003, after the Commission staff received Weisberg's September 29th Letter, the Commission declared the June 2003 Form S-3 effective.

### WEISBERG MISLED RAMP'S AUDITOR ABOUT THE PIPE TRANSACTIONS

109.     Between October 31 and November 3, 2003, Ramp entered into termination agreements with the investors in PIPEs #4 and #5 and issued $1.4 million in promissory notes to those investors to account for the funds raised in PIPEs #4 and #5.  Both the termination agreements and promissory notes were backdated to September 30, 2003 to account for Ramp's receipt of funds in the third quarter of 2003.

110.     On November 7, 2003, an accountant from Ramp's auditor emailed Weisberg and asked him for a legal opinion regarding the rescission and termination of PIPEs #4 and #5.  That accountant told Weisberg that he believed Ramp should disclose to the Commission and AMEX the decision to rescind PIPEs #4 and #5 and replace them with new promissory notes.  On November 10, 2003, Weisberg wrote a letter to Ramp's auditor acknowledging that Ramp entered into PIPEs #4 and #5 in July and September 2003.  Weisberg wrote that PIPEs #4 and #5 violated Section 5 of the Securities Act and that Weisberg advised Ramp to rescind and terminate PIPEs #4 and #5 on or before September 30, 2003.  Weisberg further wrote that Ramp, on Weisberg's advice, had entered into termination agreements with the investors on September 30, 2003 and that Ramp was not required to notify the Commission or the AMEX about the existence of PIPEs #4 and #5.

111.    Weisberg's November 10, 2003 letter falsely stated that Ramp entered into termination agreements with the investors on September 30, 2003.  In fact, Ramp did not enter into the termination agreements until at least October 31, 2003.  Weisberg's letter did not disclose that the termination of PIPEs #4 and #5 was backdated.

## RAMP MISREPRESENTED PIPES #4 AND #5 IN ITS QUARTERLY FILING

112.    In its Form 10-Q for the period ended September 30, 2003 ("September 2003 Ramp Form 10-Q"), Ramp omitted and misrepresented facts concerning the rescission and termination of PIPEs #4 and #5.  Weisberg prepared the disclosure language regarding PIPEs #4 and #5 for the September 2003 Ramp Form 10-Q, which Ramp filed on November 14, 2003.  In particular, Ramp disclosed the following in its September 2003 Form 10-Q:

> On September 30, 2003, the Company issued an aggregate of $1,400,000 of promissory notes (the "Notes"), with an 18-month term and bearing interest at a rate of 10% per annum.  The Notes were issued in exchange for $1,400,000 of outstanding 7% convertible debentures previously issued by the Company in an offering to non-US investors.  The holders of these debentures consented to the exchange when it was determined that, under the rules of the American Stock Exchange, stockholder approval was required before the Company could honor requests to convert these debentures into shares of the Company's common stock.  Therefore, the Company accounted for the Notes in lieu of the debentures.

113.    This was false and misleading because it did not disclose that Ramp had entered into PIPEs #4 and #5 in July and September 2003, while the June 2003 Form S-3 was still pending, and because Ramp, in fact, did not issue the promissory notes until after October 31, 2003.  Ramp's false disclosure, which hid its violation of Section 5 of the Securities Act, was qualitatively material because reasonable investors would believe it important to know that the company was not violating the law in its financing efforts.

114.    At the time, Weisberg knew, or recklessly disregarded, that the language in the September 2003 Ramp Form 10-Q was false and misleading.

## WEISBERG AND BROWN MADE MISLEADING STATEMENTS ABOUT THE
## ISRAELI INVESTOR GROUPS' CONTROL OVER RAMP'S BOARD OF DIRECTORS

115.    In March 2004, the Israeli Investor Group, acting through its nominee Hilltop

Services Ltd., invested $5 million in a Ramp PIPE transaction.  Also in March 2004, Brown

informed Saltsman and Eitan that Ramp's Board of Directors intended to remove him as

President.  Shortly thereafter, the Israeli Investor Group (through Hilltop) threatened to rescind

the investment unless Ramp met its demands regarding Brown and the composition of Ramp's

Board.

116.    On March 25, 2004, Weisberg wrote a memorandum to Ramp's Board outlining

Hilltop's demands: (1) the resignations of Ramp's three independent Board members; (2) the

appointment of two new board members as Hilltop's nominees; and (3) that Ramp retain Brown

as its President with a two-year employment agreement.  At the time Weisberg drafted the March

25, 2004 memorandum, he knew that Hilltop owned more than 5% of Ramp's stock and that the

Israeli Investor Group had not filed any beneficial ownership disclosures with the Commission.

117.    On March 29, 2004, Brown certified Board resolutions that the above actions

would be taken by Ramp.  On April 1, 2004, in a letter from the Israeli Investor Group's counsel

to Weisberg, Hilltop withdrew its demand for rescission of the $5 million investment.

118.    On April 14, 2004, Ramp filed its 2003 Ramp Form 10-K, which stated that

Ramp reduced its number of Board members in order to "avoid the possibility of a deadlocked

Board with an evenly split vote."  The 2003 Ramp Form 10-K also stated, "[a]t the time of such

change, [the company's three independent directors] indicated their intention to resign from our

Board . . . ."  The statements were false and misleading because, in reality, the independent

directors were forced to resign by the Israeli Investor Group.

41

119.    Weisberg prepared and reviewed and Brown signed and reviewed the 2003 Ramp Form 10-K.  At the time, Brown and Weisberg knew, or recklessly disregarded, that the 2003 Ramp Form 10-K contained false statements concerning the Board members' resignations.

**THE ISRAELI INVESTOR GROUP RECEIVED A
GRATUITOUS ISSUANCE OF STOCK**

120.    On August 20, 2004, Ramp filed with the Commission a Form S-3 registering the resale of the shares issued to Willow Bend Management, Ltd. and Cottonwood, Ltd. in connection with a July 2004 $4.2 million PIPE transaction  ("August 2004 Ramp Form S-3"). Both of these entities were nominees of the Israeli Investor Group.  In the August 2004 Ramp Form S-3, Ramp also disclosed that it issued additional securities to Hilltop Services Ltd. (the same Hilltop described above) pursuant to the anti-dilution rights that Hilltop had received as part of its $5 million PIPE transaction in March 2004.

121.    In fact, the Israeli Investor Group had forced Ramp to issue Hilltop over 24 million additional shares of Ramp common stock, 17 million additional warrants, and a $1.92 million convertible promissory note purportedly pursuant to the anti-dilution provision.

122.    The disclosure in the August 2004 Ramp Form, S-3 was misleading because it created the impression that Willow Bend and Cottonwood were separate and independent from Hilltop.  All three, in fact, were nominees of the Israeli Investor Group.  Weisberg prepared the August 2004 Ramp Form S-3, which Brown signed.

123.    Moreover, Ramp's issuance of the additional stock, warrants and convertible promissory note to Hilltop was unjustified and inappropriate.  An anti-dilution feature protects an investor from dilution resulting from subsequent issuances of stock to other investors at more favorable terms.  Here, however, the July $4.2 million investment did not properly trigger the anti-dilution feature because the Israeli Investor Group controlled all three entities (the two

42

investing entities, as well as Hilltop) and therefore, did not suffer from any dilution of its previous investment.

124.    Brown and Weisberg knew, or recklessly disregarded, that the issuance of securities to Hilltop was wrongful. On July 13, 2004, Brown sent Weisberg and another attorney an email in which he stated that the transaction was "highly troubling" because the investors were "not truly independent." Brown further stated that the transaction created "exposure as to the appropriateness of this transaction, and the independence (or should I say, interdependence) of all the parties." The Israeli Investor Group's counsel also cautioned about the appropriateness of the transaction. On July 9, 2004, the attorney emailed Weisberg that "the idea of paying hilltop 1.92 mm for allowing a 5mm deal strains the limits of the business judgment rule and is an invitation to litigation [against the Company and its directors]."

125.    Ramp's Form 10-Q for the period ended September 30, 2004, which Brown certified and the company filed on November 15, 2004, described the issuance of stock to Hilltop and similarly misrepresented that Hilltop and Willow Bend and Cottonwood were independent and that Hilltop's anti-dilution provision was properly triggered as a result of subsequent investments by Willow Bend and Cottonwood.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

126.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 125.

127.    Each Defendant, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:  (a) employed devices, schemes

or artifices to defraud; (b) obtained money or property by means of untrue statements of material

fact or omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; or (c) engaged in transactions,

practices or courses of business which operated or would have operated as a fraud or deceit upon

purchasers of securities.

128.    By reason of the foregoing, each Defendant, singly or in concert, directly or

indirectly, have violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(All Defendants)**

129.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 128.

130.    Each Defendant directly or indirectly, knowing or recklessly, by use of the means

or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities

exchange, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of

a material fact or omitted to state a material fact, necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; or (c) engaged

in acts, transactions, practices, or courses of business which operated or would operate as a fraud

or deceit upon persons, in connection with the purchase or sale of securities.

131.    By engaging in the conduct alleged above, each Defendant violated Section 10(b)

of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 5(a), 5(b)(2) and 5(c) of the Securities Act**
**(Saltsman and Eitan)**

132.    The Commission realleges and incorporates by reference each and every

44

allegation contained in paragraphs 1 through 131.

133.    Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c),

prohibit any person from offering or selling a security through interstate commerce unless a

registration statement is in effect as to such offer or sale.

134.    Section 5(b)(2) of the Securities Act, 15 U.S.C. § 77e(b)(2), prohibits the sale or

delivery of securities without the delivery of a prospectus.

135.    During the time Saltsman and Eitan sold Ramp and Xybernaut stock short ahead

of the effective date of the registration statements, no registration statement was in effect for the

offer or sale and no exemption from registration existed.  Moreover, Saltsman and Eitan failed to

deliver a prospectus in connection with those sales.

136.    By reason of the foregoing, Saltsman and Eitan violated and, unless enjoined, will

continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c),

and Section 5(b)(2) of the Securities Act, 15 U.S.C. § 77e(b)(2).

## FOURTH CLAIM FOR RELIEF
### Violation of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder
### (Saltsman and Eitan)

137.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 136.

138.    Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(a), and Rule 13d-1, 17

C.F.R. § 240.13d-1, thereunder require that any person or a group of persons that acquires

directly or indirectly, beneficial ownership of more than 5% of a company's class of stock

registered under Section 12 of the Exchange Act, must notify the issuer and the Commission

within 10 days of the acquisition.  Exchange Rule 13d-2, 17 C.F.R. § 240.13d-2, requires that the

person notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership.

139.    Saltsman and Eitan failed to notify the Commission that they, as a group, controlled more than 5% of Ramp and Xybernaut common stock.

140.    By reason of the foregoing, Saltsman and Eitan violated and, unless enjoined, will continue to violate Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13d-1 and 13d-2 thereunder, 17 C.F.R. §§ 240.13d-1 and 240.13d-2.

### FIFTH CLAIM FOR RELIEF
### Violation of Section 16(a) of the Exchange Act and Rule 16a-3 thereunder
### (Saltsman and Eitan)

141.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 140.

142.    Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3, 17 C.F.R. § 240.16a-3, thereunder require that any person that directly or indirectly beneficially owns more than 10% of a company's class of stock registered under Section 12 of the Exchange Act, or who is an officer or director, shall notify the Commission within ten days after the person becomes such beneficial owner, director, or officer.  Additionally, Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), requires that if there has been a change of such ownership during a month, the reporting persons shall file with the Commission a statement indicating their ownership at the end of the calendar month and the changes in that ownership that occurred during the month. Exchange Act Rule 16a-3, 17 C.F.R. § 240.16a-3, requires that initial statements of beneficial ownership be filed on Form 3, and that statements of changes in beneficial ownership be filed on Form 4.

143.     As noted above, at various times, Saltsman and Eitan owned more than 10% of

Xybernaut stock.  As such, they were obligated to file a Form 3 within ten days of becoming

owners of 10% of the company's stock, and a Form 4 for any changes in their beneficial

ownership.  They failed to make any filings under Section 16(a) to conceal their ownership and

sale of Xybernaut stock from the investing public.

144.     By reason of the foregoing, Saltsman and Eitan violated and, unless enjoined, will

continue to violate Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3

thereunder, 17 C.F.R. § 240.16a-3.

## SIXTH CLAIM FOR RELIEF
### Violation of Exchange Act Rule 13a-14
### (Edward Newman, Steven Newman, Brown)

145.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 144.

146.     Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), requires companies filing

reports with the Commission to file reports that do not contain untrue statements of material fact

or omit material facts necessary to make the statements made, in light of the circumstances in

which they were made, not misleading.  Rule 13a-14, 17 C.F.R. § 240.13a-14, requires the

principal executive officer and principal financial officer of the company to sign a certification that

the report does not contain any untrue statement of material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances in which such statements

were made, not misleading.

147.     Steven Newman, Edward Newman, and Brown signed Xybernaut and Ramp

filings, respectively, certifying the filings did not contain any untrue statements of material fact

or omit to state a material fact necessary to make the statements made, in light of the

circumstances in which the statements were made, not misleading.  Those Forms 10-K and Forms 10-Q contained false statements and omissions of material facts.

148.    By reason of the foregoing, Steven Newman, Edward Newman, and Brown violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

### SEVENTH CLAIM FOR RELIEF
**Aiding and Abetting Violation of Section 13(a)**
**of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder**
**(Edward Newman, Steven Newman, Weisberg, Brown)**

149.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 148.

150.    Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), imposes liability upon "any person that knowingly provides substantial assistance" to another violator of the Exchange Act. During the relevant time period, the Steven Newman, Edward Newman, Weisberg, and Brown actively participated in and controlled Xybernaut's or Ramp's management and operations. They each signed corporate filings and knew or were reckless in not knowing that the filings contained false and misleading information.  Therefore, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), they each are liable for aiding and abetting the companies' violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

151.    By reason of the foregoing, Steven Newman, Edward Newman, Weisberg and Brown aided and abetted violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder(Weisberg)

152.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 151.

153.    The Exchange Act and the rules promulgated thereunder prohibit any person from soliciting any proxy or consent, in respect of any registered security, by means of any proxy statement or other communication containing any untrue statement of material fact or omitting to state a material fact.

154.    By reason of the foregoing, Weisberg, aided and abetted violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Exchange Act Rule 14a-9, 17 C.F.R. §240.14a-9.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Enter a final judgment of permanent injunction permanently restricting and enjoining the Defendants (with the exception of Saltsman who is already enjoined), and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §§ 240.10b-5.

### II.

Enter a final judgment of permanent injunction permanently restricting and enjoining Eitan, and his agents, servants, employees, attorneys, attorneys in fact, and those persons in

active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Sections 5(a), 5(b)(2), and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(b)(2), and 77a(c), and Sections 13(d) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78m(d) and 78p(a), and Rules 13d-1, 13d-2, and 16a-3, 17 C.F.R. §§ 240.13d-1, 240.13d-2, and 240.16a-3.

III.

Enter a final judgment of permanent injunction permanently restricting and enjoining Weisberg, and his agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9.

IV.

Enter a final judgment of permanent injunction permanently restricting and enjoining Edward Newman, Steven Newman, Weisberg, and Brown, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

V.

Enter a final judgment of permanent injunction permanently restricting and enjoining Edward Newman, Steven Newman and Brown, and their agents, servants, employees, attorneys, attorneys in fact, and those persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

## VI.

Enter a Final Judgment ordering the Defendants to disgorge an amount equal to the funds and benefits that they obtained illegally as a result of the violations alleged herein, plus prejudgment interest.

## VII.

Enter a Final Judgment ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Enter a Final Judgment pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. §78u(d)(2), permanently prohibiting Edward Newman, Steven Newman, Weisberg, and Brown from serving as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act, 15 U.S.C. §78l, or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. §78o(d).

IX.

Grant such other and further relief as the Court may deem just and appropriate.

Dated:  March 23, 2015
New York, New York

Andrew M. Calamari
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street
New York, New York 10281-1022
(212) 336-0080 (Brody)

Of Counsel:
Amelia A. Cottrell
Todd D. Brody
Gerald A. Gross
Daphna A. Waxman