UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

SECURITIES AND EXCHANGE
COMMISSION,

                      Plaintiff,

       -against-

ZEV SALTSMAN, MENACHEM EITAN,
MARTIN E. WEISBERG, EDWARD G.
NEWMAN, STEVEN A. NEWMAN, and
ANDREW BROWN,

                    Defendants.

------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-4370 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is Defendant Steven Newman's ("Defendant") Motion to Dismiss the

Amended Complaint and, in the alternative, to strike portions of the Amended Complaint. (See

Mot. to Dismiss (Dkt. 103).) For the reasons stated below, the Motion is GRANTED IN PART

and DENIED IN PART. Specifically:

- Defendant's Motion to Dismiss Counts One and Two is DENIED except for the claims related to the stock loans and the payments to Edward Newman. With respect to the those claims, the SEC is granted leave to amend;

- Defendant's Motion to Dismiss Count Six is DENIED;

- Defendant's Motion to Dismiss Count Seven is DENIED;

- Defendant's Motion to Dismiss under the statute of limitations is DENIED; and

- Defendant's Motion to Strike is DENIED.

## I.    BACKGROUND

### A.    Allegations

Plaintiff the Securities and Exchange Commission (the "SEC") alleges the following facts in its Amended Complaint. At this stage, the court treats all of the SEC's allegations as true. Broadly, the Amended Complaint concerns certain transactions between Xybernaut, a publicly traded company that produced wearable computers (Am. Compl. (Dkt. 73) ¶ 22), and a group of investors Zev Saltsman, Menachem Eitan, and Richard Naimer (the "Israeli Investor Group") who sought to purchase Xybernaut securities. (Id. ¶ 1.) Between 2001 and 2004, the Israeli Investor Group purchased, through 21 nominees, more than 123 million shares of Xybernaut common stock through private investment in public equity ("PIPE") transactions,[1] at a cost of more than $67 million. (Id. ¶¶ 2, 3.) The SEC alleges that the Israeli Investor Group, along with certain directors and executives of Xybernaut, engaged in a scheme to defraud Xybernaut's shareholders. (Id. ¶ 4.)

This motion concerns the SEC's allegations against Steven Newman ("Defendant"). From August 1997 through May 2005, Defendant served as Xybernaut's Vice-Chairman of the Board of Directors. (Id. ¶ 20.) From January 2003 until April 2005, Defendant also served as Xybernaut's president and COO. (Id.) Defendant was principally involved in raising capital for Xybernaut and directing the company's press releases. (Id.)

The SEC alleges that Defendant joined the Israeli Investment Group's scheme to defraud Xybernaut's shareholders in a number of ways. Broadly, the SEC alleges that Defendant hid the

---

[1] A PIPE transaction is a private sale of securities in a public company to a limited group of investors, at a discount to current market value. (Am. Compl. (Dkt. 73) ¶ 2.) It is a direct investment in the company, in which the proceeds of the investment go directly to the company and the investor receives securities issued directly from the company. (Id.)

Israeli Investor Group's true identity from Xybernaut's shareholders, hid the material terms of a number of the Israeli Investor Group's investments in Xybernaut from Xybernaut's shareholders, and received payments from the Israeli Investor Group for facilitating transactions between the Group and Xybernaut without disclosing those payments to Xybernaut's shareholders. Below, the court outlines the factual foundations for each scheme in which the SEC alleges that Defendant participated.

    1.  Allegations Concerning the Identity of Investors

   In connection with the PIPE transactions, Xybernaut filed several registration statements (and amendments thereto) registering the resale of the shares issued to the Israeli Investor Group. (Id. ¶ 4.) These registration statements were false and misleading because Defendant, along with other officers and directors of Xybernaut, concealed the fact that the Israeli Investor Group had control over the large blocks of shares that it purchased. Defendant did this by naming nominee entities and nominee directors as the control persons, even though he knew that the Israeli Investor Group had actual control over the shares. (Id. ¶¶ 4, 5.) The Israeli Investor Group would not have invested, or would have invested significantly less, if Xybernaut had required that their true names be disclosed as the owner of the shares. (Id. ¶ 5.)

   These registration statements, which were approved of and signed by Defendant,—along with other public filings and statements— gave the false impression that Xybernaut had been able to obtain financing from multiple "institutional investors," which would have demonstrated the company's vitality and future prospects. (Id. ¶ 6.) The identity of the owners of these large blocks of shares was material to long-term investors and prospective investors not only because the PIPE transactions would have significant dilutive effect on those investors' holdings, but also

because investment from "institutional investors" signaled a belief that Xybernaut had real promise. (Id. ¶ 7.)

However, the Israeli Investor Group was a group of individuals, not an "institutional investor." (Id. ¶ 49.) Moreover, the Israeli Investor Group was Xybernaut's primary—and for large periods of time, only—source of funding; and it was a short-term investor who was quickly liquidating its shares and short-selling[2] the company's stock. (Id. ¶ 6.) The Israeli Investor Group profited from this scheme by executing short sales in Xybernaut stock and by covering those short positions with newly registered PIPE shares, which it purchased at a significant discount to market price. (Id. ¶ 9.) In total, the Israeli Investor Group earned more than $39 million in profits from their trades in Xybernaut stock. (Id. ¶ 59.)

    2.    Stock Loans

Xybernaut conducted private placements of its shares with investors in PIPE transactions in order to continue its operations notwithstanding large annual operating losses during 1998 and 1999. (Id. ¶ 25.) To encourage the Israeli Investor Group to pursue these transactions, Defendant lent the Group Xybernaut shares that were either held in his name or in the names of trusts that he controlled, so that the Israeli Investor Group could short Xybernaut stock without depositing additional collateral. (Id. ¶ 9.) Specifically, the SEC alleges that in 2000, Defendant loaned 300,000 shares of Xybernaut stock to the Israeli Investor Group. (Id. ¶¶ 10, 60.) The Israeli Investor Group used the shares to cover its short positions in Xybernaut. (Id. ¶ 63.) The SEC reasons that because of this stock loan, Defendant had an interest in certain PIPE

---

[2] In a short sale, an investor borrows shares for the purpose of selling them at the current price, with the right to purchase the stock at a lower price. Accordingly, it represents a bet that the price of the stock will decrease.

transactions consummated in 2001 and 2002. (Am. Compl. ¶¶ 64-65.) However, no Xybernaut filings ever disclosed the stock loan.

### 3. Warrant Repricing

As part of many of the PIPE transactions, the Israeli Investor Group received Xybernaut warrants. (Id. ¶ 41.)[3] In July 2002, Xybernaut filed a Form S-3[4] regarding the sale of shares and warrants to Rema Investments Ltd. in a PIPE transaction. (Id. ¶ 66.) The same Form S-3 also disclosed that new warrants had been issued to Eva Holdings, Holly Investments, and Yeshua Investments as consideration for the exercise of warrants previously issued to those entities. (Id.) That description was misleading because, in fact, the issuance of the warrants to Eva, Holly, and Yeshua was related to the Rema financing. (Id. ¶ 67.) Indeed, the Israeli Investor Group negotiated the warrant repricing as a term of the Rema financing. (Id.) Moreover, the disclosure hid the fact that Eva, Holly, and Yeshua exercised their warrants at a lower price than they had been issued for. (Id. ¶ 68.)

### 4. Share Authorization

In 2004, Xybernaut had a funding crisis. (Id. ¶ 70.) However, the company could not engage in further PIPE transactions because it had already issued almost all of its authorized shares. (Id.) On November 1, 2004, Xybernaut issued a preliminary proxy statement announcing that the company would seek the approval of an amendment to the company's Certificate of Incorporation, which increased the number of authorized shares. (Id. ¶ 71.) Both Xybernaut's public filings and statements, including statements by Defendant, indicated that

---

[3] Warrants, as used here, were essentially options to purchase additional Xybernaut shares at a fixed price. (Id. ¶ 25.)

[4] A Form S-3 is a registration statement. (Am. Compl. ¶ 26.) The filing of Form S-3 was integral to the PIPE deals because it was needed before the Israeli Investor Group could resell the shares it received in the PIPE deals to the market. (Id.)

Xybernaut did not have a specific use planned for the new shares. (Id. ¶¶ 71-73.) Those representations were false; in fact, Xybernaut had actively sought, and received, financing from the Israeli Investor Group to use the newly issued shares in a PIPE transaction. (Id. ¶ 74, 76.)

### 5. December 2004 PIPE Transaction

In December 2004, Xybernaut and the Israeli Investor Group negotiated the terms of a new PIPE deal. (Id. ¶ 77.) The Israeli Investor Group asked for a large discount from the market price. (Id. ¶ 78.) Defendant responded that he could not give a discount greater than 20% without causing an adverse effect of Xybernaut's share price. (Id.) However, the Israeli Investor Group would not proceed with the transaction unless the discount rate was greater than 20%. (Id.) To reach an agreement, Defendant agreed to provide a 3.5% finder's fee to the Israeli Investor Group. (Id. ¶ 79.) This secret payment allowed Defendant offer an effective discount of more than 20% without disclosing this. (Id.) Indeed, Xybernaut did not disclose the finder's fee. (Id. ¶ 80.)[5]

### 6. Payment to Edward Newman

In 2002, Xybernaut filed a Form S-3 in connection with a series of PIPE transactions. (Id. ¶ 86.) The Form S-3 did not disclose that Edward Newman—Defendant's brother and Xybernaut's CEO and Chairman of the Board (Id. ¶¶ 19, 20)—had received a $100,000 payment in connection with the transactions. (Id.) And, Martin Weisberg—Xybernaut's securities counsel and a member of the Board (Id. ¶ 18)—and Edward Newman concealed the payment in subsequent filings. (Id. ¶ 87.)

---

[5] This was not the only time Xybernaut made payments to the Israeli Investor Group without disclosing the true nature of those payments. In 2002, Xybernaut paid Dune Holdings Ltd., an entity controlled by the Israeli Investor Group, for services that Dune never provided. (Id. ¶ 82.)

### 7. Payments to Defendant

Defendant also received monetary incentives from the Israeli Investor Group, which encouraged his complicity in hiding the existence of the Israeli Investor Group and ensured access to future PIPE transactions at advantageous terms. (Id. ¶ 10.) In July 2001, an entity named Da Vinci International Limited—which the Newmans controlled—received $120,000 in addition to Xybernaut warrants as a purported "finder's fee" in connection with a July 2001 PIPE transaction that included the Israeli Investor Group. (Id.) During 2003 and 2004, Newman received a payment of $1.463 million directly from the Israeli Investor Group. (Id. ¶ 90.) In 2004, the Israeli Investor Group paid an additional $1 million to a foreign trust that Newman controlled. (Id.) The majority of these payments came from the proceeds of the Israeli Investor Group's sale of Xybernaut stock that it received in the various PIPE transactions. (Id. ¶ 92.) The payments were never disclosed. (Id. ¶¶ 10, 93.)

### B.  Procedural History

The SEC commenced this action on October 19, 2007, over eight years ago. (Compl. (Dkt. 1).) On January 10, 2008, with the parties' consent, the Department of Justice ("DOJ") intervened in this action and moved to stay the proceedings due to the pendency of a parallel criminal case, United States v. Saltsman, No. 07-CR-641 (NGG) (E.D.N.Y.). (Mot. to Intervene and Stay (Dkt. 12).) The court granted the DOJ's motion to intervene, and also stayed Defendant's time to answer, move, or otherwise respond to the SEC's original Complaint. (Feb. 11, 2008, Order (Dkt. 23).)

Nearly five years later, on March 20, 2015, the SEC informed the court that the parallel criminal action had been resolved as to all Defendants—with the exception of Defendant Eitan, who remains a fugitive and might never be prosecuted—and requesting, with the consent of all

parties, that the stay be lifted. (Dkt. 72.) Accordingly, the court lifted the stay and reopened the case. (Mar. 20, 2015, Order (Dkt. 74).)

The SEC filed the Amended Complaint on March 23, 2015. Defendant now moves to dismiss the Amended Complaint.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). In reviewing a complaint, the court must accept as true all allegations of fact and draw reasonable inferences from the allegations in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a 'probability requirement,'" but requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[M]ere 'labels and conclusions' or 'formulaic recitation[s]' of the elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original) (quoting Twombly, 550 U.S at 555).

8

## B.    Pleading Fraud with Particularity

While securities complaints brought by the SEC are not governed by the Private

Securities Litigation Reform Act, they are subject to the heightened pleading standards imposed

by Federal Rule of Procedure 9(b) to the extent that they make allegations sounding in fraud.

See SEC v. Espuelas, 579 F. Supp. 2d 461, 469 (S.D.N.Y. 2008). Rule 9(b) requires that a party

state "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Id.

"[T]he relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken

for license to base claims of fraud on speculation and conclusory allegations." Shields v.

Citytrust Bancorp., 25 F.3d 1124, 1128 (2d Cir. 1994). Rule 9(b) requires plaintiffs to "allege

facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, 47

F.3d 47, 52 (2d Cir. 1995). "The requisite 'strong inference' of fraud may be established either

(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud,

or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior

or recklessness." Id.

Reckless conduct is "at the least, conduct which is highly unreasonable and which

represents an extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been aware of it."

Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). "[A]n egregious refusal to see the obvious

or investigate the doubtful, may in some cases give rise to an inference of recklessness." Id.; see

also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001) ("Where the complaint

alleges that defendants knew facts or had access to non-public information contradicting their

public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business."); In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) ("Allegations of defendants' knowledge of or access to contradictory information usually are sufficient to state a claim based on recklessness.").

## III.  DISCUSSION

### A.  First and Second Claims for Relief

The First and Second Claims for Relief allege violations of Section 17a of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5.

#### 1.  Legal Standard

To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, a plaintiff must plead that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). "Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." Id.

#### 2.  Discussion

Counts One and Two of the Amended Complaint allege that Defendant violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act by making materially false or misleading statements in connection with the purchase or sale of securities. (See, e.g., Am. Compl. ¶¶ 126-28, 130-31.) The SEC alleges a number of false or misleading statements

10

made by Defendant in connection with a number of different transactions. Each of the SEC's theories is discussed below.

i.    Identity of Investors

The SEC first alleges that Defendant mislead investors by hiding the true identity of the Israeli Investor Group. The SEC maintains that Defendant accomplished this task by stating that Xybernaut had received investments from multiple "institutional investors," disclosing that investments were coming from nominee companies controlled by nominee directors, and failing to disclose that the Israeli Investor Group actually controlled each entity investing in Xybernaut. Thus, according to the SEC, Defendant "actively helped the Israeli Investor Group hide its interest" in Xybernaut. (Id. ¶ 4.)

a.    Disclosure of Beneficial Holders

Defendant first argues that Counts One and Two fail to state a claim because "[n]o statute or regulation required [Defendant] to research and disclose the 'beneficial holders' of Xybernaut securities." (Def.'s Mem. (Dkt. 103-1) at 11.) Defendant argues that absent such a duty, the Forms S-3 that he signed could not be misleading, because "Xybernaut's filings did what Item 507 of Regulation S-K . . . required—identified the persons who had voting and/or dispositive control over the shares issued in PIPE transactions." (Id. at 10.)[6] The SEC responds

---

[6] Item 507 provides:

> If any of the securities to be registered are to be offered for the account of security holders, name each such security holder, indicate the nature of any position, office, or other material relationship which the selling security holder has had within the past three years with the registrant or any of its predecessors or affiliates, and state the amount of securities of the class owned by such security holder prior to the offering, the amount to be offered for the security holder's account, the amount and (if one percent or more) the percentage of the class to be owned by such security holder after completion of the offering.

17 C.F.R. § 229.507.

that Defendant's "argument is a red herring," noting that "[t]he Amended Complaint specifically alleges that Defendant knew that Saltsman, Eitan, and Naimer (and not the nominee directors) had dispositive and voting control over the Xybernaut securities at issue in the PIPE transactions or was reckless in not knowing this fact." (SEC Mem. (Dkt. 103-8) at 13.) ) Thus, the SEC claims that regardless of whether Item 507 (or any other statute or SEC rule) requires the disclosure of beneficial holders of securities, the Forms S-3 at issue here required the disclosure of the Israeli Investor Groups' ownership. (Id.)

The SEC is correct. Although Defendant frames the issue as a legal question about whether Item 507 requires the disclosure of beneficial holders, both parties largely agree on the scope of Item 507. Both parties explicitly argue that Item 507 requires the disclosure of persons who have voting and/or dispositive voting control over the shares at issue. (Compare Def.'s Mem. at 10 ("The SEC does not dispute that Xybernaut's filings did what Item 507 of Regulation S-K, 17 C.F.R. § 229.507, on its face, required—identified the persons who had voting and/or dispositive control over the shares issued in PIPE transactions." (emphasis added); Def.'s Reply (Dkt. 103-15) at 3 ("Before Xybernaut conducted PIPE transactions, it filed Forms S-3 that furnished the information required by Item 507 of Regulation S-K about the investors who would buy and potentially resell shares. Item 507 required Xybernaut to 'name each such security holder.' Xybernaut's Form[s] S-3[] accurately named the persons 'holding voting and/or dispositive control over the shares.'" (internal alteration omitted) (emphasis added), with SEC Mem. at 13-14 ("The Amended Complaint specifically alleges that Defendant knew that Saltsman, Eitan, and Naimer (and not the nominee directors) had dispositive and voting control over the Xybernaut securities . . . or was reckless in not knowing this fact. . . . Simply put, Defendant's disclosure of the nominees alone as 'the persons who had voting and/or dispositive

12

control over the shares' was misleading on its face.") (emphases added).) Thus, the parties' dispute is not about whether Item 507 requires the disclosure of beneficial holders, but rather concerns whether the Amended Complaint adequately alleges that the Israeli Investor Group had ultimate voting authority over the shares issued pursuant to the Forms S-3.[7]

Paragraph 39 of the Amended Complaint states:

> From 2001-2004, the Israeli Investor Group invested in numerous PIPE transactions with Xybernaut, again hiding behind the names of nominee companies and directors. Naimer was in charge of forming

---

[7] Both the Complaint and the parties' briefing on this issue are obtuse. Defendant argues that Item 507 requires the disclosure of persons who possess voting and/or dispositive control over the shares at issue but never beneficial owners. The SEC counters that the court need not reach the issue of whether Item 507 reaches beneficial owners because it adequately alleged that Defendant knew that the Israeli Investor Group possessed voting and/or dispositive control over the shares at issue.

Therefore, each side appears to assume that there is some difference between a person who possesses voting and/or dispositive control over the shares and a person who is a beneficial owner of the shares. However, even the Amended Complaint appears to conflate voting and/or dispositive control and beneficial ownership. (See Am. Compl. ¶ 44 ("Each Form S-3 named the nominee directors as having voting and/or dispositive control over the shares even though Regulation SK and the guidance from the Commission's Division of Corporate Finance required the company to disclose the beneficial owners. The Defendants and Weisberg knew, or recklessly disregarded, that Saltsman, Eitan, and Naimer had dispositive and voting control over the Xybernaut securities issued in the PIPE transactions.").

Turning to the SEC's regulations, there appears to be little difference between voting and/or dispositive control and beneficial ownership. The SEC's telephone guidance on Item 507 references Rule 13d-3 to define beneficial ownership for the purposes of Item 507. See S.E.C., Compliance & Disclosure Interpretations, Sec. 140, Question 140.02 (2013) ("The company must identify in the registration statement the person or persons who have voting or investment control over the company's securities that the entity owns. Use Rule 13d-3 by analogy to make the determination."). Rule 13d-3 defines beneficial owner for the purposes of Section 13(d) and (g) of the Exchange Act as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a).

Accordingly, looking to the Rule 13d-3 definition, beneficial holders include those with voting and/or dispositive power over the shares. See, e.g., CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 297 (2d Cir. 2011) (Winter, J. concurring) (framing the beneficial ownership inquiry as whether a party has investment or voting power over the shares at issue); S.E.C. v. Wyly, 117 F. Supp. 3d 381, 387 (S.D.N.Y. 2015) (same). Thus, there appears to be little difference, if any, between possessing voting and/or dispositive control over securities and being the beneficial owner of securities.

However, "[t]here appears to be no generally accepted or universal definition of the term 'beneficial owner.'" CSX Corp., 654 F.3d at 296 (2d Cir. 2011) (Winter, J. concurring). Perhaps then, Defendant's true position is that Item 507 never requires disclosure of the person possessing ultimate control over the securities at issue as long as the person with formal voting and dispositive control is disclosed. That is certainly an argument that Defendant could make. However, Defendant has not yet made this argument and the court will not decide the issue until it is adequately made and presented by the parties.

the entities and employed the services of a management company located in the Turks and Caicos Islands for this purpose. The offshore management company provided employees to serve as nominee directors. Those nominee directors exercised no actual authority or control over the entities or over the shares issued to those entities. Naimer also set up companies in several other countries (including Anguilla and the BVI) to be used as nominees and allowed employees of his law firm Granat (including a receptionist) to serve as directors. Again, the nominee directors who were Granat employees exercised no actual authority or control over the nominee entities or the shares. All decisions were made by Saltsman, Eitan, and Naimer on behalf of the Israeli Investor Group.

(Am. Compl. ¶ 39.) Likewise, the Amended Complaint alleges that "[t]he Defendants and

Weisberg knew, or recklessly disregarded, that Saltsman, Eitan, and Naimer had dispositive and

voting control over the Xybernaut securities issued in the PIPE transactions." (Id. ¶ 44; see also

id. ¶ 31 ("In November 1999, Xybernaut filed an Amended Form S-3, signed by [Defendant] and

Edward Newman, which falsely identified a nominee director as the control person for Crystalite

Investments. In fact, the entity was controlled by Saltsman."); id. ¶ 35 ("The transaction was

structured so that the investment was not made in the name of any of the members of the Israeli

Investor Group, but in the name of Dalston Holdings Ltd., a Turks & Caicos company, that had

been created by Naimer. [Defendant] understood that the Israeli Investor Group controlled the

stock.").)

Defendant has not argued that Amended Complaint fails adequately to plead that the

Israeli Investor Group held "voting and/or dispositive control over the shares." (See Def.s'

Reply at 3 (setting forth Defendant's view on the reach of Item 507).) Instead, Defendant argues

only that Xybernaut's Forms S-3 accurately disclosed such persons. (Id.) That is a factual claim

not yet ripe for determination. Cf. S.E.C. v. Wyly, 117 F. Supp. 3d 381, 386-88 (S.D.N.Y. 2015)

(engaging in factual determination of whether a person had voting power or dispositive control

over shares). Certainly, Defendant is free to argue at the summary judgment stage that the

nominee directors exercised actual voting and/or dispositive control over the shares or that Defendant's disclosure was adequate. However, at this stage, the court cannot make such a determination. Accordingly, Defendant's argument premised on the claim that Item 507 does not require the disclosure of beneficial holders is rejected.

b. Institutional Investors

Defendant attacks the SEC's theory that many of the Forms S-3 were false because they stated that investors were "institutional investors," arguing that this theory fails to state a claim. (See Def.'s Mem. at 17-20.) Defendant argues that his disclosure cannot be false because there is no definition of "institutional investor." (Id. at 18-19.) The SEC disagrees, claiming that "the whole point of [the institutional investor] representation was to mislead investors to believe that there was serious institutional investor interest in the stock, not interest by a few short selling opportunists." (SEC Mem. at 17.) In any event, the SEC argues that at the motion to dismiss stage, drawing all inferences in favor of the SEC as the court must, the court can conclude that "reasonable investors would have understood the phrase 'institutional investor' to refer to actual institutions (such as banks, mutual funds, hedge funds, investment companies, insurance companies, pension plans)." The court agrees with the SEC.[8]

At the motion to dismiss stage, the court cannot undertake the necessarily factual inquiry to determine how a reasonable investor would understand the phrase "institutional investor." Importantly, the inquiry at this stage is whether the SEC has pleaded adequately that the "representations, viewed as a whole, would have misled a reasonable investor." Rombach v.

---

[8] In his Reply, Defendant also argues that the SEC has not pleaded that Defendant ever stated that the investors were "institutional investors." (Def.'s Reply at 5-6.) That is false. Defendant premises his argument on statements made on various conference calls. (Id.) However, the Amended Complaint specifically points to certain Forms S-3 that Defendant signed, as making the false representations concerning the "institutional investors." (Am. Compl. ¶¶ 49-50.) Thus, the SEC has alleged that Defendant made the false representations.

Chang, 355 F.3d 164, 178 n.11 (2d Cir. 2004). Therefore, the question is not whether some definition of "institutional investor" would render Defendant's statements literally true. Instead, the question is, whether a reasonable investor would have been misled by Defendant's statements. See S.E.C. v. Stratocomm Corp., No. 15-1538-CV, 2016 WL 3355378, at *1 (2d Cir. June 16, 2016) ("[U]ntrue assertions, ambiguous statements, and half-truths can render a statement misleading."); In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) ("Even assuming these statements were not literally false, the 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" (quoting Operating Local Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC, 595 F.3d 86, 92 (2d Cir. 2010))). Thus, the court rejects Defendant's argument that his statements could not have been false or misleading because there is no controlling definition of "institutional investor." While the court recognizes that the phrase "institutional investor" has different meaning in different contexts (see, e.g., Def.'s Mem. at 18-19 (surveying the Code of Federal Regulations for different meanings of "institutional investor")), the SEC need only plausibly allege that a reasonable investor would have understood "institutional investor" to preclude investment by three individual short-sellers.

Thus, at this stage the court considers only whether the Amended Complaint puts forth sufficient factual allegations from which the court could plausibly infer that a reasonable investor would have been misled by Defendant's statements. The court finds that it has.

Indeed, even Defendant concedes that certain uses of the phrase "institutional investor" exclude individual investors. (See Def.'s Mem. at 19.) Thus, at most Defendant's argument is that the phrase "institutional investor" could—or could not—include individual investors. That is, Defendant concedes that certain uses of the phrase "institutional investor" would not apply to

16

the Israeli Investor Group, which was comprised of three individual investors. When confronted with ambiguous disclosures at the motion to dismiss stage, courts in this circuit routinely deny the motion and instead wait for a factual record to develop regarding how a reasonable investor would have understood the disclosure. See, e.g., Levy v. Maggiore, 48 F. Supp. 3d 428, 445 n.11 (E.D.N.Y. 2014) ("To the extent that this word is ambiguous, the Court cannot say, at this early stage of the proceedings, that a reasonable investor would have understood it to mean what Defendants urge."); In re BioScrip, 95 F. Supp. 3d at 727. This approach makes sense. The court is not in a position at the motion to dismiss phase to assess how a reasonable investor would have understood the phrase "institutional investor." Indeed, Defendant's own briefing demonstrates that sophisticated securities market actors may use the phrase differently in different contexts. Because Defendant concedes that one use of the phrase "institutional investor" (exclusion of individuals) would have made his statements untrue, and the Amended Complaint alleges that investors were actually misled (see, e.g., Am. Compl. ¶ 50), the court finds that the SEC's Amended Complaint plausibly alleges falsity.

c. Materiality of the Identity of the Investors

Defendant next makes two related arguments. First, he argues that "[e]ven if the [SEC's rules] were read to require [Defendant] to disclose the identities of the beneficial holders of Xybernaut securities, omission of those identities from the corporation's SEC filings was not material." (Def.'s Mem. at 15.) He reasons:

> The Israeli Investor Group's alleged control over the PIPE investing entities is simply immaterial. The amended complaint never contends that the PIPE terms themselves were unfair or fraudulent. It does not allege that [Defendant's] conduct affected Xybernaut's market price. It does not allege that investors in Xybernaut cared who provided the PIPE financing that kept an unprofitable corporation alive, why they provided it, or what they did with the shares they were issued. Lastly, the amended complaint never

17

> alleges that the PIPE agreements with the Israeli Investor Group
> were less favorable than Xybernaut could have negotiated with other
> PIPE investors, if any existed.

(Id. at 15-16 (emphasis in original).) Second, he argues that it was immaterial where he

disclosed that the investors were "institutional" because a reasonable investor would not have

taken to the term to imply anything about the investors. (Id. at 19-21.) The SEC responds that

by creating the impression that Xybernaut had received funding from multiple "institutional

investors," the company was able to create the impression that it was receiving investment based

on its viability and future prospects. (SEC Mem. at 21.) Such an impression was critical, the

SEC argues, because Xybernaut's investors were concerned that the PIPE transactions could

have a significant dilutive effect on their investments. (Id.)

As a preliminary matter, the court notes that "[d]etermination of materiality is a mixed

question of law and fact that the Supreme Court has stated is especially well suited for jury

determination." United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991). Thus, "when

presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed on the ground

that the alleged misstatements or omissions are not material unless they are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of

their importance." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (internal

quotation marks and alteration omitted). Thus, at this stage, the court asks only whether the

Amended Complaint plausibly alleges that a reasonable investor would have considered the

identity of the Israeli Investor Group material in making their investment decision. The court

finds that it has.

First, the court rejects Defendant's argument that the Amended Complaint fails to plead

materiality at all. (See Def.'s Mem. at 15-16.) To the contrary, the Amended Complaint does

18

exactly what Defendant says that it is required to do. That is, it alleges that Xybernaut investors

cared about (1) who provided PIPE financing; (2) why it was provided; and (3) what the PIPE

financiers did with their shares when issued. Specifically, the Amended Complaint alleges that

"[b]y characterizing the Israeli Investor Group as 'institutional investors,' the Defendants and

Weisberg were trying to convey to reasonable investors that the entities participating in the PIPE

transactions were long-term investors, which was not the truth." (Am. Compl. ¶ 50.) Next,

Amended Complaint asserts that, "these false statements were intended to give shareholders and

other investors the impression that serious long term investors saw significant long term value in

Xybernaut." (Id. ¶ 54.) Finally, Amended Complaint explains why a reasonable investor would

care about the identity of the PIPE investor:

> The identity of the beneficial owners of the large quantity of shares
> being sold in the PIPE transactions (in many cases greater than 5%
> of the outstanding shares) was material to long-term investors and
> prospective investors. These investors were concerned that the PIPE
> transactions were having a significant dilutive impact on their
> investments. The representations made by the Defendants,
> Weisberg, and Brown in the Forms S-3, periodic filings, press
> releases, and quarterly earnings calls, however, led reasonable
> investors to believe that the participants in the PIPE transactions
> were multiple institutions and long-term investors who, through
> their significant investments in the companies, expressed their belief
> that Xybernaut and Ramp had real promise and an ability to succeed
> in a challenging market. The Israeli Investor Group however, was
> the exact opposite; an opportunistic, short-term investor that was
> going to liquidate the millions of shares it had purchased. In
> addition, the Israeli Investor Group was a short seller whose trading
> activity could not only adversely impact the price of the stock but
> also increase the stock's volatility, driving away prospective long-
> term investors.

(Id. ¶ 7.) Therefore, the court finds that the Amended Complaint alleges materiality.

Defendant's second argument is that even assuming the Amended Complaint alleges

materiality, those allegations are not adequate. (Def.'s Mem. at 19-20.) Specifically, Defendant

argues that because PIPE transactions "by their very nature, create opportunities for short-selling," a reasonable investor "had to be aware of a substantial likelihood that the purchasers of newly-issued Xybernaut shares issued through a PIPE might be short sellers buying the stock at a significant discount." (Id. at 19-20.) In support of this argument, Defendant quotes Robert B. Thompson & Donald C. Langevoort, Redrawing the Public-Private Boundaries in Entrepreneurial Capital Raising, 98 Cornell L. Rev. 1573, 1601 (2013), who argue that:

> With the assistance of a placement agent, PIPE investors—which can be hedge funds, venture capital providers, or other kinds of institutional investors—bring knowledge and skill to bear in the private negotiation, leading to the discount from the prevailing market price at which the investors are willing to buy the securities. That discount is often sizable. To the extent practicable, the investors then hedge their risk by short selling the issuers' securities as soon as the PIPE deal is publicly announced.

(Def.'s Mem. at 11 (quoting Thompson & Langevoort, 98 Cornell L. Rev. at 1599-600).) Based on this description, Defendant reasons that no reasonable investor would care whether the PIPE buyers were institutions or individuals because they were likely to hedge their investments through short selling regardless.

However, the next sentence of the article indicates that reasonable investors do care about the identity of PIPE buyers: "Under the right conditions, the willingness of reputable investors to take on the risk is a positive signal about the otherwise financially challenged issuer." Thompson & Langevoort, 98 Cornell L. Rev. at 1600. Later, the authors explicitly argue that the identity of PIPE investors matters:

> What is missing [from the discussion about the proper regulation of PIPE transactions] is any serious exploration of when and how aggressively PIPE investors dispose of their shares after the effectiveness of the registration. If shares are held even after the effective date and only gradually dispersed into the public markets, we have less cause for concern; if they are dumped promptly via

> heavy broker-dealer marketing efforts, then we have more to worry
> about.
>
> The evidence suggests substantial variation, both over time and
> depending on the particular deal. Some PIPE investors are venture-
> capital funds that, while gaining the right to resell, tend to hold and
> engage in serious monitoring efforts while they remain invested.
> This behavior is typically a positive signal to the market and not
> surprisingly leads to a stock price increase upon announcement. The
> investors do their diligence, though perhaps not as much as when
> they are more tightly locked in to the investment. By contrast,
> ordinary hedge funds have no reputation for sticking around, and the
> stock price reaction to their presence as PIPE investors seems to be
> negative. Other deals with more reputable intermediaries probably
> fall in between.

Id. at 1602-03. Other literature is in agreement. See, e.g., Na Dai, Does Investor Identity

Matter? An Empirical Examination of Investments by Venture Capital Funds and Hedge Funds

in PIPEs, 13 J. Corp. Fin. 538, 561-62 (2007). Thus, looking just to the material cited by

Defendant, it is plausible that the identity of a PIPE investor could matter to a reasonable

investor because it signals to the market the relative strength of the PIPE company.

The materiality allegations in the Amended Complaint allege exactly such a signaling

effect. (See, e.g., Am. Compl. ¶ 7 ("The representations made by the Defendants, Weisberg, and

Brown in the Forms S-3, periodic filings, press releases, and quarterly earnings calls, however,

led reasonable investors to believe that the participants in the PIPE transactions were multiple

institutions and long-term investors who, through their significant investments in the companies,

expressed their belief that Xybernaut and Ramp had real promise and an ability to succeed in a

challenging market."). In fact, the Amended Complaint alleges that Xybernaut encouraged

investors to engage in precisely this type of reasoning. For example, in connection with a 2001

PIPE transaction, Edward Newman allegedly stated: "[A]s institutional investors continue to

show confidence in the company's future, we are also working with a number of sources to

21

provide additional strategic capital to fund our expected growth." (Am. Compl. ¶ 51 (alteration omitted).) This statement strongly suggests that Xybernaut was securing strategic capital, implying a belief in the company's future.[9] Thus, it appears that the SEC has adequately alleged a plausible theory of materiality.

The cases cited by Defendant do nothing to alter the court's conclusion. Indeed, each case Defendant cites stands for the general and unremarkable proposition that the identity of one party to a transaction is sometimes not material. See, e.g., Barnett v. Kirshner, 527 F.2d 781, 785 (2d Cir. 1975) ("Where there is a fiduciary relationship and the identity of the purchaser is material because the purchaser is aware of some fact which is unknown to the seller, then disclosure of his identity becomes necessary."); United States v. Bingham, 992 F.2d 975, 976 (9th Cir. 1993) ("[T]he government failed to prove that Bingham's lie about his identity created any real risk of loss for the brokers."); Manela v. Garantia Banking Ltd., 5 F. Supp. 2d 165, 175 (S.D.N.Y. 1998) ("[P]laintiffs point to no evidence supporting the possibility that knowledge of the seller's identity was relevant to the value of the securities or the consideration paid."); Geiger v. Solomon-Page Grp., Ltd., 933 F. Supp. 1180, 1187 (S.D.N.Y. 1996) ("Accordingly, under the circumstances of this case, particularly the nature of the underwriting, and in light of the information that was disclosed in the prospectus, the fact that the nine Unaffiliated Selling Shareholders were employed by Stratton is so obviously unimportant that reasonable investors would not differ on its lack of importance."). However, other cases clearly show that investor identity often is material. See, e.g., United States v. Bilzerian, 926 F.2d 1285, 1299 (2d Cir. 1991) ("It was not unreasonable for the jury to conclude that erroneously describing the source of funds as 'personal' was material, for it indicated the

---

[9] The court expresses no views as to whether Edward Newman's statement may be attributable to Defendant. Instead, the court simply uses the statement to demonstrate the plausibility of the SEC's materiality theory.

honesty and feasibility of Bilzerian's plans for the investment."); S.E.C. v. Levy, 706 F. Supp. 61, 72-73 (D.D.C. 1989) ("Accordingly, defendant's failure to reveal in his Schedule 13D and amendments thereto that his purchases of IDI stock were substantially funded by money borrowed from NBC constitutes a material omission."). Indeed, many of the cases upon which Defendant relies explicitly note that investor identity may be material, see, e.g., Kirshner, 527 F.2d at 785 n.5 (listing cases where investor identity was found to be material), and others have been subsequently distinguished where there is reason to believe that investor identity is material, see, e.g., S.E.C. v. Parnes, No. 01-CV-0763 (LLS) (THK), 2001 WL 1658275, at *8 (S.D.N.Y. Dec. 26, 2001) ("Here, unlike Manela, the identity of the buyer was material to whether the consideration would be accepted.").

Accordingly, the court finds that the Amended Complaint adequately alleges that the PIPE investors' identity was material.

ii.     Stock Loans

The SEC next alleges that Defendant misleadingly failed to disclose that certain PIPE transactions were related-party transactions.[10]  Specifically, the SEC alleges that in 2000, Defendant loaned 300,000 shares of Xybernaut stock to the Israeli Investor Group. (Am. Compl. ¶¶ 10, 60.) The Israeli Investor Group then used the shares to cover its short positions in Xybernaut. (Id. ¶ 63.) The SEC reasons that because of this stock loan, Defendant had an interest in certain PIPE transactions consummated in 2001 and 2002. (Am. Compl. ¶¶ 64-65.) However, no Xybernaut filings ever disclosed the stock loan, which made Xybernaut's filings misleading.

---

[10] As the court explains in more detail below, certain SEC rules require the disclosure of related-party transactions, that is, transactions between issuers and entities in which the issuer's officers and executives have interests.

Defendant argues that the SEC fails adequately to plead that Xybernaut's failure to disclose the PIPEs as related-party transactions violated the securities laws. Defendant makes two arguments. (Def.'s Mem. at 21-26.) First, he argues that he had no duty to make such a disclosure. (Id. at 21-25.) Second, he insists that, in any event, the stock loans were not material. (Id. at 26.) On this issue, the court agrees with Defendant.

### a. Item 404 Disclosure Theory

"Disclosure of related-party transactions is governed by Statement of Financial Accounting Standards ("FAS") No. 57 and Item 404 of Regulation S–K. FAS 57 requires disclosures of material related-party transactions. Item 404 requires disclosures of related-party transactions when the amount involved exceeds $[60],000, and in which any related person had or will have a direct or indirect material interest." S.E.C. v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 393-94 (S.D.N.Y. 2014) (internal citations and quotation marks omitted).

The SEC alleges that Defendant's duty to disclose the stock loans arose under 17 C.F.R. § 229.404 ("Item 404").[11] This provision requires issuers to:

> Describe briefly any transaction, or series of similar transactions, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, or series of similar transactions, to which the registrant or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any of the following persons had, or will have, a direct or indirect material interest, naming such person and indicating the person's relationship to the registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person's interest in the transaction(s):
>
> (1) Any director or executive officer of the registrant; . . .

---

[11] Item 404 has been amended since the relevant events in the Complaint. The court refers to Item 404 in the form in which it existed at the time of the transactions at issue.

17 C.F.R. §229.404. Thus, in relevant part, Item 404 requires disclosure where a registrant engages in a transaction in which an executive officer of the registrant has an indirect material interest in the transaction.

Item 404's instructions provide clarity on how to define an indirect material interest. Instruction One provides that "[t]he materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case. The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transactions are among the factors to be considered in determining the significance of the information to investors." 17 C.F.R. § 229.404. Instruction Eight exempts a number of transactions from disclosure:

> Paragraph (a) requires disclosure of indirect, as well as direct, material interests in transactions. A person who has a position or relationship with a firm, corporation, or other entity that engages in a transaction with the registrant or its subsidiaries may have an indirect interest in such transaction by reason of such position or relationship. Such an interest, however, shall not be deemed "material" within the meaning of paragraph (a) where: . . .
>
> The interest of such person arises solely from the holding of an equity interest . . . or a creditor interest in another person that is a party to the transaction with the registrant or any of its subsidiaries, and the transaction is not material to such other person.

17 C.F.R. § 229.404. Finally, Instruction Nine provides that "[t]here may be situations where, although these instructions do not expressly authorize nondisclosure, the interest of a person specified in paragraph[] (a)(1) . . . in a particular transaction or series of transactions is not a direct or indirect material interest. In that case, information regarding such interest and transaction is not required to be disclosed in response to this paragraph." 17 C.F.R. § 229.404.

The SEC explains its Item 404 disclosure theory as follows: (1) in 2000 and 2001, Defendant engaged in stock loans to the Israeli Investor Group in order to incentivize their

25

investment in Xybernaut through PIPE transactions (Am. Compl. ¶ 62); (2) thus, Defendant had indirect financial interests in the PIPE transactions; (3) because Defendant was an officer and director of Xybernaut, the PIPE transactions were related-party transactions; and (4) therefore, disclosure was required (see SEC Mem. at 25). Defendant objects to the second premise. He argues that his role in the PIPE transactions (from the Israeli Investor Group side) "seem much more akin to circumstances that Instruction 8 labels as immaterial." (Def.'s Reply at 10.)

As a preliminary matter, the analogy to Instruction Eight is not particularly helpful. Defendant suggests that his relationship with the Israeli Investor Group is akin to being "a director of another entity which is a party to the transaction" or having "limited ownership interests in such an entity." (Id. at 10-11.) Of course, as Defendant himself recognizes, neither of these descriptions accurately reflect Defendant's relationship with the Israeli Investor Group. Defendant was not a director of the Israeli Investor Group; indeed, he held no position in the Group at all. Likewise, Defendant did not have an ownership interest in the Group.

Instead, the SEC alleges that Defendant had "an interest" in the Israeli Investor Group's investment "[a]s a result of the[] stock transfers." (Am. Compl. ¶ 64.) That pleading fails for two independent reasons.

First, the SEC has failed to allege what material interest Defendant had in the 2000 and 2001 PIPE transactions. "Item 404(a) requires that a transaction involving a director or officer be reported only if the director or officer of the registrant has a material interest in the transaction[.]" Bond Opportunity Fund II, LLC v. Heffernan, 340 F. Supp. 2d 146, 158 (D.R.I. 2004). The Amended Complaint does not explain how the stock transfers gave Defendant any stake in the subsequent PIPE transactions. Instead, the Amended Complaint alleges that Defendant provided stock to the Israeli Investor Group so that the Group could cover

their short position hedges in future PIPE transactions. (Am. Compl. ¶ 62.) That is, Defendant facilitated future PIPE transactions by providing the Israeli Investor Group with alternative sources of collateral to cover the hedging strategy that the Group employed to make the PIPE transactions profitable. Such an allegation makes plain that Defendant wanted future PIPE transactions to occur, but it fails to allege that Defendant had a material interest in any future PIPE transactions. In other words, it does not allege any interest (other than the desire for Xybernaut to receive future funding) that Defendant had in the PIPE transactions at issue. Cf. Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (finding in the context of pleading scienter through showing motive and opportunity, that "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud"). Without an assertion of concrete and personal benefit to Defendant, the SEC has failed adequately to allege that the 2001 and 2002 PIPE transactions were related-party transactions.[12]

Second, the SEC does not specify which PIPE transactions were related-party transactions. While, the SEC lists all of the PIPE transactions (see Am. Compl. ¶ 41), and the date of the allegedly misleading statements (Am Compl. ¶¶ 64, 65), this does not explain which of these transactions were allegedly related-party transactions. For example, the SEC alleges that there were seven PIPE transactions between Xybernaut and the Israeli Investor Group in 2001 and 2002. Yet, the SEC does not allege which of these transactions should have been disclosed as related. Indeed, the SEC does not even say which transactions were influenced by

---

[12] The Amended Complaint alleges a number of facts from which the court could infer Defendant's material interest in continuing the PIPE transactions with the Israeli Investor Group in 2000 and 2001. These facts include: (1) Defendant was in charge of Xybernaut's financing (Am. Compl. ¶ 20); (2) Xybernaut needed capital (id. ¶ 25); (3) Saltsman and Defendant were friends (id. ¶ 48); and (4) a company controlled by Edward and Defendant received finder's fees in connection with the June 31, 2001, and July 31, 2001, PIPE transactions (id. ¶¶ 83, 85). However, the SEC has not alleged that these facts gave rise to Defendant having an indirect material interest in the PIPE transactions and, therefore the court has not considered such an argument.

27

the stock loans. Even at the motion to dismiss stage, this pleading is insufficient. See, e.g., In re Jiangbo Pharm., Inc., Sec. Litig., 884 F. Supp. 2d 1243, 1259 (S.D. Fla. 2012) ("By failing to state when the transaction occurred, Plaintiffs also fail to sufficiently allege that Defendants had a duty to disclose the transaction at the time they made the statements Plaintiffs challenge."), aff'd sub nom. Brophy v. Jiangbo Pharm., Inc., 781 F.3d 1296 (11th Cir. 2015).

### b. Affiliate Disclosure Theory

In a footnote, the SEC argues that "[t]he Amended Complaint provides a second reason why the stock loans needed to be disclosed. Because the Israeli Investor Group held more tha[n] 10% of the shares of Xybernaut," the Group was "an 'affiliate' of Xybernaut." (SEC Mem. at 24 n.15.) Accordingly, the SEC claims that the loans between Defendant and the Israeli Investor Group were related-party transactions. (See Id.) Defendant argues that this claim fails for two reasons. First, he claims that "[t]he word 'affiliate' appears nowhere in Item 404 and the SEC cites no precedent for holding [Defendant] liable on this basis." (Def.'s Reply at 11.) Second, he argues that "[a]s a matter of chronology, the SEC does not specify whether the 'beneficial owners' crossed the 10 percent threshold at the times of the filings that allegedly omitted related[-]party transactions." (Id.) The court agrees that the SEC has failed adequately to plead a claim under the affiliate-disclosure theory.

As a preliminary matter, transactions between affiliated entities may trigger disclosure requirements. Disclosure of related-party transactions is governed not just by Item 404 but also by FAS No. 57. See China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d at 393-94. FAS No. 57 "provides that a public company's '[f]inancial statements shall include disclosures of material related-party transactions.'" Lewy v. SkyPeople Fruit Juice, Inc., No. 11-CV-2700 (PKC), 2012 WL 3957916, at *18 (S.D.N.Y. Sept. 10, 2012). It defines "'related party transactions' to

28

include those between 'an enterprise and its principal owners, management, or members of their immediate families,' as well as those between a company and its 'affiliates.'" Id. And finally, it "defines 'affiliate' to mean 'a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise.'" Id.

However, the SEC has not asserted that the alleged related-party transactions occurred when the Israeli Investor Group was an affiliate of Xybernaut. Instead, the Amended Complaint alleges that Xybernaut and the Israeli Investor Group were affiliates at two times: August 30, 2002, and November 6, 2002. (Am. Compl. ¶ 41.) The stock loans both occurred before 2002. (Id. ¶ 10 (first stock loan in November 2000), ¶ 61 (second stock loan in October 2001).) Thus, the Amended Complaint does not even facially allege that the Israeli Investor Group was affiliated with Xybernaut when the stock loans took place. In addition, and as explained above, the SEC does not specify which PIPE transactions were related-party transactions and which were related to the stock loans. As such, the court cannot determine whether the Israeli Investor Group was affiliated with Xybernaut at the time of those transactions. Accordingly, the SEC has failed to adequately plead the affiliate-disclosure theory.

For the reasons stated above, the court dismisses without prejudice the SEC's claims premised on the failure to disclose the 2000 or 2001 PIPE transactions or stock loans as related-party transactions. However, because the pleading deficiencies appear curable, the court will allow the SEC to file a second amended complaint should it so choose.

iii.     Warrant Repricing

The SEC next alleges that Defendant misled investors by failing to disclose that Xybernaut's repricing of certain warrants in 2002 was related to a 2002 PIPE transaction. Specifically, the SEC alleges that in 2002, Xybernaut filed a Form S-3 regarding the sale of

shares and warrants to Rema Investments Ltd. in a PIPE transaction. (Id. ¶ 66.) The same Form S-3 also disclosed that new warrants had been issued to Eva Holdings, Holly Investments, and Yeshua Investments as consideration for the exercise of warrants previously issued to those entities. (Id.) However, the Form S-3 did not disclose that the Rema transaction was related to the Eva, Holly, and Yeshua repricing; nor did it disclose the Eva, Holly, and Yeshua warrants had been repriced. (Id. ¶ 67.)

Defendant argues that the representations he made concerning warrant pricing and the Rema transaction were not misleading for three reasons: first, the August 13, 2002, Form 10-Q, filed about a month after the filing of the relevant Form S-3, disclosed the gross proceeds that Xybernaut received from the exercise of certain outstanding warrants; second, the July 12, 2002, Form S-3 did not conceal that the Yeshua, Holly, and Eva warrants were repriced as part of the Rema transaction (Def.'s Mem. at 27); and third, any misrepresentation in the S-3 was not material (Def.'s Reply at 13). The SEC disagrees. It argues that the Form 10-Q could not meaningfully correct the misrepresentation contained in the Form S-3, because it was filed one month after the Form S-3. (SEC Mem. at 30.) In addition, the SEC contends that the Form S-3 is facially misleading with regard to the relationship between Yeshua, Holly, Eva, and Rema. (Id. at 29-30.) The court agrees with the SEC.

First, even accepting Defendant's view that the Form 10-Q theoretically could have corrected the misstatement in the Form S-3, the court rejects Defendant's argument that disclosures in the August 13, 2002, Form 10-Q made the July 12, 2002, Form S-3 not misleading.

Under the so-called truth-on-the-market defense, a misstatement may become immaterial if corrective disclosures are "conveyed to the public with a degree of intensity and credibility

sufficient to counter-balance effectively any misleading information created by the alleged misstatements." In re MBIA, Inc., Sec. Litig., 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000)). However, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." Ganino, 228 F.3d at 167.

Under this stringent standard, the court cannot conclude as a matter of law that the Form 10-Q addressed and dispelled the alleged misrepresentations contained in the Form S-3. The SEC's theory is that the Form S-3 was misleading because it "(1) created the false impression that the issuance of the warrants to [the] three entities . . . was unrelated to the current PIPE transaction with Rema; and (2) created the false impression that warrants were exercised by Eva, Holly, and Yeshua at the exercise price disclosed in prior Forms S-3 (i.e. between $2.50 and $4.53) when, in fact, the exercise price was $0.50." (SEC Mem. at 28.) The disclosure that Defendant claims clarified the Form S-3 simply states that "[d]uring June 2002, the Company received gross proceeds of $772,180 and issued 1,544,361 shares of its common stock through the exercise of certain of these warrants." (Def.'s Mem. at 27.) That disclosure does nothing to alert an investor to the relationship between Eva, Holly, Yeshua, and Rema. Indeed, Defendant does not even attempt to explain how the Form 10-Q disclosed the linkage between the Eva, Holly, Yeshua, and Rema transactions. (See Def.'s Mem. at 27 (relying only on the Form S-3 to argue that the relationship between the entities was disclosed).) Likewise, the disclosure does not say which entities exercised the warrants; therefore, it may not have alerted investors that Eva, Holly, and Yeshua's warrants were repriced. Thus, the court rejects Defendant's argument that the Form 10-Q could have cured any misstatements in the Form S-3.

That leaves the critical question of whether the Form S-3 was materially misleading in the first place. Defendant says that it was not, because "[a]ny diligent reader of the Form S-3 would have known that the PIPE purchasers and warrant holders were related, off-shore corporate entities, because the S-3 revealed that the same person in the Turks & Caicos islands h[e]ld voting and/or dispositive control" over each entity. (Def.'s Mem. at 27-28.) Defendant is correct that "an investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 (2d Cir. 2005) (quoting Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993)). However, Defendant "do[es] not explain what 'minimal diligence' investors could have performed." In re MBIA, Inc., Sec. Litig., 700 F. Supp. 2d 566, 584 (S.D.N.Y. 2010). In fact, crediting the allegations in the Amended Complaint, the identity of a nominee director does not provide an investor with any information about the true owners or decision-makers of the entity.

Indeed, the Amended Complaint alleges that the Israeli Investor Group used the nominee entities and directors to mask the true identity of control persons. (See, e.g., Am. Compl. ¶¶ 5-6.) Such a practice is well known. See, e.g., Bruce Zagaris, A Brave New World: Recent Developments in Anti-Money Laundering and Related Litigation Traps for the Unwary in International Trust Matters, 32 Vand. J. Transnat'l L. 1023 (1999) ("For Guernsey, the Edwards report calls for dealing with the problem of nominee directors—the so called 'Sark lark.' This phenomenon involves residents of Sark, a small island under Guernsey's jurisdictions, who sit as directors on many different company boards. While the population of Sark is only 575, the total directorships held amount to approximately 15,000. Three residents hold between 1,600 and 3,000 directorships each."); Ernest R. Larkins, Multinationals and Their Quest for the Good

<u>Tax Haven: Taxes Are but One, Albeit an Important, Consideration</u>, 25 Int'l

Lawyer 471, 481 (1991) ("In most well-known tax havens, advisory firms can guide investors

and businessmen with alacrity through the procedures of establishing a corporate entity.  Among

other things, these firms may provide legal and tax advice, assist in financial planning and

investment decisions, facilitate foreign currency exchanges, administer local bank accounts, train

those unfamiliar with business practices in the country, arrange suitable office space, procure

nominee directors and shareholders as needed, register patents and trademarks, form and register

the company, and if requested, actually manage the assets or business.").  As alleged in the

Amended Complaint, the entire purpose of naming a nominee director was to mask the actual

identity of the true owners.  It is therefore unclear what, if any, diligence an investor could have

done to determine that the Rema transaction was related to the warrant repricing.  Thus, the court

finds that the Form S-3 was misleading.

       Finally, the court finds that the SEC has plausibly alleged materiality with regard to the

misrepresentation in the Form S-3.  In his Reply, Defendant argues that any misstatement was

not material because "[The SEC] does not say whether the repricing of the warrants was good or

bad for Xybernaut or its shareholders.  Would a reasonable investor believe that it was better or

worse for Xybernaut's future prospects that selling the warrants at 50 cents a share was related or

unrelated to a PIPE financing priced at 60 cents a share?  The SEC doesn't say." (Def.'s Reply

at 12.)  However, the Amended Complaint alleges that the warrant repricing was an undisclosed

condition of the Rema transactions.  (Am. Compl. ¶ 67.)  Namely, the Amended Complaint

asserts that the warrant repricing was an undisclosed mechanism to lower the Israeli Investor

Group's price to engage in the Rema transaction. (<u>Id.</u> ¶¶ 67-69.)  The Amended Complaint

alleges that Xybernaut's investors cared deeply about the discount given to counter-parties in the

33

PIPE transactions. (Am. Compl. ¶¶ 79, 81.) Thus, investors would have found the discount

given to the Israeli Investor Group in the Rema transaction material. Accordingly, the court

finds that the SEC has adequately pleaded that the price of the Rema transaction was material.

And therefore, the court finds that the SEC states a claim with regard to the warrant-repricing-

scheme.

iv.     Share Authorization

The SEC next alleges that in 2004, Xybernaut sought shareholder approval to issue

additional shares. (Am Compl. ¶ 71.) In seeking this approval Defendant repeatedly represented

that Xybernaut did not have a specific plan for those shares. (Id. ¶¶ 71-73) The SEC maintains

that those statements were false because Xybernaut had already negotiated with the Israeli

Investor Group to use the new shares in a PIPE transaction. (Id. ¶ 74.)

Defendant makes two arguments for why the SEC's share-authorization allegations fail to

state a claim. First, he argues that he did not have a duty to disclose the possibility of an

additional PIPE transaction. (Def.'s Mem. at 29.) Next he argues that, in any event, that any

omission was immaterial. (Id. at 29-30.) The SEC disagrees asserting that because Defendant

chose to speak about the share issuance, he had a duty to speak accurately. (SEC Mem. at 32.)

Additionally, the SEC argues that the alleged misrepresentation was material. (Id. at 32-33.)

Specifically, the SEC argues that Xybernaut's shareholders would have wanted to know whether

a new round of PIPE financing was anticipated when they approved more share issuances

because PIPE financings are dilutive. (Id. at 32-33.)

The court agrees that once Defendant decided to speak about the share issuance, he was

required to speak accurately. "[T]he lack of an independent duty to speak in the first instance

becomes irrelevant once a party chooses to discuss material issues, because upon choosing to

34

speak one 'has a duty to be both accurate and complete.'" Lapin v. Goldman Sachs Grp.,
Inc., 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (quoting Caiola v. Citibank, N.A., 295
F.3d 312, 331 (2d Cir. 2002)). The SEC alleges that Defendant made a number of statements
about Xybernaut's plans for the newly issued shares. (Am. Compl. ¶¶ 71-73.) Once Defendant
spoke on the subject, he was obligated to speak honestly.

However, the SEC alleges that failed this obligation. Specifically, the SEC claims that
although "Xybernaut was actively seeking financing from the Israeli Investor Group and
intended to use the newly authorized shares for a PIPE transaction with the Israeli Investor
Group" (Am. Compl. ¶ 74), Defendant stated that (1) the company had "no arrangements or
understandings for the issuance of the additional shares" (id. ¶ 71); (2) the company had not
"identified any specific activity that [the shares] will be designated for" (id. ¶ 72); and (3) "[w]e
are not actively looking for it as we speak and haven't been this year particularly (id. ¶ 73).

Defendant counters that none of the above statements were false or material. He argues
that the statements were not false, because at the time of Defendant's statements there was only
the "possibility" of additional PIPE transactions with the Israeli Investor Group. (See Def.'s
Mem. at 29 (quoting Am. Compl. ¶ 75).) Therefore, Defendant argues, his statements were true.
The court disagrees. First, Defendant's third allegedly false statement—that Xybernaut was not
actively looking for financing—was literally false if, as the SEC alleges, Xybernaut was actively
negotiating with the Israeli Investor Group at the time the statement was made. Second, the SEC
alleges that at the time of Defendant's statements, Xybernaut "intended to use the newly
authorized shares for a PIPE transaction with the Israeli Investor Group." (Am. Compl. ¶ 74.) If
this allegation is true, then Defendant's statements that Xybernaut had no understandings about
the eventual use of the shares and had no specific plans for the shares were also false, or at least

potentially misleading. See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd., 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (noting that misleading half-truths may underlie a securities claim). Accordingly the court finds that, the SEC has adequately pleaded falsity.

Defendant next argues that his statements were not material because any reasonable investor would think that a company that seeks an increase in authorized shares and needs more capital was at least contemplating selling shares to raise capital. (Def.'s Reply at 11.) Defendant's argument has some logic. Indeed, the court believes that a reasonable investor probably would surmise that a company with a history of PIPE transactions—which needed capital and was seeking to increase its authorized number of shares—may have been considering another PIPE transaction.

However, such an assumption does not hold if executives and officers of the company told investors that they were not actively considering such transactions. Furthermore, it is plausible that a shareholder would consider the imminence of a PIPE transaction material when they considered increasing the number of authorized shares. It is one thing to increase the number of authorized shares so that management has flexibility to negotiate down-the-line financing as needed. In that case, investors plausibly could not worry about the dilutive effect of future stock issuances, because they would know that management would need to disclose future deals as they arose. The lag time would give investors the chance to cash out before their shares were diluted. It is different to increase the number of authorized shares at the very moment that management is negotiating a deal to issue those shares. In that case, an investor may not have a chance to cash out before the impending dilution is priced into the market. Therefore, the court

finds that the SEC adequately has pleaded that Defendant's statements about the share issuance were material.

Accordingly, the court finds that the SEC has stated a claim with regard to the share authorization.

v.        December 2004 PIPE Transaction

The SEC next alleges that in 2004, Defendant failed to disclose that he had authorized Xybernaut to pay the Israeli Investor Group a secret finder's fee in connection with the December 2004 PIPE transaction. (Am. Compl. ¶ 79.) The SEC alleges that the undisclosed finder's fee allowed Defendant to represent that Xybernaut had given the Israeli Investor Group a smaller discount on Xybernaut shares than had actually been given. (Id.)

Defendant argues that this claim fails because the finder's fee was not material to the December 2004 PIPE transaction. (Def.'s Mem. at 30.) The court disagrees with Defendant for two independent reasons.

First, the Amended Complaint pleads facts that indicate that the finder's fee was material because it allowed the Israeli Investor Group to receive a discount of more than 20% from Xybernaut's stock price. The Amended Complaint alleges that the 20% threshold matters: "Defendant responded that he could not offer the larger discount to the market price because he believed that any discount greater than 20% would have an adverse impact on Xybernaut's share price." (Am. Compl. ¶ 78.0

The Second Circuit has instructed district courts to consider qualitative factors when assessing materiality. See, e.g., Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716-18 (2d Cir. 2011). One such qualitative factor is "management's expectation that the misstatement will result in a significant market reaction." ECA, Local 134 IBEW Joint Pension Trust of

37

Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45150-52 (1999)). Here, the Amended Complaint alleges facts from which a jury could infer that reasonable investors cared if the discount that Xybernaut offered to PIPE counter-parties was greater than 20%. If that allegation is true, it supports the SEC's position that the finder's fees are material.

Second, the finder's fee represents a 15% change to the discount offered to the Israeli Investor Group. This far exceeds the 5% preliminary assumption threshold for materiality that the SEC recommends and the Second Circuit has endorsed. See, e.g., Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011). Indeed, even if the court were to compare the finder's fee to the total value of the PIPE transaction, then the finder's fee still would be 3% of the transaction. Although this falls below the 5% threshold, when combined with the qualitative factors discussed above, the court still cannot find that the finder's fee was so obviously unimportant to a reasonable investor to be immaterial.

Accordingly, the court finds that the SEC has sufficiently pleaded that the finder's fee was material.

vi.     $100,000 Payment to Edward Newman[13]

Next, the SEC alleges that Defendant failed to disclose that the Israeli Investor Group paid his brother, Edward Newman, $100,000 in connection with a 2002 PIPE transaction. (Id. ¶ 86.)

Defendant argues that the SEC has failed adequately to plead that he knew that Edward Newman had been paid arguing that "[t]he SEC does not explain how [Defendant] knew that Edward Newman received a $100,000." (Def.'s Mem. at 32.) Therefore, Defendant contends

---

[13] Defendant also argues that the allegations concerning payment to Da Vinci are time barred. (Am. Compl. ¶ 83.) The court addresses that issue below. (See infra Part III.D.)

that the SEC has not alleged scienter. The SEC argues that the Amended Complaint alleges numerous facts from which the inference could be drawn that Defendant knew about the payments to his brother; namely, that Defendant was in charge of raising funds and obtaining financing for Xybernaut, that it was important for Defendant to understand who was investing in Xybernaut, and that Defendant negotiated the PIPE transactions. (SEC Mem. at 35 (citing Am. Compl. ¶¶ 20, 29).) However, the court agrees with Defendant; the Amended Complaint does not allege sufficient facts from which the court can infer that Defendant knew about the $100,000 payment.

First, the allegations that Defendant was in charge of raising funds, obtaining financing, understanding who invested in Xybernaut, and negotiating the PIPE transactions, simply do not support an inference that he knew that his brother was paid $100,000. Although each activity relates to Defendant's role in the underlying PIPE transactions, they do not support the inference that Defendant knew every term of every financing transaction. Moreover, even if the court concluded that Defendant did know each and every term of every PIPE deal, the Amended Complaint does not even allege that the $100,000 payment was a negotiated term of the PIPE transaction. Therefore, even if the court could infer that Defendant knew or should have known every term of every financing transaction, there is no reason to believe he would have known about the $100,000 payment.

Second, the Amended Complaint alleges facts that indicate that Defendant did not know about the $100,000 payment. The SEC alleges that "Weisberg directed the transfer of $100,000 of the money from this private placement to Edward Newman's personal bank account" (Am. Compl. ¶ 86), and that "Weisberg and Edward Newman concealed the $100,000 payment in

subsequent filings" (id. ¶ 87). However, Amended Complaint never explains how Defendant learned of the payment if Weisberg and Edward Newman were concealing it.

Accordingly, the court dismisses the allegations related to the $100,000 payment. However, because the pleading deficiencies appear curable, the court will allow the SEC to file a second amended complaint should it so choose.

vii.      Kickbacks

Finally, the SEC alleges that in 2001, 2003, and 2004, Defendant was paid $2.4 million by the Israeli Investor Group in order to facilitate PIPE transactions. (Am. Compl. ¶ 90.) Defendant never disclosed that he received payments to facilitate the PIPE deals. (Id. ¶¶ 94-96.) Defendant argues that the payments are not material, because the SEC has not pleaded that the alleged kickbacks altered the terms of the PIPE transactions. (Def.'s Mem. at 33.) The SEC disagrees for two reasons. First, it argues that the payment of kickbacks is material as a matter of law. (SEC Mem. at 36.) Second, the SEC insists that it has adequately pleaded an improper quid pro quo by which the undisclosed kickbacks altered the terms of the PIPE transactions. (Id. at 36-38.) The court agrees with the SEC in both respects.

The alleged kickbacks are material even if the SEC cannot point to an explicit impact on the terms of the PIPE transactions.[14] S.E.C. v. Feminella, is on point. There, the SEC brought an enforcement action under Section 17(a) and Rule 10(b) against a stockbroker, Feminella. 947 F. Supp. 722, 723 (S.D.N.Y. 1996). The SEC alleged that Feminella engaged in a scheme whereby he paid kickbacks to the Chief Financial Officer of Consumers Union ("CU") on CU's purchases

---

[14] The court does not need to determine whether every kickback would be material in every situation. Defendant has not argued that the amount of the kickbacks here were so minimal that no investor would care to know about them. Thus, the court only answers the more limited question of whether the SEC must allege specifically how the kickbacks changed the terms of the sale.

40

of securities, in exchange for CU directing transactions to him. Id. Feminella moved to dismiss

the complaint, arguing that the kickbacks did not affect the price of the securities sold. Id.

at 731. The court disagreed reasoning that "[a]ssuming that the allegations contained in the

Complaint are true, CU was wholly unaware that part of its payments was being diverted to one

of its own agents, through defendant. If such kickbacks were attainable, they should have been

received by CU itself, not its agent." Id. at 732.[15] The Feminella court is not alone in making

this observation. Indeed, courts in this circuit routinely find that undisclosed kickbacks affect the

price of the transaction at issue. See, e.g., Szulik v. Tagliaferri, 966 F. Supp. 2d 339, 363

(S.D.N.Y. 2013); United States v. Rudi, 902 F. Supp. 452, 456-57 (S.D.N.Y. 1995).

Next, the SEC properly pleaded that the kickbacks did change the terms of the PIPE

transactions. Namely, the SEC alleges that the kickbacks were paid to (1) ensure that Xybernaut

did not demand that the Israeli Investor Group refrain from short selling as part of the PIPE

transactions (Am. Compl. ¶ 90); (2) ensure access to future PIPE transactions (SEC Mem. at 37);

and (3) encourage Defendant's complicity in hiding the Israeli Investor Group's identity (id.).

Defendant disputes that any of the SEC's rationales presents a valid quid pro quo theory.

First, Defendant argues that it is nonsensical for the SEC to argue that the Israeli Investor

Group purchased access to future PIPEs that did not ban short selling of the issuer's securities

prior to the filing of the registration statement. (Def.'s Reply at 17.) Defendant explains: "The

SEC alleges that if the Israeli Investor Group sold short when it knew Xybernaut was about to

file a Form S-3, the 'Group' would have been in possession of material inside information.

Surely the SEC cannot be contending that Xybernaut had some duty to include contractual

---

[15] The court notes that in Feminella, the defendant framed his argument as attacking the 'in connection with the purchase or sale of a securities' element. Feminella, 947 F. Supp. at 731-32. Here, Defendant frames the argument as attacking materiality. In truth, the arguments are the same. Each defendant argues that the kickback did not impact the price of the transaction.

provisions that would have forbidden the Israeli Investor Group from committing felony violations of the securities laws?" (Id. at 17-18 (internal citations omitted).)

However, Defendant's argument misconstrues the SEC's claim. The SEC simply argues that the Israeli Investor Group avoided unfavorable short-selling deal terms because of the kickbacks. And, the SEC alleges facts that support such a claim. First, the SEC alleges that at the time of the PIPE transactions some, but not all, PIPE issuers included contractual language banning PIPE counter-parties from short selling. (Am. Compl. ¶ 28.) Next, the SEC alleges that the Israeli Investor Group would not have invested had a no-short-selling covenant been required. (Id.) Finally, the SEC alleges that the kickbacks ensured that the PIPE deal would not require a no-short-selling covenant. (Id. ¶ 90.) Whether some other securities law duty required PIPE counter-parties to refrain from short selling prior to the filing of a registration statement is irrelevant to the SEC's theory. If it is true, as the SEC alleges, that many, but not all, PIPE transactions included no-short-selling convents, then the Israeli Investor Group got some benefit from avoiding an unfavorable covenant.

Second, Defendant argues that the Israeli Investor Group could not have been paying for future access to PIPE transactions, because "in the SEC's own exhibits, Xybernaut CFO Davis cites fruitful meetings and discussions with institutional investors, world-class funds and brokers and mentions both institutional owners and a retail shareholder base which now numbers at about 75,000." (Def.'s Reply at 18.) According to Defendant, this apparently shows that Xybernaut sought PIPE investors beyond the Israeli Investor Group. (Id.) That may be true. However, the SEC alleges that Xybernaut ultimately engaged in all of its post-August 2002, PIPE transaction with the Israeli Investor Group. (Am. Compl. ¶ 74.) The SEC further alleges that the Israeli Investor Group was the sole party to engage in the PIPE transactions precisely

because of the kickbacks. (Id. ¶ 90.) The court finds that the SEC has alleged a plausible kickback claim.

Third, Defendant argues that hiding the existence of the Israeli Investor Group did not require a kickback, because the disclosure of beneficial holders was not required under Item 507. (Def.'s Reply at 18.) The court does not reach this issue of whether Item 507 requires the disclosure of beneficial holders for the reasons stated above (see supra Part III.A.2.i.a), and because the SEC has plausibly alleged that the kickbacks impacted the PIPE transactions in other ways the court need not address the issue here.

Accordingly, the court finds that the SEC has adequately pleaded that the alleged kickbacks were material.

viii. Pleading Fraud with Particularity

Finally, Defendant argues that the SEC has failed to plead fraud with particularity, for two reasons. First, Defendant claims that "[t]he amended complaint is maddeningly imprecise about what specific false Form 10-K and 10-Q filings [Defendant] allegedly signed and what other false statements he allegedly made." (Def.'s Mem. at 35.) Second, Defendant argues that the Amended Complaint fails to allege his knowledge that the Israeli Investor Group was the beneficial holders of Xybernaut shares. (Id.) The court rejects Defendant's argument on both grounds.

First, the court finds that the Amended Complaint is clear about which of Defendant's statements are allegedly false or misleading. The Amended Complaint is very specific in alleging which documents Defendant signed and why those documents are false. For example, the Amended Complaint alleges that Defendant signed each of the false Forms S-3. (Am. Compl. ¶¶ 36, 44.) It then alleges why each specific Form S-3 was misleading. (See Am.

Compl. ¶¶ 45-50.) The Amended Complaint likewise specifically alleges which Form 10-K was authored by Defendant and why that filing was false. (See Am. Compl. ¶ 95.)

Second, the Amended Complaint alleges with particularity how Defendant knew that the Israeli Investor Group was the true holders of the Xybernaut shares. Namely, the SEC alleges that Saltsman told Defendant that the Israeli Investor Group was the true investor. (Am. Compl. ¶ 48.) Moreover, Defendant negotiated each PIPE transaction with Saltsman and Eitan. (Id.) During the course of these interactions, Defendant and Saltsman became close friends, which gave Defendant even more insight into the true nature of the deals. (Id.) Importantly, the SEC also alleges that Defendant knew that the Israeli Investor Group was the true buyer of Xybernaut shares before any of the PIPE transactions began. (Id. ¶ 30.) Therefore, the SEC has adequately pleaded that Defendant knew who the true owners were at the time that he made representations about the owners of Xybernaut shares.

Accordingly, the court rejects Defendant's Rule 9(b) challenge to Counts One and Two.

**B.     Sixth Claim for Relief**

Count Six of the Amended Complaint alleges that Defendant violated Rule 13a-14 by falsely certifying that Xybernaut's Forms 10-K and 10-Q were accurate. (Am. Compl. ¶ 148.) Exchange Act Rule 13a-14 requires principal financial officers to execute a certification for certain public filings. S.E.C. v. Egan, 994 F. Supp. 2d 558, 568 (S.D.N.Y. 2014). Rule 13a-14 is violated when that certification contains false information. S.E.C. v. Subaye, Inc., No. 13-CV-3114 (PKC), 2014 WL 448414, at *10 (S.D.N.Y. Feb. 4, 2014).

The parties correctly note that if the SEC has adequately pleaded a Rule 10b-5 and Rule 17 violation with respect to a statement in a Form 10-K or Form 10-Q, then the SEC has also adequately pleaded a Rule 13a-14 violation. (See SEC Mem. at 46; Def.'s Reply at 19-20.)

See, e.g., S.E.C. v. Stanard, No. 06-CV-7736 (GEL), 2009 WL 196023, at *28 (S.D.N.Y. Jan. 27, 2009) (Lynch, J.).

The SEC bases its Rule 13a-14 claim on the alleged misstatements contained in the December 31, 2003, Form 10-K. (SEC Mem. at 46.) The SEC alleges that this Form 10-K was inaccurate because it did not disclose the kickback scheme. As explained above, the SEC has adequately pleaded a Rule 10b-5 and Section 17 violation with regard to the kickback scheme. For the same reasons, the court finds that the SEC has done the same for its Rule 13a-14 claim.

### C.    Seventh Claim for Relief

Count Seven of the Amended Complaint alleges that Defendant aided and abetted fraud pursuant to Section 20(e) of the Exchange Act. (Am Compl. ¶ 150.) Section 20(e) states that "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e).

### 1.    Legal Standard

Section 20(e) has three elements: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." S.E.C. v. Subaye, No. 13-CV-3114 (PKC), 2014 WL 448414, at *9 (S.D.N.Y. Feb. 4, 2014) (internal quotations omitted).[16]

---

[16] "Although the current language of Section 20(e) includes the words 'or recklessly' after 'knowingly,' those words were added by the Dodd-Frank Act in July of 2010. Because the events in the Complaint occurred before this date, the amendment does not apply." S.E.C. v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 394 n.8 (S.D.N.Y. 2014) (internal citations omitted).

2.    Discussion

Defendant raises two arguments as to why the Section 20 charges should be dismissed. First, Defendant contends that the SEC cannot claim that he is both the primary actor and an aider and abettor. (Def.'s Mem. at 39). Specifically, he argues, that "[i]n essence, the SEC alleges that [Defendant] aided and abetted his own conduct as a corporate officer—something that Section 20 does not permit." (Id.) Second, Defendant argues that the SEC did not plead its Section 20 claim with sufficient specificity to satisfy Rule 9(b).

i.    Simultaneous Allegations of Primary and Secondary Violations

Defendant argues that Section 20(e) does not apply to primary actors and that therefore, he cannot be liable under Section 20 because the SEC has alleged that he was a primary actor.  In support of this assertion, Defendant relies on S.E.C. v. Apuzzo, in which the Second Circuit held that Section 20 was enacted "precisely to allow the SEC to pursue aiders and abettors who . . . were not [] themselves involved in the making of the false statements." S.E.C. v. Apuzzo, 689 F.3d 204, 213 (2d Cir. 2012). (See also Def.'s Mem. at 40.) . According to Defendant, the fact that Section 20 was enacted to target secondary actors means that a Section 20 claim cannot be stated against an alleged primary violator. (Def.'s Mem. at 39-40.)

Defendant has misinterpreted the holding of Apuzzo. Apuzzo concerns whether the SEC must plead proximate cause for aiding and abetting liability. Apuzzo, 689 F.3d at 212.  Indeed, nowhere does Apuzzo discuss whether a single defendant can be charged as both a primary actor and as an aider and abettor.

Accordingly, courts in the Second Circuit have found that a complaint may charge a single defendant as both a primary actor and as an aider and abettor. "Under a regime permitting alternative pleading, there is nothing inconsistent with the SEC bringing securities law claims

46

based on the same course of conduct under both primary and aiding and abetting theories of liability." Subaye, 2014 WL 448414, at *11; see also China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d at 395 (discussing the counter-intuitive nature of finding that someone who is in charge of a company would be unaware of violations within that company); cf. Vanleeuwen v. Keyuan Petrochemicals, Inc., No.13-CV-6057 (PAC), 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) (noting that in the Section 20(a) context, "[w]hile a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage" (citation omitted)). Similarly, district courts in other circuits have held that a single complaint may allege both primary and secondary violations is in accord with courts throughout the country. See, e.g., S.E.C. v. Brown, 878 F. Supp. 2d 109, 117 (D.D.C. 2012); S.E.C. v. Patel, No. 07-CV-39 (SJM), 2009 WL 3151143, at *21 (D.N.H. Sept. 30, 2009); S.E.C. v. Peterson, No. 83-CV-2325 (JBM) (N.D. Ill. 1983).

Therefore, the court finds that the SEC can plead that Defendant was both a primary and a secondary violator.

### ii.       Pleading with Particularity

Defendant next argues that the SEC did not plead its Section 20 claim with enough specificity to satisfy Rule 9(b). The heightened pleading standard of Rule 9(b) applies to aiding and abetting claims. See S.E.C. v. Alt. Green Techs., Inc., No. 11-CV-9056 (SAS), 2012 WL 4763094, at *3-4 (S.D.N.Y. Sept. 24, 2012). Accordingly, the SEC must plead with specificity: (1) the existence of security law violations by the primary actors; (2) knowledge of the violations on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the carrying out of the violation. S.E.C. v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009).

As explained above, the court finds that the SEC adequately pleaded its claims against the primary actors. (See supra Part III.A-B.)

Next, the court finds that the SEC has pleaded knowledge with specificity. Both actual knowledge and conscious avoidance are sufficient to plead scienter. See Banco Industrial de Venez., C.A. v. CDW Direct L.L.C., 888 F. Supp. 2d 508, 514 (S.D.N.Y. 2012) (finding that either actual knowledge or conscious avoidance suffices for knowledge in aiding and abetting, while constructive knowledge does not). The SEC alleges that Defendant signed Xybernaut's registration statements (Am. Compl. ¶ 6), lent his shares of Xybernaut stock and authorized finder's fees (id. ¶ 9), was in charge of obtaining financing (id. ¶ 29), and was told specifically by Saltsman of the plans for the Israeli Investment Group's investments in Xybernaut (id. ¶ 48). It would be "nonsensical" to find that Defendant "somehow lack[ed] knowledge of conduct for which he himself was responsible." China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d at 395. Indeed, the fact that Defendant was "personally involved in or responsible for the securities law violations alleged" cuts in favor of his having knowledge of the violations alleged by the SEC. Subaye, 2014 WL 448414, at *11. Accordingly, the court finds that the SEC has adequately pleaded knowledge on the part of Defendant.

Finally, the SEC adequately alleges substantial assistance. "[T]o satisfy the 'substantial assistance' component of aiding and abetting, the SEC must show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" Apuzzo, 689 F.3d at 206 (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)). The Amended Complaint contains sufficient allegations to support an inference that Defendant offered substantial assistance to the alleged fraud. Namely, Defendant took out loans to facilitate the

fraud (Am. Compl. ¶ 36), was interested in the PIPE transactions (id. ¶ 64), hid the Israeli Investment Group's finder's fee (id. ¶ 79), and received payments for facilitating the PIPE transactions (id. ¶ 90). These examples speak to Defendant's association with the venture, that he wished to bring it about, and that he undertook efforts to make it succeed. See Apuzzo, 689 F.3d at 206.

Accordingly, the court finds that the SEC has pleaded its Section 20 claim with sufficient specificity; and therefore the Defendant's motion to dismiss the seventh claim for relief is denied.

### D.  Statute of Limitations

#### 1.  Initial Complaint Filed in the Limitations Period

Defendant next argues that all claims arising out of his actions prior to October 19, 2002, should be dismissed because the SEC did not file its Complaint within the five-year limitations period imposed by 28 U.S.C. § 2462. (See Def.'s Mem. at 43-47.) The SEC responds that 28 U.S.C. § 2462 does not apply to actions seeking disgorgement and injunctive relief and, therefore, does not apply here. (SEC Mem. at 40-41.) The SEC is correct.

Section 2462 sets forth a general limitations period for penalty provisions throughout the United States Code. See Gabelli v. S.E.C., 133 S. Ct. 1216, 1219 (2013). It reads:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C.A. § 2462. The question before the court is whether disgorgement or injunctions—the remedies sought here—are properly categorized as fines, penalties, or forfeitures.

### i.    Disgorgement

As always, statutory interpretation begins with the statutory text. "Our starting point in

statutory interpretation is the statute's plain meaning, if it has one." United States v. Dauray, 215

F.3d 257, 260 (2d Cir. 2000). "But oftentimes the 'meaning—or ambiguity—of certain words or

phrases may only become evident when placed in context.'" King v. Burwell, 135 S.

Ct. 2480, 2489 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132

(2000)). Accordingly, "when deciding whether the language is plain, we must read the words 'in

their context and with a view to their place in the overall statutory scheme.'" Id. (quoting Brown

& Williamson, 529 U.S. at 133). On its face, Section 2462 applies only to fines, penalties, and

forfeitures. Therefore, Section 2462 applies to disgorgement only if disgorgement is a fine,

penalty, or forfeiture.

### a.    Fine or Penalty

Disgorgement is not a fine. A fine is a "payment to a sovereign as punishment for some

offense." Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492

U.S. 257, 265 (1989); see also Black's Law Dictionary 750 (10th ed. 2014) (defining fine as "[a]

pecuniary criminal punishment or civil penalty payable to the public treasury"). On the other

hand, disgorgement is not a punishment. S.E.C. v. Lorin, 869 F. Supp. 1117, 1122

(S.D.N.Y. 1994).

Likewise, the Second Circuit has rejected the argument that disgorgement is a penalty.

See S.E.C. v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 288 n.8 (2d Cir. 2013) ("Aside from

appellants' assertion that the disgorgement award should be considered a penalty because it

incorporated profits earned by PSPF, an argument we reject, we do not understand the appellants

to argue that a disgorgement award would be subject to the statute of limitations provided by 28 U.S.C. § 2642.").

### b. Forfeiture

The harder question is whether disgorgement is a forfeiture. Circuit courts are split on this question. Compare S.E.C. v. Graham, No. 14-13562, 2016 WL 3033605, at *4-5 (11th Cir. May 26, 2016) (holding that disgorgement is synonymous with forfeiture), with Riordan v. S.E.C., 627 F.3d 1230, 1234 (D.C. Cir. 2010) (holding that disgorgement is not a forfeiture). And the Second Circuit has yet to resolve the issue. See, e.g., S.E.C. v. Montle, 65 F. App'x 749, 754 (2d Cir. 2003) (summary order) (declining to reach the issue).

Nonetheless, the vast majority of courts in this circuit have found that disgorgement is not a forfeiture. See, e.g., S.E.C. v. Spongetech Delivery Sys., Inc., No. 10-CV-2031 (DLI) (RML), 2015 WL 5793303, at *11 (E.D.N.Y. Sept. 30, 2015) ("Unlike disgorgement, civil penalties are subject to the five-year statute of limitations in 28 U.S.C. § 2462."); S.E.C. v. Vuono, No. 13-MC-405 (JFB), 2013 WL 6837568, at *6 (E.D.N.Y. Dec. 26, 2013) ("Several courts in the Second Circuit have held that disgorgement is equitable as a matter of law and, therefore, not subject to the limitations period in 28 U.S.C. § 2462 where it is remedial in nature, rather than punitive."); S.E.C. v. Straub, No. 11-CV-9645 (RJS), 2013 WL 4399042, at *5 (S.D.N.Y. Aug. 5, 2013) ("However, even if reversal would eliminate the SEC's claim for civil penalties, the claims for disgorgement and injunctive relief would still survive."); S.E.C. v. Power, 525 F. Supp. 2d 415, 426-27 (S.D.N.Y. 2007) ("It has been held that Section 2462 does not apply to equitable remedies, which seek either to return opposing parties to their status quo ante or to protect the public from harm. Disgorgement is an equitable remedy to which Section 2642 does not apply." (internal citations omitted)); S.E.C. v. Jones, 476 F.

Supp. 2d 374, 385 (S.D.N.Y. 2007) ("[T]he Commission's action for disgorgement in this case is not subject to the five-year limitations period in § 2462.").

The court agrees that disgorgement is not forfeiture for two reasons. First, disgorgement and forfeiture have distinct legal meanings. Both at the time that Section 2462's antecedent statutes were first passed and continuing until today, disgorgement and forfeiture have been independent remedies with important procedural and substantive differences. Second, disgorgement, unlike forfeiture, fines, or penalties, is not punitive.

The antecedents to Section 2462 date back to the 1790s, and its statutory language has changed little since. 3M Co. (Minnesota Min. & Mfg.) v. Browner, 17 F.3d 1453, 1457 & n.7 (D.C. Cir. 1994). Therefore, the court first looks to the meaning of disgorgement and forfeiture in the late 1700s to guide interpretation of the statute. See Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 275 (1994) (noting that courts should interpret statutes in light of the meaning of words at the time of the statute's enactment).

In the late 1700s, disgorgement was understood to be an equitable remedy allowing chancery courts to order the repayment of ill-gotten gains. See S.E.C. v. Cavanaugh, 445 F.3d 105, 116-20 (2d Cir. 2006). By contrast, in the 1790s forfeiture had two meanings. A forfeiture proceeding was a statutory civil remedy to recovery property used in violation of customs and revenue laws. Austin v. United States, 509 U.S. 602, 612-13 (1993). Alternatively, forfeiture could be used as a synonym for fine. Id. at 614 n.7 ("Dictionaries of the time confirm that 'fine' was understood to include 'forfeiture' and vice versa." (citing T. Sheridan, A General Dictionary of the English Language (1780); J. Walker, A Critical Pronouncing Dictionary (1791); J. Kersey, A New English Dictionary (1702))). In either case, forfeiture was a legal remedy. Therefore, early disgorgements and forfeitures proceeded before different tribunals and

52

on different legal theories. See, e.g., Stevens v. Gladding, 58 U.S. 447, 450 (1854) ("[E]quity

cannot relieve against common law or statute penalties and forfeitures."); Horsburg v. Baker, 26

U.S. 232, 236 (1828) ("[A] Court of Chancery is not the proper tribunal for enforcing

forfeitures.").

The distinctions between forfeiture and disgorgement continue to exist today. "[W]hile

both criminal forfeiture and disgorgement serve to deprive wrongdoers of their illicit gain, the

two remedies reflect different characteristics and purposes—disgorgement is an equitable

remedy that prevents unjust enrichment, and criminal forfeiture a statutory legal penalty imposed

as punishment." S.E.C. v. Contorinis, 743 F.3d 296, 306 (2d Cir. 2014). Indeed, the Supreme

Court recently reaffirmed that disgorgement—unlike forfeiture—is an equitable remedy. See

Kaley v. United States, 134 S. Ct. 1090, 1102 n.11 (2014).

These distinctions matter. For example, the Second Circuit has held that because

disgorgement is an equitable remedy intended to restore the status quo, innocent third parties

may be required to disgorge—but not forfeit—ill-gotten assets. Contorinis, 743 F.3d at 306-08.

Likewise, whereas forfeiture "applies only to specific assets," disgorgement does not.

Kaley, 134 S. Ct. at 1102 n.11.

Furthermore, disgorgement is not punitive. Since at least 1915, Section 2642 has been

read to apply only to punishments. See Gabelli, 133 S. Ct. at 1223 ("[T]his case involves

penalties, which go beyond compensation, are intended to punish, and label defendants

wrongdoers." (citing Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 423 (1915) ("The words

'penalty or forfeiture' in this section refer to something imposed in a punitive way for an

infraction of a public law, and do not include a liability imposed solely for the purpose of

redressing a private injury, even though the wrongful act be a public offense, and punishable as

such."))). This makes sense because fines, penalties, and forfeitures are all punishments. Disgorgement, however, "is imposed not to punish, but to ensure illegal actions do not yield unwarranted enrichment even to innocent parties." Contorinis, 743 F.3d at 307.

Moreover, even if the court were to conclude that the statutory term "forfeiture" was ambiguous (which, as explained above, it is not), the fact that disgorgement is not punitive offers additional evidence that Congress did not intend forfeiture to mean disgorgement. The interpretive canon noscitur a sociis "counsels lawyers reading statutes that a word may be known by the company it keeps." Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280, 287 (2010) (citation and internal quotation marks omitted). Both fines and penalties are punishments. See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265(1989) (noting that "fine" means "a payment to a sovereign as punishment for some offense"); Gabelli v. S.E.C., 133 S. Ct. 1216, 1218 (2013) ("[C]ivil penalties go beyond compensation, are intended to punish, and label defendants wrongdoers."). Applying the noscitur a sociis canon, the court will not read forfeiture broadly as encompassing non-punitive remedies, because the scope of Section 2462 is otherwise limited to punishments. See Yates v. United States, 135 S. Ct. 1074, 1085 (2015) ("We rely on the principle of noscitur a sociis—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." (internal citation and quotation marks omitted)). Thus, because disgorgement is not punitive, it is not a forfeiture.

Accordingly, the court finds that because forfeiture is not the same as disgorgement, Section 2462 does not reach disgorgement, and therefore, the SEC's claims are not time barred.

c.    Defendant's Arguments

Nonetheless, Defendant urges the court to find that forfeiture and disgorgement are identical for two reasons. First, he argues that the Supreme Court's decision in Gabelli v. S.E.C., 133 S. Ct. 1216 (2013), implicitly applied the five-year limitations period to all SEC enforcement actions regardless of the remedy sought. Second, he urges the court to follow S.E.C. v. Graham, 21 F. Supp. 3d 1300 (S.D. Fla. 2014), which held that disgorgement is a forfeiture for the purposes of Section 2462. The court rejects both arguments.

First, Gabelli did not decide whether disgorgement (or other equitable remedies) was covered by Section 2462. See Gabelli, 133 S. Ct. at 1220 n.1 ("The SEC also sought injunctive relief and disgorgement, claims the District Court found timely on the ground that they were not subject to § 2462. Those issues are not before us."). Neither does the logic of Gabelli require the court to adopt a cribbed reading of Section 2462.

On one hand, Gabelli strongly reinforces the importance of statutes of limitations. The Supreme Court explained that statutes of limitations are important because they set "a fixed date when exposure to the specified Government enforcement efforts ends, advancing the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." Id. at 1221 (internal quotation marks omitted). However, the court in Gabelli was also clear that these principles yield to countervailing statutory language. See id. at 1224 (noting that although the Court found that Section 2462 does not follow a discovery rule, Congress is permitted to draft statutes of limitation that do follow a discovery rule). Thus, the lesson of Gabelli is not that the Government's enforcement power must always end after five years. Instead, it is that courts interpreting Section 2462 should carefully read the statute.

Moreover, even if the court were inclined to adopt the narrow reading of Section 2462 that Defendant urges, the Second Circuit has foreclosed such an interpretation. Following the Supreme Court's remand in Gabelli, the Second Circuit found that the Court's reversal only affected the portion of the Second Circuit opinion dealing with civil penalties. S.E.C. v. Gabelli, 518 F. App'x 32, 32 (2d Cir. 2013) (summary order). The court otherwise adhered to the panel opinion, id., which had found that equitable remedies were not covered by Section 2462, S.E.C. v. Gabelli, 653 F. 3d 49, 61 (2d Cir. 2011). Thus, the court rejects Defendant's argument that the reasoning of Gabelli extends Section 2462 to cover disgorgement.

Likewise, the court declines to follow Graham. In that case, the Southern District of Florida found that "disgorgement of all ill-gotten gains realized from the alleged violations of the securities laws—i.e., requiring defendants to relinquish money and property—can truly be regarded as nothing other than a forfeiture[.]" S.E.C. v. Graham, 21 F. Supp. 3d 1300, 1310-11 (S.D. Fla. 2014). Following Defendant's briefing, the Eleventh Circuit expanded on, and affirmed, Graham's disgorgement holding, stating "no meaningful difference in the definitions of disgorgement and forfeiture." S.E.C. v. Graham, No. 14-13562, 2016 WL 3033605, at *5 (11th Cir. May 26, 2016). Thus, the Eleventh Circuit found that "[b]ecause forfeiture includes disgorgement, § 2462 applies to disgorgement." Id. at *5. For the following reasons, however, the court finds Graham to be unpersuasive.

First, in determining that disgorgement and forfeiture have "no meaningful difference," the Graham court failed to consider the varied historical meaning of the two terms, the continued differences between the two remedies, and the statutory context of Section 2462. See Graham at *5; Torres v. Lynch, 136 S.Ct. 1619, 1622-26 (2016) (noting that courts must "interpret the relevant words not in a vacuum, but with reference to the statutory context" and look consider

"well-established background principle[s]"). (See also supra Section III.D.1.) Instead, Graham's determination—that disgorgement is at most a subset of forfeiture and at least a synonym—was based almost entirely on dictionary definitions. See Graham at *5.

Second, even relying exclusively on the dictionaries cited by Graham,[17] disgorgement and forfeiture appear to have separate and distinct meanings. Black's Law Dictionary defines disgorgement as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." Black's Law Dictionary 568 (10th ed. 2014). Forfeiture is defined as "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." Id. at 765. Graham concedes that these definitions are not identical but instead are "very similar." Graham at *5. However, the similarity between the definitions does not denote equivalency. To the contrary, that the terms are similar but not interchangeable further indicates Congress's conscious choice to include one and not the other. The expressio unius canon provides that "to include one thing implies the exclusion of the other, or the alternative"; as such, the drafting choice to include "forfeiture" in § 2462 can be read as an implicit and, therefore, intentional exclusion of "disgorgement" from the statute. Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 221 (2d Cir. 2009) (citing Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d 789, 794 (2d Cir. 1999)). Because the two words are distinct, the choice to include one and not the other does not indicate implicit inclusion of both (as Graham held), but rather the exclusion of the latter. As such, even assuming that current dictionary definitions are the most persuasive authority, Graham drew the wrong conclusion.

---

[17] It is also troubling that Graham relies exclusively on modern dictionary definitions for terms used in a statute passed in 1948 with antecedents dating back to the 1790s. See 28 U.S.C.A. § 2642, 3M Co., 17 F.3d at 1457 & n.7.

Finally, while no court has yet interpreted the Eleventh Circuit's decision in Graham, every court that considered the district court's ruling on disgorgement, which is substantively the same as the Eleventh Circuit,[18] has rejected it. See S.E.C. v. Jones, No. 13-CV-00163 (BSJ), 2015 WL 9273934, at *6 (D. Utah Dec. 18, 2015) ("The court finds Graham unpersuasive and inapplicable to the case at hand."); S.E.C. v. Collyard, No. 11-CV-3656 (JNE) (JJK), 2015 WL 8483258, at *8 (D. Minn. Dec. 9, 2015) ("But that decision [Graham] is something of an outlier."); S.E.C. v. Stoecklien, No. 15-CV-0532 (JAH) (WVG), 2015 WL 6455602, at *3 (S.D. Cal. Oct. 26, 2015) ("This Court does not find Graham persuasive in light of the many cases finding section 2462 inapplicable to cases seeking disgorgement, the Supreme Court's limitation on its holding in Gabelli and the Ninth Circuit's indication disgorgement is equitable in nature.").

Thus, the court agrees with the courts that have viewed Graham as an outlier. Accordingly, the court reiterates its finding that disgorgement is not a forfeiture for the purposes of Section 2462; accordingly, the SEC may seek disgorgement of ill-gotten gains, even gains that arise from acts that occurred more than five years before the commencement of this action.

ii.     Injunction

The court next considers the question of whether an injunction is covered by Section 2462. The Second Circuit has largely rejected the argument that all injunctions are covered by Section 2462. As explained above, following the Supreme Court's opinion in Gabelli, the Second Circuit vacated the panel's decision concerning a civil penalty, but "otherwise adhere[d] to its earlier opinion." Gabelli, 518 F. App'x at 33. The earlier opinion had found that the SEC's request for an injunction was proper. Gabelli, 653 F.3d at 61. Thus,

---

[18] Compare Graham, at *5, with S.E.C. v. Graham, 21 F. Supp. 3d 1300, 1310-11 (S.D. Fla. 2014), ("The disgorgement of all ill-gotten gains realized from the alleged violations of the securities laws—i.e., requiring defendants to relinquish money and property—can truly be regarded as nothing other than a forfeiture (both pecuniary and otherwise), which remedy is expressly covered by § 2462.").

the Second Circuit appears to have found that injunctions are not barred by Section 2462. This position is in accord with other circuits throughout the country. See e.g., Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1018 (8th Cir. 2010) (finding that Section 2462 "by its terms applies only to claims for "any civil fine, penalty, or forfeiture," and therefore does not bar equitable remedies"); United States v. Telluride Co., 146 F.3d 1241, 1248 (10th Cir. 1998). In fact, even the Eleventh Circuit in Graham held that "[b]ecause injunctions are equitable, forward-looking remedies and not penalties within the meaning of § 2462, . . . the five-year statute of limitations is inapplicable to injunctions such as the one the SEC sought in this case." Graham, 2016 WL 3033605, at *3.

Moreover, injunctions differ from fines, penalties, and forfeitures in important ways. First and foremost, as the Eleventh Circuit observed in Graham, injunctions—unlike penalties, fines, and forfeitures—are forward looking. See id., at *2-3 ("[A] penalty addresses a wrong done in the past. Injunctions, by contrast, typically look forward in time." (internal citation omitted)). Second, injunctions—unlike fines, penalties, and forfeitures—are equitable in nature. S.E.C. v. Tandem Mgmt. Inc., No. 95-CV-8411 (JGK), 2001 WL 1488218, at *5-6 (S.D.N.Y. Nov. 21, 2001).

Accordingly, the court concludes that the SEC may seek an injunction based on conduct that occurred outside of the five-year limitations period.[19]

2.     Relation Back

Finally, Defendant argues that the SEC cannot use the relation-back doctrine to save its claims related to beneficial holders and "institutional investors" from the statute of limitations.

---

[19] The court notes that "[w]hether a permanent injunction constitutes a 'penalty' under Section 2462 depends on the likelihood of recurrence." S.E.C. v. Power, 525 F. Supp. 2d 415, 427 (S.D.N.Y. 2007). Defendant does not argue that the SEC has failed to plead likelihood of recurrence. Thus, the court does not consider whether the injunction that the SEC seeks is proper, as applied.

(Def.'s Mem. at 48-50.) Although the court's finding above obviates the requirement that the SEC resort to the relation-back doctrine at all, the court finds that even if a limitation period applied to the remedies that the SEC seeks, relation-back would apply to the SEC's beneficial holder and "institutional investor" claims.

Federal Rule of Civil Procedure 15(c)(1) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading." Slayton v. Am. Exp. Co., 460 F.3d 215, 228 (2d Cir. 2006) (internal quotation marks and citation omitted). "Thus, an amended pleading that lays out the allegations of a previous pleading in more definite and precise terms will relate back, but claims based on an 'entirely distinct set' of factual allegations will not." W.B. David & Co. v. De Beers Centenary AG, 507 F. App'x 67, 70 (2d Cir. 2013) (summary order) (quoting Slayton, 460 F.3d at 228).

Defendant argues that the original complaint did not include allegations (1) related to the failure to disclose beneficial holders in violation of Item 507, and (2) that Defendant falsely labeled the Israeli Investor Group as "institutional investors." (Def.'s Mem. at 48.) Specifically, Defendant argues that "Item 507 is not mentioned in the original complaint. The staff's 'telephone interpretation' is not mentioned. The term 'institutional investor' is not mentioned. The statute of limitations does not permit the SEC to introduce these new theories of liability well over a decade after the events in question." (Id.) The SEC responds that "the pleadings in the SEC's Amended Complaint concern the same transactions and occurrences described in the original Complaint." (SEC Mem. at 43.) The SEC is correct.

The original complaint alleges that from 2001 to 2004, the Israeli Investor Group invested a total of $67 million in PIPE transactions with Xybernaut. (Compl. (Dkt. 1) ¶ 20.) These are the same transactions alleged in the Amended Complaint. (Am. Compl. ¶ 40 (alleging the same PIPE transactions).) The original complaint further alleges that the Israeli Investor Group made investments in Xybernaut through nominee entities (Compl. ¶ 24), that Xybernaut's public filings falsely listed the nominee directors, rather than the Israeli Investor Group, as the holders of the Xybernaut shares (id. ¶ 34), and that Defendant knew that the filings were false (id. ¶ 36). The Amended Complaint alleges the same scheme. (See e.g., Am. Compl. ¶¶ 39, 48, 49.) The addition of allegations about Item 507 or "institutional investors" does not in any way alter the scheme that the SEC alleges; instead, the added detail "renders prior allegations more definite and precise." Slayton, 460 F.3d at 228. Indeed, it requires "no leap of imagination" to expect that when the SEC alleged in the original complaint that Xybernaut's Forms S-3 were misleading because they hid the true identities of the owners of the stock (Compl. ¶ 35), that the SEC would explain precisely the language the Forms S-3 used to mislead investors. See Slayton, 460 F.3d 229.

Thus, because the Amended Complaint simply restates the claims of the original complaint, the court finds that the relation-back doctrine would protect many of the SEC's claims related to beneficial holders and "institutional investors", even if a statute of limitations applied.

### E.     Reference to the Deferred Prosecution Agreement

Last, Defendant moves to strike paragraph 20 of the Amended Complaint and any additional references to Newman's indictment and deferred prosecution agreement ("DPA")

from the Amended Complaint, alleging that all such references are improper and prejudicial. (See Def.'s Mem. at 50-52.)

### 1. Legal Standard

A court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Resolution of a Rule 12(f) motion is left to the district court's discretion. See E.E.O.C. v. Bay Ridge Toyota, Inc., 327 F. Supp. 2d 167, 170 (E.D.N.Y. 2004). However, motions to strike are generally disfavored and should be granted only when "there is a strong reason for doing so." Dolan v. Fairbanks Capital Corp., No. 03-CV-3285 (DRH) (AKT), 2008 WL 4515932, at *11 (E.D.N.Y. Sept. 30, 2008) (quoting Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)). Thus, "motions to strike . . . will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." Crespo v. N.Y.C. Transit Auth., No. 01-CV-0671 (ILG), 2002 WL 398805, at *11 (E.D.N.Y. Jan. 7, 2002) (internal citation and quotation marks omitted).

For a motion to strike redundant or impertinent material, "the [movant] must demonstrate that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant." Wine Mkts. Int'l, Inc. v. Bass, 177 F.R.D. 128, 133 (E.D.N.Y. 1998) (citing Laverpool v. N.Y.C Transit Auth., 760 F. Supp. 1046, 1061 (E.D.N.Y. 1991); Moy v. Adelphi, 866 F. Supp. 696, 709 (E.D.N.Y. 1994)). A motion to strike material for impertinence or immateriality "will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." Lipsky, 551 F.2d at 893. In order to succeed on such a motion, the movant must show that "(1) no evidence in support of the allegations would be admissible;

(2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." Lynch v. Southampton Animal Shelter Found. Inc., 278 F.R.D. 55, 63 (E.D.N.Y. 2011) (quoting Roe v. City of N.Y., 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)).

        2.    Discussion

Defendant moves to strike paragraph 20 of the Amended Complaint and any additional references to Newman's indictment and DPA, alleging that all such references are improper and prejudicial. (See Def.'s Mem. at 50-52.) Defendant additionally argues that any references to the DPA are inadmissible under Federal Rule of Evidence 410(a)(4). (Def.'s Reply at 23.) The SEC counters that the DPA and Defendant's admissions therein are admissible under Federal Rule of Evidence 801(d)(2) or 804(b)(3). (SEC Mem. at 49.)

Both parties' arguments regarding reference to the DPA in the pleadings are predicated on the DPA's admissibility as evidence. Evidentiary questions regarding admissibility "should especially be avoided at such a preliminary stage of the proceedings [because] [u]sually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." Lipsky, 551 F. 2d at 893, see also Great Rock Golf 2006, LLC v. Town of Riverhead, No. 12-CV-3585 (SJF) (WDW), 2013 WL 3788606, at * 8 (E.D.N.Y. July 18, 2013) (holding that the court could not rule on admissibility of stipulations for the purpose of a 12(f) motion, noting that determinations would be "more properly made upon a motion in limine pursuant to [the Federal Rules of Evidence]"); Sloup v. Loeffler, No. 05-CV-1766 (JFB) (JO), 2006 WL 767869, at *3 (E.D.N.Y. Mar. 13, 2006). Here, Defendant

concedes that the DPA would be admissible for some purposes but contends it is not admissible for others.[20]

Moreover, given Defendant's concession, there is little question as to the relevance of the DPA. Generally, "neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." T.E.G. N.Y. LLC, 2004 WL 626802, at *8 (quoting Lipsky, 551 F.2d at 893). Therefore, for a portion of a complaint to be stricken, it must be so glaringly unrelated to the alleged claims as to be plainly irrelevant. See Reiter's Beer Distrib. v. Christian Schmidt Brewing, 657 F. Supp. 136, 143-44 (E.D.N.Y. 1987) (holding that paragraphs of a complaint containing general information about the "history of litigation in the beer industry in general" should be stricken given that the court found it "hard to fathom how it pertains to [the relevant] subject matter"). Here, it cannot be said that the DPA and Defendant's statements therein "have no bearing to the relevant issues." T.E.G. N.Y. LLC, 2004 WL 626802, at *8 (quoting Lipsky 551 F.2d at 893).

Additionally, Defendant fails to articulate how reference to the DPA would result in prejudice, instead calling it an "improper cheap shot." (Def.'s Mem. at 50.) If Defendant believes that the SEC "was motivated by an improper purpose, that is the proper subject of a Rule 11, not a Rule 12 motion." Lynch, 278 F.R.D. at 63.[21] Accordingly, paragraph 20 and other references to Defendant's DPA will not be stricken from the amended complaint.

---

[20] (Compare Def.'s Mem. at 50-51, with Def.'s Reply at 23, n. 8, ("[Defendant] agrees with the SEC that if he is found liable, the Court can consider the DPA in calculating disgorgement.").)

[21] The court expresses no opinion as to the relevance of the DPA for any particular trial purpose or as to whether it is probative or prejudicial. Defendant is welcome to file a motion in limine regarding admissibility of the DPA.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion is GRANTED IN PART and DENIED in PART. Specifically,

- Defendant's Motion to Dismiss Counts One and Two is DENIED except for the claims related to the stock loans and the payments to Edward Newman. With respect to the stock-loan claim and the payment-to-Edward-Newman claim, the SEC is granted leave to amend;

- Defendant's Motion to Dismiss Count Six is DENIED;

- Defendant's Motion to Dismiss Count Seven is DENIED;

- Defendant's Motion to Dismiss under the statute of limitations is DENIED; and

- Defendant's Motion to Strike is DENIED.

Should the SEC elect to replead any of the dismissed claims, the SEC shall file a second amended complaint within twenty-one (21) days.

SO ORDERED.

s/Nicholas G. Garaufis

/NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
August 2 , 2016